UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| -against- | : | |
| | : | 13 Cr. 211 (NRB) |
| RAJARENGAN RAJARATNAM, | : | |
| a/k/a "Rengan Rajaratnam," | : | **ORAL ARGUMENT REQUESTED** |
| Defendant. | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RAJARENGAN
RAJARATNAM'S MOTION TO DISMISS THE INDICTMENT AND TO SUPPRESS
THE WIRETAP EVIDENCE**

**LANKLER SIFFERT & WOHL LLP**
Daniel M. Gitner
Michael D. Longyear
500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399 (telephone)
(212) 764-3701 (facsimile)
dgitner@lswlaw.com

*Attorneys for Rajarengan Rajaratnam*

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

I.   THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO
     ALLEGE  AN ESSENTIAL ELEMENT OF THE CRIMES CHARGED ........... 2

     A.   The Indictment Fails to Allege that Rengan Had the Requisite
          Knowledge ...........................................................................................3

     B.   Legal Standard Governing "Tippee" Insider Trading................................ 4

     C.   Pleading Insider Trading........................................................... 6

II.  COUNT ONE IS DUPLICITOUS BECAUSE IT ALLEGES TWO
     SEPARATE CONSPIRACIES AS A SINGLE CONSPIRACY ........................ 10

     A.   Count One Charges the CLWR and AMD Conspiracies as One
          Offense, When They Constitute Two Separate Offenses ......................... 10

     B.   Count One Is Duplicitous and Cannot Stand As Is.................................. 13

III. COUNTS FOUR AND SEVEN SHOULD BE DISMISSED AS
     REPUGNANT BECAUSE THEY ARE INCONSISTENT WITH COUNT
     ONE AND INTERNALLY INCONSISTENT.................................................... 18

     A.   Count One Is Inconsistent with Counts Four and Seven ......................... 18

     B.   Counts Four and Seven Are Repugnant.................................................. 21

IV.  THE WIRETAP EVIDENCE SHOULD BE SUPPRESSED ............................. 23

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998).................................................................................6

*Bateman Eichler, Hill Richards, Inc.* v. *Berner*
    472 U.S. 299 (1985).................................................................................6

*Chiarella v. United States*,
    445 U.S. 222 (1980).................................................................................4

*Dirks v. SEC*,
    463 U.S. 646 (1983)........................................................................ passim

*Elkind v. Liggett & Myers, Inc.*,
    635 F.2d 156 (2d Cir. 1980)....................................................................8

*Franks v. Delaware*,
    438 U.S. 154 (1978)....................................................................1, 23, 24

*Ingram v. United States*,
    360 U.S. 672 (1959).................................................................................7

*Katz v. United States*,
    389 U.S. 347 (1967)...............................................................................24

*SEC v. Obus*,
    693 F.3d 276 (2d Cir. 2012).................................................................6, 22

*State Teachers Retirement Board v. Fluor Corporation*,
    592 F. Supp. 592 (S.D.N.Y. 1984)..........................................................9

*United States v. Berlin*,
    472 F.2d 1002 (2d Cir. 1973)..................................................................6

*United States v. Cantrell*,
    612 F.2d 509 (10th Cir. 1980)...............................................................21

*United States v. Carr*,
    557 F.3d 93 (2d Cir. 2009).....................................................................10

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005).......................................................................7

*United States v. Cisneros*,
    26 F. Supp. 2d 24 (D.D.C. 1998) ................................................................21

*United States v. Conde*,
    309 F. Supp. 2d 510 (S.D.N.Y. 2003) .................................................... 21- 22

*United States v. Du Bo*,
    186 F.3d 1177 (9th Cir. 1999) .....................................................................6

*United States v. Eason*,
    434 F. Supp. 1217 (W.D. La. 1977) ............................................................21

*United States v. GAF Corp.*,
    928 F.2d 1253 (2d Cir. 1991) ...............................................................17, 22

*United States v. Gibson*,
    310 F.2d 79 (2d Cir. 1962) .........................................................................16

*United States v. Giordano*,
    416 U.S. 505 (1974) ..................................................................................23

*United States v. Hood*,
    210 F.3d 660 (6th Cir. 2000) .....................................................................16

*United States v. McKeon*,
    738 F.2d 26 (2d Cir. 1984) ...................................................................16, 22

*United States v. Murray*
    618 F.2d 892 (2d Cir. 1980) .......................................................................13

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ................................................................................4, 7

*United States v. Peltz*,
    433 F.2d 48 (2d Cir. 1970) ..........................................................................7

*United States v. Rajaratnam*,
    09 Cr. 1184, 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010) ..................................24

*United States v. Rajaratnam*,
    753 F. Supp. 2d 299 (S.D.N.Y. 2010) ..........................................................11

*United States v. Rajaratnam*,
    802 F. Supp. 2d 491 (S.D.N.Y. 2011) ...........................................................9

*United States v. Ramirez-Martinez*,
    273 F.3d 903 (9th Cir. 2001) .....................................................................16

*United States v. Salerno,*
    937 F.2d 797 (2d Cir. 1991)..................................................................17, 22

*United States v. Sturdivant,*
    244 F.3d 71 (2d Cir. 2001)...................................................................13, 14

*United States v. Thompson,*
    356 F.2d 216 (2d Cir. 1965)........................................................................6

*United States v. Universita,*
    298 F.2d 365 (2d Cir. 1962)...................................................................22-23

*United States v. Valentine,*
    820 F.2d 565 (2d Cir. 1987)......................................................................23

*United States v. Whitman,*
    904 F. Supp. 2d 363 (S.D.N.Y. 2012)..........................................................9

*United States v. Witasick,*
    No. 07 Cr. 30, 2008 WL 1924023 (W.D. Va. Apr. 28, 2008)...........................16

## STATUTES

15 U.S.C. § 78ff(a)...........................................................................................7

18 U.S.C. §§ 2510-2522 .................................................................................23

18 U.S.C. § 2518(1) .......................................................................................23

18 U.S.C. § 2518(10) ....................................................................................1, 23

## OTHER AUTHORITIES

1 *Fed. Prac. & Proc. Crim.* § 125, at 546 (4th ed. 2008).........................................6

Charles Alan Wright *et al.*, Federal Practice and Procedure, § 145 at 98 (4th ed. 2008).............16

*Indictments*, 42 Geo. L.J. Ann. Rev. Crim. Proc. 287, 309 (2013)................................16

Selective Disclosure and Insider Trading, 65 Fed. Reg. 51716, 51722 (Aug. 24. 2000) ...............8

Defendant Rajarengan ("Rengan") Rajaratnam[1] respectfully moves this Court pursuant to Federal Rules of Criminal Procedure 12(b)(3)(B) and 8(a) to: (1) dismiss the Indictment for failure to allege a crime; (2) find Count One duplicitous; and (3) dismiss Counts Four and Seven as repugnant.  Rengan further moves pursuant to 18 U.S.C. § 2518(10) and *Franks v. Delaware*, 438 U.S. 154 (1978) to suppress the wiretap evidence.

