ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-15-14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -                  :

RAJARENGAN RAJARATNAM,            :
    a/k/a "Rengan Rajaratnam,"
                                  :

          Defendant.              :

- - - - - - - - - - - - - - - - x

SUPERSEDING INDICTMENT

S1 13 Cr. 211 (NRB)

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Relevant Entities and Individuals

1.   At all times relevant to this Indictment, the Galleon Group ("Galleon") operated a family of hedge funds in New York, New York.  Galleon Management, LP ("Galleon Management") managed a number of these funds, including the Galleon Technology Offshore Fund and the Galleon Technology MAC 88 Fund (collectively, the "Galleon Tech Funds"), the Galleon Diversified Fund, the Galleon Crossover Fund, and the Galleon Buccaneer Fund.

2.   At various times relevant to this Indictment, RAJARENGAN RAJARATNAM, a/k/a "Rengan Rajaratnam," the defendant (hereinafter, "RENGAN RAJARATNAM"), worked at Galleon, including as an analyst and a portfolio manager for the Galleon Crossover Fund and the Galleon Buccaneer Fund.  In addition, at all relevant times, RENGAN RAJARATNAM maintained a personal

brokerage account at Fidelity Investments (the "Fidelity Brokerage Account").

3.     At all times relevant to this Indictment, Raj Rajaratnam was the founder and head of Galleon.  In addition, Raj Rajaratnam was the brother of RENGAN RAJARATNAM, the defendant.  At various times relevant to this Indictment, Raj Rajaratnam had authority to direct trades in, among other Galleon funds, the Galleon Tech Funds, the Galleon Diversified Fund, the Galleon Crossover Fund, and the Galleon Buccaneer Fund.

4.     At all times relevant to this Indictment, Clearwire Corporation ("Clearwire") was a publicly-traded provider of wireless high-speed Internet service based in Kirkland, Washington.  Clearwire's common stock traded on the Nasdaq Stock Market under the ticker symbol "CLWR."

5.     At all times relevant to this Indictment, Rajiv Goel worked at Intel Corporation ("Intel").  Goel worked in Intel's Treasury Group and was responsible for assisting Intel Capital, the investment arm of Intel, with its strategic investment decisions.  At all times relevant to this Indictment, Goel owed a duty of trust and confidence to Intel to maintain the confidentiality of its non-public information.

6.     At all times relevant to this Indictment, Advanced Micro Devices, Inc. ("AMD") was a publicly-traded designer and producer of semiconductors and other high-

2

technology products based in Sunnyvale, California.  AMD's common stock traded on the New York Stock Exchange under the ticker symbol "AMD."

　　　　7.　　At all times relevant to this Indictment, Anil Kumar, a co-conspirator not named as a defendant herein, worked at McKinsey & Company, Inc. ("McKinsey"), a global management consulting firm, as a senior partner and director.  In that capacity, Kumar advised various clients in the technology industry concerning their business strategies, including AMD. At all times relevant to this Indictment, Kumar owed a duty of trust and confidence to McKinsey and AMD to maintain the confidentiality of their non-public information.

### The Insider Trading Scheme

　　　　8.　　In or about 2008, RENGAN RAJARATNAM, the defendant, Raj Rajaratnam, and others known and unknown, participated in a scheme to defraud by obtaining, sharing and disclosing material, nonpublic information belonging to publicly-traded companies ("Inside Information") and/or executing securities transactions on the basis of Inside Information.  RENGAN RAJARATNAM and Raj Rajaratnam engaged in this conduct for the purpose of executing profitable securities transactions in RENGAN RAJARATNAM's Fidelity Brokerage Account, the Galleon Buccaneer Fund, the Galleon Crossover Fund, and the Galleon Tech Funds, with knowledge that the Inside Information

3

had been disclosed in violation of duties of trust and
confidence.