## PRELIMINARY STATEMENT

The Indictment fails to charge a crime and includes a duplicitous count and several repugnant counts.  The Indictment seeks to hold Rengan responsible for the same conduct for which his older brother, Raj, was convicted, but in a manner that would allow the government to prove less than was required in the prosecution of Raj.  Moreover, the government has taken positions in this Indictment that contradict positions the government took in the prosecution of Raj.

Most notably, the Indictment fails to allege an essential element of knowledge required by the Supreme Court in *Dirks v. SEC*, 463 U.S. 646 (1983), which the government was required to prove against Raj.  In addition, while Count One is styled as charging a single conspiracy, in fact it charges conduct that constitutes two distinct conspiracies.  In Raj's trial, the government sought and achieved conviction against Raj for his participation in these two, separate conspiracies that the government now improperly seeks to charge as one offense against Rengan. Moreover, the Indictment charges Rengan with counts that are both internally inconsistent and inconsistent with each other, by alleging that Rengan and Raj caused the same stock purchase. Lastly, the prosecution relies upon wiretapped conversations that were improperly obtained and should be suppressed.

For all these reasons, as discussed below, the Indictment should be dismissed.

---

[1] For clarity, this brief refers to Rajarengan Rajaratnam as "Rengan," and to his brother, Raj Rajaratnam, as "Raj."

I.    **THE INDICTMENT SHOULD BE DISMISSED FOR FAILURE TO ALLEGE AN ESSENTIAL ELEMENT OF THE CRIMES CHARGED**

The Indictment alleges that Rengan received confidential information from his brother, Raj, who in turn had received it from insiders.  Specifically, the Indictment charges Rengan with conspiring with Raj (and others) to obtain inside information regarding two companies: Clearwire Corporation ("CLWR") and Advanced Micro Devices, Inc. ("AMD").  The Indictment further charges Rengan with causing purchases of CLWR stock.[2]

The Indictment should be dismissed because it fails to allege that Rengan knew that either of the alleged tippers—Rajiv Goel or Anil Kumar—received any personal benefit in connection with passing the "inside information" to Raj.  As a remote tippee, Rengan was permitted to trade on confidential information unless he knew that an insider had disclosed the information for personal gain.  The Indictment does not allege that Goel or Kumar received a personal benefit in exchange for passing information to Raj, let alone that Rengan had any knowledge of any such personal benefit.  These omissions are fatal to the Indictment and warrant dismissal.

Moreover, allowing this Indictment to stand absent any allegation that Rengan knew that a tipper had disclosed the information for personal gain would be unjust, because in the prosecution of Raj—who was charged both with being a tippee (but farther up the chain than Rengan), and trading on the inside information at issue here[3]—the Court required proof of this element.

---

[2] The Indictment is attached as Exhibit A to Declaration of Daniel M. Gitner, dated February 7, 2014.  All exhibits hereinafter cited are attached to the Declaration of Daniel M. Gitner, dated February 7, 2014.  For clarity, if an Exhibit was also a government exhibit admitted into evidence in *United States v. Raj Rajaratnam*, 09 Cr. 1184 (S.D.N.Y.), it will be identified with a parenthetical containing its corresponding "GX" exhibit number.

[3] The charges against Raj included that he caused two of the same purchases of CLWR stock that Rengan is now charged with causing.  Count Four of the Second Superseding Indictment charging Raj, (*see* Ex. B), alleged the CLWR conspiracy, while Count Five alleged the AMD conspiracy.  Meanwhile, Counts Six and Seven of that

### A.   The Indictment Fails to Allege that Rengan Had the Requisite Knowledge

The Indictment fails to allege that Rengan had the required knowledge to violate the insider trading laws because it never alleges that he knew that the insiders had disclosed the alleged inside information for a personal benefit.

If anything, the Indictment's allegations concerning Rengan's knowledge about the source of the alleged inside information are inconsistent.  The Indictment vaguely alleges that "Rengan Rajaratnam . . . engaged in this conduct for the purpose of executing profitable securities transactions . . . with knowledge that the Inside Information had been disclosed in violation of duties of trust and confidence," but never alleges that the inside information had been disclosed in exchange for personal gain.  (Indictment ¶ 8.)

Elsewhere, the Indictment alleges that Rengan purchased shares of CLWR common stock "with knowledge that the Intel Information had been improperly obtained," but never defines the impropriety.  (Indictment ¶ 13.)

The Indictment also alleges that the Crossover Fund—an entity—purchased CLWR shares "with knowledge that the Intel Inside Information had been improperly obtained," but fails to allege that the Fund (or any person associated with it) knew that the information had been disclosed for personal gain.  (Indictment ¶ 14.)

In fact, the Indictment's "Means and Methods" section shows clear that the Indictment does not intend to allege that Rengan knew that the insiders had disclosed the inside information for a personal benefit.  That section, contained in paragraph 35, alleges that the insiders improperly had disclosed the inside information to Raj, who then shared that information with Rengan.  But nowhere does it state that Rengan knew that the inside information had been

---

indictment charged the same purchases of CLWR stock with which Rengan is charged in Counts Four and Seven of the instant Indictment.

disclosed for a personal benefit.  Rather, the section only alleges that Raj, *not* Rengan, knew that the insiders had disclosed information in violation of fiduciary duties.  (*See* Indictment ¶ 35(b) (Raj shared the information "with knowledge that the Inside Information had been disclosed in violation of fiduciary and other duties of trust and confidence.").)

### B.   Legal Standard Governing "Tippee" Insider Trading

A person who knowingly receives and trades on material nonpublic information from an insider does not, without more, commit securities fraud.  The Supreme Court has repeatedly held that there is "no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information.'"  *United States v. O'Hagan*, 521 U.S. 642, 660 (1997) (quoting *Chiarella v. United States*, 445 U.S. 222, 233 (1980)).  *See also Dirks v. SEC*, 463 U.S. 646, 654-59 (1983).  A duty to refrain from trading, therefore, does not arise merely from the receipt of nonpublic information from an insider.