### Insider Trading in Clearwire

9.    In or about 2008, RENGAN RAJARATNAM, the
defendant, Raj Rajaratnam, and others known and unknown,
participated in a scheme to defraud by executing securities
transactions based on Inside Information relating to Intel and
Clearwire.  The means by which RENGAN RAJARATNAM and Raj
Rajaratnam carried out the fraudulent scheme were as follows:
(i) Rajiv Goel obtained Inside Information from Intel relating
to Intel's plans to make a $1 billion strategic investment in
Clearwire in exchange for an equity ownership position in
Clearwire, as described in further detail below (the "Intel
Inside Information"); (ii) Goel disclosed the Intel Inside
Information to Raj Rajaratnam in violation of fiduciary and
other duties of trust and confidence that Goel owed to Intel;
(iii) Raj Rajaratnam, knowing that Goel had disclosed the Intel
Inside Information to him in violation of his duties to Intel,
further disclosed the Intel Inside Information to RENGAN
RAJARATNAM; (iv) RENGAN RAJARATNAM and Raj Rajaratnam purchased
Clearwire common stock on the basis of the Intel Inside
Information.

10.    Specifically, in or about March 2008, Rajiv Goel
learned from others at Intel about Intel's non-public plans to
participate in a multi-party transaction in which (i) Intel

4

planned to invest $1 billion into Clearwire; (ii) Sprint Nextel
Corporation ("Sprint") would contribute its wireless spectrum to
Clearwire; (iii) other parties to the transaction included
Comcast Corporation ("Comcast"), Time Warner Cable, Inc. ("Time
Warner Cable"), and Google, Inc. ("Google"); (iv) Clearwire
would emerge as a new wireless communications company owned by,
among others, Intel (with 10 percent ownership of the new
Clearwire entity), the existing public shareholders of Clearwire
(with 16 percent ownership of the new entity), Craig McCaw, the
founder of Clearwire (with 5 percent ownership of the new
entity); and (v) the new entity would have $3.5 billion in cash
separate and apart from the cash position of the existing
Clearwire entity.

   11.  In or about March 2008, Rajiv Goel disclosed the
Intel Inside Information to Raj Rajaratnam for the purpose of
enabling Raj Rajaratnam to execute securities transactions and
earn profits.  Goel disclosed the Intel Inside Information, all
of which was non-public when he did so, in violation of
fiduciary and other duties of trust and confidence that Goel
owed to Intel.  For example, on or about March 20, 2008, at
approximately 9:11 p.m., Goel advised Raj Rajaratnam that
Intel's board had "approved this deal," the day before,
referring to the transaction described in paragraph 10.

   12.  In or about March 2008, Raj Rajaratnam further
disclosed the Intel Inside Information to RENGAN RAJARATNAM, the

defendant, so that RENGAN RAJARATNAM could use it to execute securities transactions and earn profits.

13.    The next trading day after Rajiv Goel's March 20, 2008 call to Raj Rajaratnam was on or about March 24, 2008. Beginning on or about March 24, 2008, through and including on or about April 4, 2008, in his Fidelity Brokerage Account, RENGAN RAJARATNAM, the defendant, purchased at least approximately 72,000 shares of Clearwire common stock based, in whole or in part, on the Intel Inside Information, with knowledge that the Intel Inside Information had been improperly obtained.

14.    From on or about March 24, 2008, through and including on or about March 27, 2008, based, in whole or in part, on the Intel Inside Information: (a) the Galleon Tech Funds acquired at least approximately 261,800 shares of Clearwire; (b) the Galleon Crossover Fund acquired at least approximately 120,000 shares of Clearwire common stock; and (c) the Galleon Buccaneer Fund acquired at least approximately 170,000 shares of Clearwire common stock.

15.    On or about March 25, 2008, after the U.S. stock markets had closed, the *Wall Street Journal* published an online news article stating that Comcast and Time Warner were in discussions with Clearwire and Sprint regarding the creation of a joint venture to operate a high-speed nationwide wireless network.  The *Journal* article indicated that Sprint and

6

Clearwire were "trying to raise at least $3 billion" for the joint venture and that "Intel Corp. has signaled a willingness to put in about $1 billion or more."