More is required, and the Supreme Court has specified what that "more" is.  In *Dirks* v. *SEC*, the Court addressed tippee liability at length.  Raymond Dirks received material nonpublic information from an insider at a company who tipped Dirks about potential fraud at the insider's company in the hope that Dirks would investigate further and expose the fraud.  Dirks relayed this information to clients and investors who sold their stock, thereby avoiding losses when the company's fraud became known and its stock price plummeted.  The SEC sued Dirks, alleging that he had aided and abetted securities fraud by relaying confidential and material inside information to people who traded the stock.

The Supreme Court held that Dirks did not violate Section 10(b) and Rule 10b-5, and explicitly rejected the SEC's theory that a tippee must refrain from trading "whenever he receives inside information from an insider."  *Id*. at 655.  The Court emphasized that tippee

4

liability derives from the tipper's liability, and turns on the purpose of the tipper's disclosure of inside information and the tippee's knowledge of the tipper's improper purpose. The Court emphasized that the securities laws were intended, among other things, to eliminate the use of inside information for personal advantage. Therefore, the particular fiduciary breach that triggers fraud liability is the insider's use of corporate information for his own personal benefit:

> Whether disclosure is a breach of duty therefore depends in large part on the purpose of the disclosure. . . . [T]he test is whether the insider personally will benefit, directly or indirectly, from his disclosure.

*Id*. at 662.

With respect to tippee liability, the Court noted that "the typical tippee" has no independent fiduciary duties to issuers or their shareholders. *Id*. at 655. The Court rejected the notion that a tippee inherits a duty to disclose or abstain from trading "solely because a person knowingly receives material nonpublic information from an insider and trades on it." *Id*. at 658. Tippees commit insider trading, the Court held, only if they "*knowingly* participate with the fiduciary [*i.e.*, the insider] in such a breach," or if the tipper discloses the information with the "improper purpose of exploiting the information for their personal gain." *Id*. at 659 (emphasis added). That is, tippee liability exists "only when the insider has breached his fiduciary duty to the shareholders by disclosing the information to the tippee *and the tippee knows or should know that there has been a breach*." *Id*. at 660 (emphasis added). *See also id*. at 660 n.20 (listing authorities indicating that tippees must have knowledge of the insider's breach).

Under *Dirks*, then, a culpable tippee must know of the insider's breach of duty to shareholders, and that breach must involve a disclosure of material non-public corporate information for personal gain. Absent such knowledge, the tippee does not know that the tipper

has committed a fraudulent breach of fiduciary duty as defined in *Dirks*.  The Supreme Court

confirmed this in *Bateman Eichler, Hill Richards, Inc.* v. *Berner*, explaining:

> A tippee generally has a duty to disclose or to abstain from trading on material nonpublic information only when he knows or should know that his insider source 'has breached his fiduciary duty to the shareholders by disclosing the information,'—in other words, where the insider has sought to 'benefit, directly or indirectly, from his disclosure.'

472 U.S. 299, 311 n.21 (1985) (quoting *Dirks*, 463 U.S. at 662).

Recently, the Second Circuit confirmed this long-standing principle in *SEC v. Obus*, 693

F.3d 276 (2d Cir. 2012).  In discussing tipping chains, the Court held that a tipper is liable when

he breaches his duty to keep material nonpublic information confidential by "intentionally or

recklessly relaying the information to a tippee" *and* receiving a "personal benefit from the tip."

*Id.* at 289.  A tippee, in turn, is liable if the tippee "knew or had reason to know" that the

information was "improperly obtained," that is, "that the information was obtained through the

tipper's breach."  *Id.*

## C.    Pleading Insider Trading

The government is required to allege "[e]very essential element of the offense" in the

Indictment.  *See* 1 *Fed. Prac. & Proc. Crim.* § 125, at 546 (4th ed. 2008); *see also Almendarez-

Torres v. United States*, 523 U.S. 224, 228 (1998) ("An indictment must set forth each element

of the crime that it charges.").  This includes all the critical components of knowledge that define

the culpable mental state.  *See, e.g., United States v. Du Bo*, 186 F.3d 1177, 1180 (9th Cir. 1999)

("[Defendant's] conviction . . . must be overturned because his indictment lacks a necessary

allegation of criminal intent"); *United States v. Berlin*, 472 F.2d 1002, 1006-09 (2d Cir. 1973)

(holding an indictment deficient where it failed to allege the *mens rea* requirement for material

elements of the statute at issue); *United States v. Thompson*, 356 F.2d 216, 226 (2d Cir. 1965)

6

(holding that where the "essential element" of intent was omitted for a material part of the crime charged, "the indictment certainly was defective").

Because personal benefit is an essential element of an insider trading violation, the indictment must allege that Rengan knew that the insiders who allegedly tipped Raj did so "for their personal gain." *Dirks*, 463 U.S. at 659.  The Securities Exchange Act of 1934 requires the prosecution to prove beyond a reasonable doubt that any criminal violation of the Act or rules promulgated thereunder was done "willfully."  15 U.S.C. § 78ff(a); *see O'Hagan*, 521 U.S. at 665-66 ("To establish a criminal violation of Rule 10b-5, the Government must prove that a person 'willfully' violated the provision.").  The Second Circuit has defined willfulness in this context "as 'a realization on the defendant's part that he was doing a wrongful act' under the securities laws." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (quoting *United States v. Peltz*, 433 F.2d 48, 55 (2d Cir. 1970)).  This *mens rea* requirement applies equally to the substantive counts and the conspiracy count in the Indictment because "'[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself.'"  *Ingram v. United States*, 360 U.S. 672, 678 (1959) (internal quotations omitted).

A tippee does not break the insider trading laws unless he knows that the tipper breached his duty by disclosing material nonpublic information in exchange for a personal benefit.  Here, Rengan is alleged to be a remote tippee, but there is no allegation that he knew that either insider disclosed the information in exchange for a personal benefit.  The Indictment's failure to allege that Rengan knew that the source of the alleged inside information had breached a fiduciary duty—in other words, that either Goel or Kumar obtained a personal benefit in exchange for providing the inside information at issue—is fatal to the Indictment and warrants full dismissal.