16.  On or about March 25, 2008, at approximately 8:22 p.m., RENGAN RAJARATNAM, the defendant, called Raj Rajaratnam to complain about the *Wall Street Journal* article.  Referring to the Intel Inside Information, RENGAN RAJARATNAM said to Raj Rajaratnam, "We're fucked man" because the "Clearwire stuff" had "just hit the *Wall Street Journal*."  RENGAN RAJARATNAM explained that the *Journal* article was "short on details, but they kind of say, you know, they're looking to raise as much as three billion, but they don't have any of the equity split.  But they named . . . Comcast, they named Time Warner, Clearwire, Sprint."  Raj Rajaratnam replied, "O.K., shit."  RENGAN RAJARATNAM then said, "So, I don't know how much you got in today," referring to Raj Rajaratnam's purchases of Clearwire stock that day, "but I think [Clearwire's share price] is gonna rip [rise sharply] tomorrow."

17.  In fact, Clearwire's share price did rise sharply in response to the *Wall Street Journal* article.  On or about March 26, 2008, the morning after the article was published, Clearwire common stock opened at a price of $15.85 per share, up approximately 18 percent ($2.46) over the previous day's closing price.

18.   From on or about March 26, 2008, through and including on or about April 21, 2008, RENGAN RAJARATNAM, the defendant, sold his entire position of 72,000 shares of Clearwire common stock in his Fidelity Brokerage Account for a total profit of at least approximately $100,000.

19.   From on or about March 26, 2008, through and including on or about April 21, 2008, the Galleon Tech Funds, the Galleon Crossover Fund, and the Galleon Buccaneer Fund sold their positions in Clearwire common stock, resulting in an aggregate profit of at least approximately $700,000.

### Insider Trading in AMD

20.   From at least in or about March 2008, through and including in or about October 2008, RENGAN RAJARATNAM, the defendant, Raj Rajaratnam, and others known and unknown, participated in a scheme to defraud by executing securities transactions based on Inside Information obtained from AMD.   The means by which RENGAN RAJARATNAM, Raj Rajaratnam and others carried out the fraudulent scheme were as follows: (i) Anil Kumar, a McKinsey partner, obtained Inside Information from McKinsey's client, AMD, relating to a significant transaction wherein AMD planned to spin off its manufacturing or "fab" business into a new entity, and two investment companies wholly owned by the Abu Dhabi Government (collectively, the "Abu Dhabi Investment Authority") would invest up to six to eight billion dollars in the new entity and would separately invest cash in

AMD (hereinafter, the "AMD Inside Information"); (ii) Kumar disclosed the AMD Inside Information to Raj Rajaratnam in violation of fiduciary and other duties of trust and confidence that Kumar owed to McKinsey and AMD; (iii) Raj Rajaratnam, with knowledge that Kumar obtained the AMD Inside Information in violation of his duties to McKinsey, disclosed the Inside Information to RENGAN RAJARATNAM; (iv) Raj Rajaratnam caused the Galleon Buccaneer Fund to acquire 250,000 shares of AMD common stock on behalf of RENGAN RAJARATNAM based on the AMD Inside Information, with RENGAN RAJARATNAM's concurrence; and (v) Raj Rajaratnam caused the Galleon Tech Funds and the Galleon Diversified Fund to acquire AMD common stock based on the AMD Inside Information.

    21.  Specifically, in or about 2008, AMD retained McKinsey to provide consulting services in connection with AMD's negotiations with the Abu Dhabi Investment Authority concerning its proposed transaction with AMD.  Beginning in or about 2008, Anil Kumar worked on this matter for AMD, learned the AMD Inside Information, and disclosed it to Raj Rajaratnam.  For example, on or about August 15, 2008, at approximately 3:34 a.m., Kumar received an email from a McKinsey colleague stating that AMD and the Abu Dhabi Investment Authority had "a handshake agreement on the deal."  Later that day, at approximately 11:04 a.m., Kumar told Raj Rajaratnam by telephone that "yesterday" AMD and the Abu Dhabi Investment Authority had "shaken hands and said that

they're going ahead with the deal" in which the Abu Dhabi
Investment Authority would invest "six to eight billion"
dollars.  Kumar said to Raj, "[Y]ou can now just buy" AMD stock.