*Dirks* and its progeny make clear that an insider breaches his duty to the company by divulging his company's material nonpublic information in exchange for a personal benefit—in essence, when the insider engages in self-dealing.  *Dirks*, 463 U.S. at 662.  Personal benefit reveals the insider's criminal purpose in disseminating the information.  Likewise, knowledge of that personal benefit reveals whether the tippee has the requisite scienter.

Drawing a bright line to require this knowledge is essential to distinguish the actions of a legitimate market participant ferreting out information with dogged persistence, from illegal activity.  *See, e.g., Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 165 (2d Cir. 1980) ("A skilled analyst with knowledge of the company and the industry may piece seemingly inconsequential data together with public information into a mosaic which reveals material non-public information."); Selective Disclosure and Insider Trading, 65 Fed. Reg. 51716, 51722 (Aug. 24. 2000) ("Analysts can provide a valuable service in sifting through and extracting information that would not be significant to the ordinary investor to reach material conclusions.").  The Indictment's failure to allege that Rengan knew that the information had been obtained in exchange for a personal benefit robs him of the benefit of that bright line.

Raj, however, had the benefit of that bright line.  In that case, with regard to the same inside information, insiders, and "tips," at issue here, the government alleged (as *Dirks* requires) that Raj—a tippee—knew that the tipper had disclosed in exchange for personal gain.  (*See* Ex. B ¶¶ 17, 24.)  The Court charged the jury that in order to find Raj guilty of insider trading, it must find that Raj knew that the information was material and nonpublic, *and* knew that the insider had obtained a direct or indirect benefit from the disclosure.[4]  The government did not object to this charge.  (Ex. D at 5151-54.)

---

[4]  Judge Holwell charged (continued on next page):

In a later opinion denying Raj's Fed. R. Crim. P. 29 motion, Judge Holwell confirmed that a tippee must have "'knowledge of *each element*, including the personal benefit, of the tipper's breach.'"  *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 498-99 (S.D.N.Y. 2011) (quoting *State Teachers Retirement Board v. Fluor Corporation*, 592 F. Supp. 592, 594 (S.D.N.Y. 1984)) (emphasis in original).  Judge Holwell relied on *Dirks'* reasoning that "[d]erivative liability can attach only if the tippee recognizes that the relationship between tipper and tippee is such that the tippee has effectively become a participant after the fact in the insider's breach."  *Rajaratnam*, 802 F. Supp. 2d at 499.  Referring to the tippee's (*i.e.,* Raj's) scienter with respect to some of the very tips at issue in Rengan's case, Judge Holwell stated:

> "[U]nless the tippee knew . . . that the tipper had satisfied the elements of tipper liability, the tippee cannot be said to be a knowing participant in the tipper's breach."

*Id.* (quoting *Fluor*, 592 F. Supp. at 595).

---

(continued from previous page)

> To meet its burden, the government must also prove beyond a reasonable doubt that Mr. Rajaratnam knew that the information had been disclosed by an insider in breach of a duty of trust and confidence.  The mere receipt of material, non-public information by the defendant from an insider is not sufficient.  *The government must show that Mr. Rajaratnam knew that the information was material nonpublic information that had been disclosed by an insider who directly or indirectly obtained some personal benefit from the disclosure.*

(Ex. C at 48 (emphasis added).)

In another insider trading case, *United States v. Whitman,* 904 F. Supp. 2d 363 (S.D.N.Y. 2012), the Court issued an opinion justifying its charge regarding a tippee's knowledge of the personal benefit.  In that opinion, the Court acknowledged that a tippee must have a "general understanding that the inside information was obtained from an insider who breached a duty of confidentiality in exchange for some personal benefit, although the tippee need not know the details of the breach or the specific benefit the insider received or anticipated receiving."  *Id.* at 374.  Under this reasoning, too, the Indictment is flawed because it fails to allege Rengan's knowledge of the personal benefit—general or otherwise.  *Whitman* is currently on appeal, and one of the issues presented is whether the District Court erred in suggesting that a general understanding—as opposed to specific knowledge—of the personal benefit was sufficient.  *See United States v. Whitman*, No. 13-491 (oral argument held November 4, 2013); *see also United States v. Chiasson*, No. 13-1837 (2d Cir.) (oral argument proposed for the week of April 7, 2014) (issue of a tippee's knowledge of the personal benefit also presented on appeal).  Moreover, at least one other District Court in this District has charged that defendants (tippees or remote tippees) must know that the tipper received a personal benefit.  *See United States v. Martoma*, No. 12 Cr. 973 (ECF No. 229 (jury charge) at 32) ("[Defendant] must have known that [the tippers] disclosed the information in violation of a duty of confidentiality and that it was disclosed in exchange for a personal benefit.") (attached to Gitner Decl., Ex. E).

Principles of fairness dictate that Rengan, at a minimum, should be tried under the same standard as Raj.  It would be bizarre and unjust if Rengan—a remote tippee—were prosecuted using a lower scienter threshold than was his brother—who allegedly was higher up on the tippee chain and received tips directly from the insiders in the same alleged conspiracies as those charged here.[5]  In view of Judge Holwell's holding, the Indictment's failure to allege Rengan's knowledge of the tipper's personal benefit is telling.  It may well be that the government did not allege this essential element as to Rengan because it cannot.

Because the Indictment fails to allege an essential element of the crimes charged, it should be dismissed in its entirety.

## II.     COUNT ONE IS DUPLICITOUS BECAUSE IT ALLEGES TWO SEPARATE CONSPIRACIES AS A SINGLE CONSPIRACY

### A.     Count One Charges the CLWR and AMD Conspiracies as One Offense, When They Constitute Two Separate Offenses

Count One of the Indictment alleges that Rengan participated in two discrete courses of insider trading conduct:

(1)     Conduct in March 2008 in which Goel, an insider at Intel Corporation, allegedly passed inside information concerning Intel's plans to invest in CLWR to Raj, who in turn allegedly passed that information to Rengan, whereupon Rengan allegedly caused purchases of CLWR shares with that information (Indictment ¶¶ 9-21, 35-36); and

(2)     Conduct in August and October 2008 in which Kumar, an insider at McKinsey & Company, Inc., allegedly passed inside information about a client, AMD, to Raj, who in turn allegedly passed that information to Rengan, and Rengan allegedly tried to cultivate a source within McKinsey.  (Indictment ¶¶ 22-32, 35-36.)

---

[5] The principles underlying the law-of-the-case doctrine are fitting.  *See, e.g., United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009) ("Both facets of the law-of-the-case doctrine are driven by *considerations of fairness to the parties*, judicial economy, and the societal interest in finality.") (Emphasis added).