22.  On or about August 15, 2008, Raj Rajaratnam
bought at least approximately three million shares of AMD common
stock for the Galleon Tech Funds and the Galleon Diversified
Fund based, in whole or in part, on the AMD Inside Information.
Over the next several weeks, Raj Rajaratnam continued to buy
millions of additional shares of AMD before on or about October
7, 2008, when the AMD-Abu Dhabi Investment Authority deal was
announced.

23.  On or about August 15, 2008, Raj Rajaratnam
provided AMD Inside Information to RENGAN RAJARATNAM, the
defendant.  At approximately 2:02 p.m., Raj Rajaratnam told
RENGAN RAJARATNAM, "I just heard that . . . AMD had a handshake
with the . . . Arabs. . . . The Arabs to put [in] six billion
dollars."  In addition, Raj Rajaratnam told RENGAN RAJARATNAM
that he had bought shares of AMD common stock, and that he was
"buying two fifty" - meaning, 250,000 shares of AMD – "for you,
OK?"  Rengan replied, "Alright, thanks a lot man, I appreciate
it."

24.  Later that day, RENGAN RAJARATNAM, the defendant,
and Raj Rajaratnam spoke again not only about the AMD Inside
Information but also about the affirmative efforts that RENGAN
RAJARATNAM was making to cultivate a second source of inside

information at McKinsey besides Anil Kumar: a new McKinsey
partner who was Rengan's Stanford Business School colleague and
Kumar's protégé at McKinsey (hereinafter, "McKinsey Partner A").
Specifically, on two telephone calls at approximately 5:32 p.m.
and 5:41 p.m. on or about August 15, 2008, RENGAN RAJARATNAM
advised Raj Rajaratnam that he had just finished a meeting with
McKinsey Partner A in which McKinsey Partner A "spilled his
beans" and "volunteered the information about the investments"
in AMD.  Raj Rajaratnam suggested, "[W]hat we wanna do is . . .
get him and then have access to, you know, be able to chat with
him" about other Inside Information.  Raj Rajaratnam asked
RENGAN RAJARATNAM, "[H]e is a little dirty, right?"  RENGAN
RAJARATNAM responded, "[H]e's a little dirty," and cited the
fact that McKinsey Partner A had confirmed the AMD investment
during their meeting earlier that day.  RENGAN RAJARATNAM
further reported that when he had asked McKinsey Partner A what
other stocks McKinsey Partner A liked, McKinsey Partner A said,
"'You know, the problem is all my best ideas . . . are inside
information.'"  RENGAN RAJARATNAM responded to McKinsey Partner
A, jokingly, "'[Y]ou know, that's not a problem I'm sure we can
hire [your wife] as a . . . consultant for Galleon.'"  In
response, McKinsey Partner A said, "'[L]et me think about
that.'"  RENGAN RAJARATNAM summarized the situation for Raj
Rajaratnam as follows:  McKinsey Partner A was "definitely, you
know, thinking about playing ball."

25.   Later that same day, RENGAN RAJARATNAM, the defendant, and Raj Rajaratnam further discussed RENGAN RAJARATNAM's efforts to obtain additional Inside Information from McKinsey Partner A.   Specifically, on August 15, 2008, at approximately 6:28 p.m., RENGAN RAJARATNAM told his brother that, in his conversation with McKinsey Partner A earlier that day, RENGAN RAJARATNAM was trying to "pump information out of my friend."   Raj Rajaratnam replied, "I understand what you're doing[.]"   A few seconds later, referring to McKinsey Partner A, RENGAN RAJARATNAM said, "Scumbag, everybody is a scumbag."