10

Although the Indictment charges that the CLWR and AMD conspiracies were part of a single conspiracy—namely, the conspiracy charged in Count One—the government took the opposite position in the prosecution of Raj.

The Criminal Complaint and the Second Superseding Indictment filed against Raj alleged that the CLWR and AMD conspiracies were separate offenses, described in different paragraphs and charged in separate counts.  (*Compare* Ex. F ¶¶ 4-6 *with* ¶¶ 10-12; *compare* Ex. B ¶¶ 15-21 *with* ¶¶ 22-28.)   In that case, the government told Judge Holwell that the CLWR and AMD conspiracies were separate conspiracies.  Quoting the government's briefs in a pretrial ruling, Judge Holwell stated that the government "frame[d]" the conduct at Galleon as involving "separate conspiracy counts based on specific illegal insider trading relationships between [Raj] Rajaratnam and his sources of Inside Information."  *United States v. Rajaratnam*, 753 F. Supp. 2d 299, 305 (S.D.N.Y. 2010).  In its brief related to that pretrial ruling, the government claimed that the CLWR conspiracy and the AMD conspiracy are distinct "Galleon Scheme conspiracies." (Ex. G at 3-4.)

The government asked the jury in that case to convict Raj of the CLWR and AMD conspiracies in two separate and independent counts.  According to the government's opening statement, Raj committed one crime in conspiring with Kumar on AMD, and committed a separate crime in conspiring with Goel on CLWR:

> [Raj Rajaratnam is] charged with several counts of conspiracy.  He's charged with conspiring with Mr. Kumar.  He's charged with conspiring with Mr. Goel . . . .

(Ex. H at 49:13-15.)[6]  During its summation, the government described the CLWR and AMD conspiracies as separate.  (Ex. I at 5162:12-16, 5163:14-15, 5197:3, and 5273:7-9.)  The

---

[6] The CLWR and AMD conspiracies were two of five conspiracies charged in the Raj Second Superseding Indictment.

government went so far as to show the jury a PowerPoint presentation intended to demonstrate that the CLWR and AMD conspiracies were separate crimes.  The presentation numbered each conspiracy separately, named them differently, and showed that the membership in each differed. According to the government's PowerPoint, Goel participated in the CLWR conspiracy but not the AMD conspiracy, while Kumar participated in the AMD conspiracy but not the CLWR conspiracy.  (Ex. J (containing slides labeled "1.  Kumar Conspiracy," "2.  Goel Conspiracy").)

After the jury convicted Raj of the AMD conspiracy count and the CLWR conspiracy count, the government asked the Court to impose sentence on him for each separate conspiracy. Judge Holwell sentenced the defendant to a term of imprisonment on each count.  (*See* Ex. K (sentencing Raj to sixty months on the conspiracy counts to run concurrently).)

While the instant Indictment includes both the CLWR conspiracy and the AMD conspiracy in a single conspiracy count, the overall allegations in the Indictment confirm the position the government took in the Raj prosecution that the alleged CLWR conspiracy is distinct from the alleged AMD conspiracy.  The Indictment alleges that the CLWR conduct occurred in March and April 2008 (Indictment ¶¶ 9-21), whereas the Indictment only alleges specific AMD conduct between August and October 2008 (Indictment ¶¶ 23-32).  It alleges that Goel participated only in the CLWR conspiracy, while Kumar participated in only the AMD conspiracy.  (*Id.*)  It alleges that the inside information at issue in each was different.  (*Compare* Indictment ¶ 9 *with* ¶ 22.)

The instant Indictment even characterizes the CLWR and AMD conduct as distinct, dividing the description of each into separate sections.  (*See* Indictment ¶¶ 9-21 (CLWR); ¶¶ 22-32 (AMD).)  Strikingly, the allegations surrounding the AMD conspiracy involve different alleged conduct than the CLWR conspiracy.  At its heart, the CLWR conspiracy concerns

allegations that Rengan caused the purchases of stock based on inside information.  (Indictment ¶ 13.)  No such allegation exists with respect to the AMD conspiracy.  Rather, the AMD conspiracy concerns allegations that Raj told Rengan that he (Raj) had "heard" about a "handshake" deal involving "Arabs," that Raj bought AMD stock for Rengan in a Galleon-owned account, and that Rengan tried to cultivate a source within McKinsey.  (Indictment ¶¶ 25-29.)  No such allegations exist with respect to the CLWR conspiracy.

As the government described the conspiracies to Judge Holwell and the Raj jury, and as the Indictment in this case makes clear, the alleged courses of conduct underlying each of the CLWR and AMD schemes warrant dividing them into separate conspiracies.  (Ex. G at 3-4 (providing chart showing separate conspiracies).)

### B.    Count One Is Duplicitous and Cannot Stand As Is

Count One is duplicitous because it charges two separate conspiracies—the CLWR conspiracy and the AMD conspiracy—in a single conspiracy count.  Allowing the single count to charge both conspiracies would unfairly and significantly prejudice the defense.

An indictment is impermissibly duplicitous when it charges two or more distinct crimes in one count, in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, if the defendant is prejudiced by combining offenses in a single count. *See United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (citing *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)).  To consider whether a duplicitous indictment prejudices a defendant, the Court should consider if it:

(1)    creates the possibility of a non-unanimous jury verdict by concealing a finding of "guilty" as to one crime and a finding of "not guilty" as to another;

(2)    deprives the defendant of adequate notice of the charges against him;

(3)     creates the possibility that the defendant could face double jeopardy in subsequent prosecutions;

(4)     obscures the basis for appropriate sentencing; or

(5)     creates a risk of prejudicial evidentiary rulings in circumstances where evidence admissible as to only one offense is admitted as to others.

*Sturdivant*, 244 F.3d at 75.

Because Count One alleges two separate conspiracy offenses in one charge, it creates a risk of juror confusion and a non-unanimous jury verdict by concealing a finding of "guilty" as to one conspiracy and a finding of "not guilty" as to another. In addition, the government's proof in the Raj matter demonstrates that each separate conspiracy depends on fundamentally different evidence, including different recorded phone calls, different trading records, different emails, different instant messages, different people, different funds, different backgrounds, and different testimony, including different cooperator testimony. Under such circumstances, it will be no surprise that the defenses to each conspiracy also will be different. There is a real danger that Rengan could be convicted on Count One if only half of the jurors credit the alleged CLWR conduct but not the AMD conduct, and the other half credit the alleged AMD conduct but not the CLWR conduct. In such circumstance, Rengan would be convicted of a crime despite a lack of unanimity regarding either conspiracy, resulting in a constitutional violation.