26.   On or about August 19, 2008, RENGAN RAJARATNAM, the defendant, had another conversation with McKinsey Partner A about the AMD Inside Information and then reported the conversation back to Raj Rajaratnam.   Specifically, at approximately 1:02 p.m. and 1:13 p.m. on August 19, 2008, RENGAN RAJARATNAM reported McKinsey Partner A's statement that, while there was some information in the marketplace about a possible transaction involving AMD, the "stories he's [McKinsey Partner A's] been reading expect [that the outside investment would be] just enough cash to cover the fabs," when in fact the outside investment would include "extra capital," a fact that McKinsey Partner A thought would "catch people's attention" when it became public.   In addition, RENGAN RAJARATNAM further described to Raj Rajaratnam his efforts to get McKinsey Partner A to "give me dirt," and referred again to McKinsey Partner A as a

"scumbag[]." Raj Rajaratnam agreed that "we've got to milk this guy and get him comfortable."

27. The concerted efforts of RENGAN RAJARATNAM, the defendant, and Raj Rajaratnam to cultivate McKinsey Partner A as a source of Inside Information at McKinsey independent of Anil Kumar was made more difficult, however, by the close relationship between McKinsey Partner A and Kumar. McKinsey Partner A repeatedly told Kumar about his conversations with RENGAN RAJARATNAM; Kumar then complained to Raj Rajaratnam about Rengan's overtures. In response to this situation, on or about August 19, 2008, at approximately 1:02 p.m., Raj Rajaratnam suggested a tactic that RENGAN RAJARATNAM could use to get additional Inside Information from McKinsey Partner A while reducing the risk that McKinsey Partner A would "go back to Anil [Kumar]." Specifically, Raj Rajaratnam urged RENGAN RAJARATNAM to share certain details about the AMD deal while asking McKinsey Partner A to "protect" RENGAN RAJARATNAM as a source, so that McKinsey Partner A would be more willing to share additional details with RENGAN RAJARATNAM.

28. As it happened, this approach had the same result: McKinsey Partner A again reported the overtures to Anil Kumar. Specifically, on or about October 2, 2008, RENGAN RAJARATNAM, the defendant, called McKinsey Partner A and shared certain details about the AMD-Abu Dhabi transaction. McKinsey Partner A reported the conversation back to Kumar, who then

called Raj Rajaratnam to complain.  Specifically, on or about
October 3, 2008, at approximately 7:52 a.m., Kumar called Raj
Rajaratnam and said:

> Raj, Rengan called [McKinsey Partner A]
> yesterday and told him that he knew all
> about the deal next week[.]
>
> . . .
>
> This completely unnerved [McKinsey
> Partner A], you know. . . . I don't
> think other guys can handle this.
> Let's ask him [RENGAN RAJARATNAM] to be
> a little discreet about these type of
> things.

29.   On October 7, 2008, at approximately 8:00 a.m.,
AMD announced the spin-off of its manufacturing operations and
the Abu Dhabi Investment Authority's investment in the
manufacturing operations and AMD itself.  When the market opened
that day, AMD common stock opened at $5.27 per share, up
approximately 25 percent ($1.04) over the previous day's closing
price of $4.23 per share.

30.   As a result of the overall market decline during
the second half of 2008, the Galleon Tech Funds, the Galleon
Diversified Fund, and the Galleon Buccaneer Fund did not realize
profits from trades based on the AMD Inside Information; indeed,
these funds sold AMD shares for a loss.

## The Conspiracy

31.   In or about 2008, in the Southern District of New
York and elsewhere, RENGAN RAJARATNAM, the defendant, Raj

Rajaratnam, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Object of the Conspiracy

32.   It was a part and an object of the conspiracy that RENGAN RAJARATNAM, the defendant, Raj Rajaratnam, and others known and unknown, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2.