Additionally, Count One does not provide adequate notice of the charge. It is impossible to know if Count One's alleged "means and methods" apply to both alleged conspiracies, or just one. By the same token, Count One alleges overt acts in March and August 2008. The Indictment's introductory paragraphs seem to state that the March 2008 overt acts apply to the CLWR conspiracy, while the August 2008 overt acts apply to the AMD conspiracy. But on its face, Count One alleges that all the overt acts apply to both.

14

Moreover, Count One's duplicitous charge creates a significant double jeopardy risk.  A guilty verdict on Count One would not allow any person to know if the jury found Rengan guilty of the CLWR conduct, the AMD conduct, or both—as, for example, the jurors could agree on CLWR but disagree on AMD.  By the same token, an acquittal on Count One also could lead to a double jeopardy risk; if the jury acquits on Count One, but convicts on the substantive counts (which all involve CLWR), the government might argue that the Count One acquittal only concerned AMD conduct.  For similar reasons, Count One's duplicitous charge would create confusion at any sentencing.

No less importantly, Count One's two-conspiracies-for-one creates a significant risk of prejudicial evidentiary rulings in circumstances where evidence admissible as to only one conspiracy is admitted as to the other.  For example, Goel's co-conspirator statements should only be admitted in connection with the CLWR conspiracy in which he allegedly participated, but as the Indictment now reads, they might be used improperly as proof of the AMD conspiracy. This problem is amplified by the fact that this case not only likely will involve cooperator testimony, but also proof of alleged co-conspirator statements through the admission of recorded discussions (assuming they are admitted).

Similarly, the basis for the admission of Rule 404(b) evidence—if any is to be admitted—will be different with regard to the CLWR and AMD conspiracies, because the defenses for each will differ.  The defense to one conspiracy likely will not put knowledge and intent at issue, while the defense to the other conspiracy may do so.  If Count One is allowed to stand as is, Rule 404(b) evidence could be admitted improperly to prove conduct when knowledge and intent are not at issue.

Because Count One's duplicity is apparent pretrial, it cannot stand. "When duplicity becomes apparent before trial, the government may remedy the problem by selecting a single basis upon which it will continue." *Indictments*, 42 Geo. L.J. Ann. Rev. Crim. Proc. 287, 309 (2013); Charles Alan Wright *et al.*, Federal Practice and Procedure, § 145 at 98 (4th ed. 2008) ("One proper remedy is to require the government to elect the single count on which it plans to rely . . . ."); *United States v. Hood*, 210 F.3d 660, 663 (6th Cir. 2000) (duplicity cured if government selects charge within count); *United States v. Ramirez-Martinez*, 273 F.3d 903, 915 (9th Cir. 2001) *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (duplicity cured if "government elects between the charges in the offending count"); *United States v. Witasick*, No. 07 Cr. 30, 2008 WL 1924023, at *2 (W.D. Va. Apr. 28, 2008) (giving "the government ten days to decide which single conspiracy theory they intend to pursue"); *cf. United States v. Gibson,* 310 F.2d 79, 80 n.1 (2d Cir. 1962) *abrogated on other grounds by Leary v. United States*, 395 U.S. 6 (1969) (holding that government avoided committing prejudicial error despite having included two statutory offenses in one count of indictment because government "did not offer evidence as to the violation of [one of the] statute[s], and the trial court did not convict on that basis").

Finally, the government has already based an entire prosecution (resulting in conviction on all counts) on the premise that the two schemes which are charged together in Count One are actually two distinct and separate offenses. In addition to arguing in pleadings and to a jury that the CLWR and AMD conspiracies are separate crimes, at the Raj trial the government elicited testimony about both conspiracies to support that position. The government's prior admissions should foreclose any argument that the CLWR and AMD conspiracies constitute one single offense. *See United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (statements by a party's

counsel in a previous trial may be deemed a party admission in a later trial so long as (1) the district court is "satisfied that the prior argument involves an assertion of fact inconsistent with similar assertions in a subsequent trial," (2) the "inconsistency . . . [is] clear and of a quality which obviates any need for the trier of fact to explore other events at the prior trial," and (3) the court finds that "the statements of counsel were such as to be the equivalent of testimonial statements . . . ."); *United States v. GAF Corp.*, 928 F.2d 1253, 1258–62 (2d Cir. 1991) (applying *McKeon* to require the admission of a bill of particulars supplied by the government at an earlier trial of the same case); *United States v. Salerno*, 937 F.2d 797, 811-12 (2d Cir. 1991), *rev'd on other grounds*, 505 U.S. 317 (1992) (applying *McKeon* to require admission of prosecution opening and closing arguments in an earlier related case).

The Raj prosecution is not the only matter where the government has taken the position that the CLWR and AMD conspiracies are distinct crimes.  The Information charging Goel, who was involved in the CLWR conspiracy, makes no mention of AMD.  (*See* Ex. L.)  Moreover, the Information charging Anil Kumar, who was involved in the AMD conspiracy, makes no mention of CLWR.  (*See* Ex. M.)  Nor do the government's sentencing submissions filed for each of these cooperating witnesses include any reference to CLWR and AMD as parts of a single conspiracy. *See United States v. Rajiv Goel*, 10 Cr. 90 (ECF No. 51); *United States v. Anil Kumar*, 10 Cr. 13 (ECF No. 47).

In sum, Rengan would be prejudiced by the combination of the CLWR and AMD conspiracies into a single count, and the government itself recognized in the Raj prosecution that the two conspiracies constitute two separate offenses.  Accordingly, at a minimum the government should be ordered to select one offense charged within the count upon which to proceed—either the CLWR or the AMD conspiracy.

17

**III.    COUNTS FOUR AND SEVEN SHOULD BE DISMISSED AS REPUGNANT BECAUSE THEY ARE INCONSISTENT WITH COUNT ONE AND INTERNALLY INCONSISTENT**

Count One charges a conspiracy to purchase securities with inside information, while Counts Four and Seven charge substantive violations of the insider trading laws related to the purchase of CLWR securities.  But Count One is inconsistent with both Counts Four and Seven.

In addition, because Count One's allegations are realleged in Counts Four and Seven, both Counts Four and Seven contain material internal contradictions.