## Means and Methods of the Conspiracy

33.   Among the means and methods by which RENGAN RAJARATNAM, the defendant, Raj Rajaratnam, and others known and unknown, would and did carry out the conspiracy were the following:

a.   Anil Kumar and Rajiv Goel, who had access to Inside Information, improperly disclosed that Inside Information to Raj Rajaratnam with the understanding that the Inside Information would be used for the purpose of purchasing or selling securities in violation of: (i) the fiduciary and other duties of trust and confidence that they owed to their respective employers and/or their clients; (ii) the expectations of confidentiality of their respective employers; and (iii) their respective employers' written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   Raj Rajaratnam shared certain of this Inside Information with RENGAN RAJARATNAM, all for the purpose of engaging in profitable securities transactions, and with knowledge that the Inside Information had been disclosed in violation of fiduciary and other duties of trust and confidence.

c.   RENGAN RAJARATNAM and Raj Rajaratnam, while in possession of the Inside Information that had been improperly disclosed in violation of duties owed to public companies,

16

purchased and sold securities based, in whole or in part, on Inside Information and thereby received illegal profits.

### Overt Acts

34.   In furtherance of the conspiracy and to effect the illegal object thereof, RENGAN RAJARATNAM, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   In or about March 2008, Raj Rajaratnam provided RENGAN RAJARATNAM with the Intel Inside Information.

b.   In or about March 2008, RENGAN RAJARATNAM purchased Clearwire common stock in his Fidelity Brokerage Account based, in whole or in part, on the Intel Inside Information.

c.   In or about August 2008, Raj Rajaratnam provided RENGAN RAJARATNAM with the AMD Inside Information.

(Title 18, United States Code, Section 371.)

### COUNTS TWO AND THREE
(Securities Fraud)

The Grand Jury further charges:

35.   The allegations contained in paragraphs 1 through 30 and 33 and 34 of this Indictment are repeated and re-alleged as though fully set forth herein.

36.   On or about the dates set forth below, in the Southern District of New York and elsewhere, RENGAN RAJARATNAM,

the defendant, willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, in connection with the purchase and sale of securities, did use and employ manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, to wit: RENGAN RAJARATNAM caused the purchase of Clearwire common stock on the basis of the Intel Inside Information, as follows:

| COUNT | APPROX. DATE | SECURITY | TRANSACTION (AMOUNT APPROXIMATE) |
|-------|--------------|----------|----------------------------------|
| TWO | March 24, 2008 | Clearwire common stock (CLWR) | Purchase of 30,000 shares in the Fidelity Brokerage Account |
| THREE | March 25, 2008 | Clearwire common stock (CLWR) | Purchase of 25,000 shares in the Fidelity Brokerage Account |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5 and 240.10b5-2, and Title 18, United State Code, Section 2.)

## FORFEITURE ALLEGATION

37.   As a result of committing one or more of the foregoing conspiracy and securities fraud offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Section 371; and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, as alleged in Counts One through Three of this Indictment, RENGAN RAJARATNAM, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the above offenses.

## Substitute Assets Provision

38.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(i)     cannot be located upon the exercise of due diligence;

(ii)    has been transferred or sold to, or deposited with, a third party;

(iii)   has been placed beyond the jurisdiction of the court;

(iv)    has been substantially diminished in value; or

(v)     has been commingled with other property which cannot be divided without difficulty;

19

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), to seek forfeiture of any

other property of said defendant up to the value of the

forfeitable property described above.

        (Title 15, United States Code, Sections 78j(b), 78ff;
         Title 18, United States Code, Sections 371 and 981;
            Title 21, United States Code, Section 853(p);
            Title 28, United States Code, Section 2461;
            and Title 17, Code of Federal Regulations,
                 Sections 240.10b-5 and 240.10b5-2.)


_____          _____
FOREPERSON                               PREET BHARARA
                                         United States Attorney


20

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### RAJARENGAN RAJARATNAM,
### a/k/a "Rengan Rajaratnam,"

Defendant.

### SUPERSEDING INDICTMENT

S1 13 Cr. 211 (NRB)

(Title 18, United States Code, Sections 2,
371; Title 15, United States Code, Sections
78j(b) & 78ff; Title 17, Code of Federal
Regulations, Sections 240.10b-5 and
240.10b5-2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

Foreperson.

May 15, 2014
Filed first Superseding Indictment.
U.S.M.J. Debra Freeman