As a result, for the reasons explained below, Counts Four and Seven must be dismissed as repugnant.  However, while this would cure Count One's inconsistency with the rest of the Indictment, Count One's duplicity would remain and requires a separate remedy.

**A.    Count One Is Inconsistent with Counts Four and Seven**

Paragraph 15 of Count One states, among other things, that:

> From on or about March 24, 2008, through and including on or about March 25, 2008, *Raj* Rajaratnam caused the Galleon Tech Funds to buy at least approximately 261,800 shares of Clearwire . . . .

(Indictment ¶ 15 (emphasis added).)

Count Four alleges that on March 24, 2008:

> *Rengan* Rajaratnam caused the purchase … of 125,800 shares [of CLWR common stock] in the Galleon Tech Funds.

(Indictment ¶ 38 (emphasis added).)  Meanwhile, Count Seven alleges that on March 25, 2008:

> *Rengan* Rajaratnam caused the purchase … of 136,000 shares [of CLWR common stock] in the Galleon Tech Funds.

(*Id.* (emphasis added).)  The Bill of Particulars makes clear that Counts Four and Seven use "cause" to mean that Rengan "direct[ed] certain Galleon Group traders . . . to execute those trades in the portfolio manager codes of CRS and TMT."  (Ex. N ¶ 8.)

There is no doubt that paragraph 15 of Count One concerns the same stock purchases as those charged in Counts Four and Seven. The numbers are identical: the 261,800 shares in paragraph 15 is equal to the sum of the shares alleged in Count Four (125,800) plus Count Seven (136,000). The dates (March 24 and 25, 2008) are identical. The funds (Galleon Tech Funds) are identical. The alleged inside information is identical.

Counts One, Four, and Seven cannot mean that *both* Raj and Rengan caused the March 24 and 25, 2008 CLWR trades in the Galleon Tech Funds. The Bill of Particulars makes clear that the Count One allegation that Raj "caused" the March 24 and 25, 2008 CLWR trades in the Galleon Tech Funds means that he did it alone, not in tandem with Rengan. The Bill of Particulars contains a section entitled "Further Specifics Regarding The Trades In the Conspiracy Count [Count One]." That section lists the trades that Rengan allegedly "made, directed, or caused to be made" in connection with Count One, including several CLWR trades made in a Fidelity account and in the Galleon Crossover Fund. The section does *not* list the March 24 or 25, 2008 Galleon Tech Funds trades at issue—or, indeed, *any* trades in the Galleon Tech Funds. (Ex. N ¶ 6).) In other words, the Bill of Particulars states that, so far as Count One is concerned, Rengan caused several trades, but does not identify the March 24 and 25, 2008 CLWR trades as among those he caused.[7]

This is consistent with the position the government took in the Raj prosecution with respect to these trades. The Indictment charging Raj stated that Raj—not Rengan—"*caused* Galleon Tech . . . to execute the securities transactions*" at issue. (*See* Ex. B ¶ 37 (Counts Six and Seven) (emphasis added).) During the pretrial proceedings in the Raj matter and the Rajiv

---

[7] Nor does paragraph 7 of the Bill of Particulars identify Rengan as having caused these trades. (*See* Ex. N ¶ 7). That paragraph lists trades in the Galleon Technology Offshore Fund, which the Indictment defines as part of the Galleon Tech Funds. (*See* Indictment ¶ 1.) But paragraph 7 of the Bill of Particulars does not allege that any person participated in these trades.

Goel matter, the government on several occasions made clear its position that Raj "caused" the execution of the March 24 and 25, 2008 Galleon Tech Funds CLWR trades with which Rengan Rajaratnam is now charged.  The government never once mentioned that Rengan had a role in the execution of the trades.  (*See* Ex. F ¶¶ 6(b), 53(d), and 53(f); Ex. L ¶ 12).)  During the Raj trial, the government elicited from its expert FBI witness that the Galleon trading records indicated that Raj used the manager code "TMT" to purchase the CLWR shares at issue.[8]  With this information in evidence, the government's summation forcefully argued that on March 24 and 25, 2008, *Raj* bought the CLWR common stock—the very stock it now alleges (in Counts Four and Seven) that *Rengan* caused the Galleon Tech Funds to purchase by directing a trader to execute a trade:

> [H]ow do you know [that Raj Rajaratnam] traded based on Goel's information?  You know it for a lot of reasons. . . . [Twelve] minutes after the markets opened on March 24, [Raj Rajaratnam] bought over 100,000 shares of Clearwire stock, that would be Exhibit 8.  He bought on March 24, the first available day, over 100,000 shares of stock at twelve minutes after the market opened [at 9:42 a.m.], and on the next day [March 25] he bought more shares.

(*See* Ex. I at 5203:6-22).)  The government never argued to the Court or the jury that Rengan had anything to do with "causing" the execution of these trades.

Thus, because Count One alleges that Raj alone "caused" the March 24 and 25, 2008, CLWR purchases in the Galleon Tech Funds, Count One is inconsistent with Counts Four and

---

[8] *See* Ex. O at 3353-54, 3391 (FBI special agent testifying that (a) he reviewed Galleon trading records related to the TMT manager code, which was "associated with [Raj] Rajaratnam," (b) on March 24, 2008 the TMT manager code was used to purchase 125,800 shares of CLWR stock in the Galleon Tech Funds (Count Four in the Rengan Indictment), and (c) on March 25, 2008 the TMT manager code was used to purchase 136,000 shares of CLWR stock in the Galleon Tech Funds (Count Seven in the Rengan Indictment)); Ex. P (GX 8) (government demonstrative indicating the CLWR shares were purchased by Manager Code TMT); Ex. Q GX 78) (government demonstrative stating that the TMT code was "Used by Raj").  Government Exhibits 8 and 78 were produced in the government's voluntary Rule 16 discovery in this case.

Seven, which allege that Rengan caused the same trades.  As discussed below, for Count One to

remain in the Indictment,[9] Counts Four and Seven must be dismissed.

### B.   Counts Four and Seven Are Repugnant

Counts Four and Seven begin at paragraph 37 of the Indictment by "repeat[ing] and

realleg[ing]" the allegations of, among other things, paragraph 15 of Count One.  Count Four

thus states that on March 24, 2008 Raj alone caused the Galleon Tech Funds to purchase CLWR

stock (¶ 15) *and* that Rengan caused the same purchase (¶ 37).  Likewise, Count Seven states that

on March 25, 2008 Raj alone caused the Galleon Tech Funds to purchase CLWR stock (¶ 15)

*and* that Rengan caused the same purchase (¶ 37).  Accordingly, both Counts Four and Seven are

internally inconsistent.

An indictment is defective as repugnant if the indictment "contains logically inconsistent

counts," *United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) (Buchwald, J.), and a

count is defective as repugnant "if there is a contradiction between material allegations in the

count," *United States v. Cisneros*, 26 F. Supp. 2d 24, 52 (D.D.C. 1998) (internal quotation marks

omitted).  *See also United States v. Cantrell*, 612 F.2d 509, 510-11 (10th Cir. 1980) (reversing

receipt conviction on the ground that indictment charging both transport of stolen goods *to*

Kansas and receipt of same goods *in* Kansas was inconsistent and unfairly hampered defendant's

ability to prepare for trial); *United States v. Eason*, 434 F. Supp. 1217, 1221 (W.D. La. 1977)

(ordering the government to decide which of three counts to pursue).

For all the reasons that Count One is repugnant with Counts Four and Seven, Counts Four

and Seven are internally repugnant because they reallege the allegations of Count One.  The

allegations that Raj alone directed the March 24 and 25, 2008, purchases of 261,800 shares of

CLWR in the Galleon Tech Funds, and that Rengan directed the same purchases are "mutually

---

[9] Count One's duplicity must be remedied separately, as discussed in Point II.

exclusive." *Conde*, 309 F. Supp. 2d at 511.  In any event, the government is constrained by what it contended in the Raj trial, namely, that Raj (not Rengan) directed the "execut[ion of] the securities transactions," (Ex. B ¶ 37 (chart detailing Counts Six and Seven).)  *See Salerno*, 937 F.2d at 811; *GAF Corp.*, 928 F.2d at 1258–62; *McKeon*, 738 F.2d at 33; *see also GAF*, 928 F.2d at 1260 ("Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts.").

The government's choice simultaneously to allege that Raj "caused" these purchases and that Rengan caused them, too, appears to be strategic.  The government claimed during the Raj trial that Raj was the final tippee, meaning he was the one who bought the 261,800 CLWR shares.  Now, the government alleges that Rengan is the final tippee who bought those 261,800 CLWR shares.  The government uses the "cause" language to obfuscate that it previously alleged that Raj was the final tippee, and to get around the requirement of *SEC v. Obus* that for a final tippee to be liable he "must both know or have reason to know that the information was obtained through a breach and trade while in knowing possession of the information."  693 F.3d at 288. The government has boxed itself in because were the government to contradict the allegation that Raj bought the 261,800 CLWR shares, it would run the risk of upsetting Raj's conviction. Meanwhile, to establish substantive liability in this case, the government must maintain that Rengan traded.

The government's strategic choice to state that both Raj and Rengan "caused" the trades cannot be countenanced because the allegations are both logically inconsistent between counts (Count One vs. Counts Four and Seven), as well as within the same counts (Counts Four and Seven).  It simply cannot be that Raj alone caused the purchases, and that Rengan did, too.

Moreover, the government would be precluded from arguing to the jury that Rengan caused the purchase of these shares when it has already argued that Raj did so alone.  *See United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("The prosecution has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth."); *see also United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987).

Accordingly, because Counts Four and Seven are logically inconsistent with Count One and are internally inconsistent within themselves, the Court should dismiss Counts Four and Seven as repugnant.

## IV. THE    WIRETAP EVIDENCE SHOULD BE SUPPRESSED

Rengan moves pursuant to 18 U.S.C. § 2518(10) and *Franks v. Delaware*, 438 U.S. 154 (1978), to have wiretapped conversations between him and his brother, Raj, suppressed as impermissibly obtained under the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510-2522. The relevant wiretaps were the subject of extensive briefing in Raj's trial, *see United States v. Raj Rajaratnam*, S1 09 Cr. 1184 (ECF Nos. 88, 120, 139), and his appeal, *United States v. Rajaratnam*, No. 11-4416 (2d Cir.) (ECF Nos. 75, 148, 189).

As described at length in the cited briefs, the government's violation of the statutory requirements of "full and complete statement[s]" of necessity and probable cause, 18 U.S.C. § 2518(1), mandate suppression.  *See United States v. Giordano*, 416 U.S. 505, 527 (1974) ("Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.").

The Fourth Amendment also requires suppression of the wiretaps because the government's application was submitted "with reckless disregard for the truth," and once the "affidavit's false material [is] set to one side, the affidavit's remaining content is insufficient" to sustain the wiretap. *Franks*, 438 U.S. at 156. The District Court's determination in the Raj matter that suppression was not required based on the new facts submitted at the *Franks* hearing violates two foundational principles of Fourth Amendment jurisprudence: (1) the constitutional requirement of *prior* judicial review, *Katz v. United States*, 389 U.S. 347, 359 (1967); and (2) the constitutional requirement that when affidavits are proven false, the search can only be sustained if the "remaining content" of the original affidavit is sufficient to support the wiretap, *Franks*, 438 U.S. at 156.

Rengan renews the arguments made by Raj, which were rejected by Judge Holwell and affirmed on appeal. *See United States v. Rajaratnam*, 09 Cr. 1184, 2010 WL 4867402 (S.D.N.Y. Nov. 24, 2010), *aff'd, United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013).[10] It is our intent to make each and every argument made in the prior briefing regarding suppression of each and every wiretap, and to preserve those issues for appeal. To avoid burdening the Court with an excessive amount of briefing, we are providing the Court with the docket numbers of the relevant briefs instead of simply repeating the arguments. We stand ready to provide copies of those briefs at the Court's request.

---

[10] Pursuant to Supreme Court Rule 13, Raj Rajaratnam has until February 18, 2014 to file a petition for a writ of certiorari.

## CONCLUSION

For the foregoing reasons, the Indictment should be dismissed, or in the alternative,

Count One should be found duplicitous and Counts Four and Seven should be dismissed.

Additionally, the wiretap evidence should be suppressed.

Dated: February 7, 2014  
      New York, NY

Respectfully submitted,

By _____  
Daniel M. Gitner  
Michael D. Longyear

LANKLER SIFFERT & WOHL LLP  
500 Fifth Avenue, 34th Floor  
New York, NY 10110-3398  
(212) 921-8399 (phone)  
(212) 764-3701  
dgitner@lswlaw.com

*Attorneys for Rajarengan Rajaratnam*

25