LANKLER SIFFERT & WOHL LLP
ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, N.Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX    (212) 764-3701

June 2, 2014

**VIA HAND DELIVERY AND ECF**

Honorable Naomi Reice Buchwald
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

   **Re: United States v. Rajarengan Rajaratnam, 13 Cr. 211 (NRB)**

Dear Judge Buchwald:

   We respectfully submit this letter at the Court's request with regard to the government's proffered evidence concerning Akamai Technologies, Inc. ("Akamai" or "AKAM"). The government's proffered Akamai proof should not be admitted for the simple reason that the evidence overwhelmingly proves that Raj *did not* share any inside information with Rengan. Thus, the proffered evidence has no probative value at all. In fact, as the below demonstrates, given the clear and convincing evidence that Raj did not share any tip with Rengan (let alone one that Rengan would have known was confidential), admission of this evidence would result in a complete waste of time. *See* Fed. R. Evid. 402, 403.[1]

   The government claims that Rengan shorted AKAM in advance of a quarterly (July 30, 2008) announcement because Raj shared with him at some unspecified point prior to July 30th a confidential tip that AKAM would issue "negative guidance" after it issued its July 30th 4:00 p.m. press release and during its 4:30 p.m. conference call. But there is *no* evidence that Raj shared any confidential AKAM information with Rengan, and Rengan's trading pattern

---

[1] *See also United States v. Gordon*, 987 F.2d 902, 908-09 (2d Cir. 1993) ("[T]he probative value of the proffered evidence depends largely on whether or not there is a close parallel between the crime charged and the acts shown," and "it is an abuse of discretion for the trial court to admit other-act evidence if the other act or acts are not sufficiently similar to the conduct at issue." (internal quotation marks omitted)); *United States v. Nekritin*, No. 10-cr-491 (S-2) (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) ("Evidence that a defendant charged with fraud engaged in other, non-fraudulent activity is generally irrelevant."); *United States v. Stein*, 521 F. Supp. 2d 266, 270 (S.D.N.Y. 2007) ("To carry its burden of establishing admissibility, the government must explain the uncharged transactions, identify similarities between the charged and uncharged transactions, and articulate how the similarities identified support" a purpose other than proving character.).

Lankler Siffert & Wohl LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 2

overwhelmingly shows that Rengan did not have the alleged inside information.

The undisputed documentary record shows that:

(1)  Rengan had a history of trading in advance of AKAM quarterly announcements;

(2)  Rengan began his short position in July 2008 *before* Raj obtained any tip;

(3)  Rengan shorted AKAM in July 2008 for legitimate market reasons, including that a Galleon analyst provided negative information about the stock;

(4)  Several others at Galleon shorted AKAM in July 2008, for legitimate market reasons;

(5)  Rengan covered 20,000 shares of AKAM on July 28th—*after* the tip to Raj and inconsistent with knowing that AKAM would be giving poor guidance during the earnings call. Rengan covered 100,000 more shares on July 30th, as set forth below;

(6)  On July 30th, several things occurred inconsistent with the government's theory:

   a.  Raj told Rengan at 3:50 p.m. on July 30th—10 minutes before the market closed and after Rengan had already placed his short trades—that Raj was short AKAM, but did not say why he was short or otherwise share any confidential information;

   b.  Rengan "covered" his shorts before the AKAM July 30th announcement at issue (meaning he acted inconsistent with knowing the alleged confidential tip); and

   c.  Rengan expressed disappointment at his failure to bet on AKAM in the right way (again, something that is inconsistent with knowing how AKAM would have turned out).

(7)  Rengan's trading in AKAM is inconsistent with Raj's trading in AKAM, and shows they were not on the same page.

To the extent the government relies on an "Instant Message" exchange and a wiretapped telephone call, those only show that Rengan "thanked" his brother—not that he thanked him for

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 3

anything having to do with AKAM. In fact, as shown below, the fairest reading of those communications is that Rengan thanked Raj for advice—not confidential information—regarding totally different stocks. Indeed, even if one stretched to conclude that the "thanks" concerned AKAM, there is no evidence that Rengan thanked his brother for providing *confidential* information about AKAM. The "thanks" could have been just for a comment like: "Hey Rengan, consider shorting AKAM."

Moreover, to the extent the government says that the fact Rengan shorted "slowly" and in pieces leading into the July 30, 2008 announcement is evidence he acted consistently with Danielle Chiesi's statements in a July 24, 2008 call, the government neglects to mention that Rengan also shorted slowly and in pieces leading into the *April* 30, 2008 announcement. In other words, the July 30, 2008 pattern is not evidence of Rengan "following" Ms. Chiesi, but is evidence that Rengan shorted AKAM in a pattern similar to Rengan's trading pattern in the previous quarter when there was no tip passed to Raj.

1. **Rengan had a history of trading AKAM prior to the quarterly announcement.** The government is attempting to admit evidence that Rengan shorted AKAM prior to AKAM's 2008 second quarter announcements, on July 30, 2008. But, Rengan had a history of trading AKAM prior to that date, and in particular trading AKAM in the days leading up to AKAM's quarterly announcements. These trades were all made for legitimate market based reasons, and there is no allegation to the contrary.

GX 301-E, in its entirety, is a Galleon document reflecting all of Galleon's trades in AKAM from January 3, 2005 through October 20, 2009.[2] Attached hereto as Exhibit A is an excerpt of GX 301-E, which shows the dates leading up to each of the quarterly announcements in 2008 up to and including the July 30, 2008 announcement. To view Rengan's trades, one need focus on the column marked "Mgr" (for "Manager"). Rengan's manager code for the relevant period was "BCR."

   a. **Fourth Quarter 2007**

The fourth quarter 2007 earnings announcement was made on February 6, 2008. We have highlighted in yellow Rengan's trades in the weeks leading into the February 6, 2008 announcement.

---

[2] This is a back-office record known as the Order Management System ("OMS"). The times indicated in the column entitled "Timestamp" are the times that the trades were entered into the OMS, not necessarily the time the trade was ordered or executed.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 4

The records show that Rengan did the following

| | |
|---|---|
| January 10: | Bought 100,000 shares; bought 10,000 shares[3] |
| January 10: | Bought 10,000 shares |
| January 16: | Sold 110,000 shares |
| January 22: | Bought 250,000 shares |
| January 23: | Sold 100,000 shares |
| January 24: | Sold 25,000 shares |
| January 25: | Sold 25,000 shares; bought 25,000 shares |
| January 30: | Bought 75,000 shares; sold 75,000 shares; bought 25,000 shares; bought 25,000 shares; sold 25,000 shares; sold 25,000 shares |
| February 5: | Bought 50,000 shares |
| February 6[4]: | Bought 125,000 shares; sold 75,000 shares |

### b.  First Quarter 2008

The 2008 first quarter announcements were made on April 30, 2008. We have highlighted in green Rengan's trading leading into the April 30, 2008 announcement.

The records show that Rengan did the following:

| | |
|---|---|
| April 7: | Shorts 20,000 shares |
| April 8: | Shorts 20,000 shares |
| April 17[5]: | Shorts 35,000 shares |

---

[3] Hereinafter, separate trades made on the same day will be separated (in chronological order) by a semi-colon.

[4] Although the timestamp indicates that this trade took place on February 7, the trade date confirms that the trade actually was executed on February 6, but the trade was not booked until the early hours of February 7.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 5

April 23:    Shorts 5,000 shares

April 30:    Covers 50,000 shares; covers 12,923 shares; covers 37,077 shares; buys 73,000 shares; buys 2,000 shares[6]

**2.    Rengan began his July 2008 short position before Chiesi passed any tip about AKAM to Raj.** Danielle Chiesi passed the alleged confidential tip about AKAM on July 24, 2008. The tip was that AKAM would issue negative guidance. (*See* Exhibit B (GX 521-T) at 1:36.) AKAM was set to provide its guidance during a 4:30 p.m. conference call on July 30th.

As GX 301-E shows, Rengan began placing his short position on AKAM on July 23, 2008—*before* the tip was passed. (*See* Ex. A (page 9, Rengan's trades highlighted in blue). Rengan continued to short AKAM leading up to the July 30, 2008 AKAM announcement.[7] Most importantly, and as discussed in further detail below, Rengan covered a sizeable amount of his short position *prior to* the announcement of the guidance, which occurred about 13 minutes into the 4:30 p.m. earnings call. In fact, he ordered a 100,000 share cover at 4:27 p.m., prior to the call's commencement.

The records show that Rengan did the following:

July 23:    Shorts 10,000 shares

July 25:    Shorts 50,000 shares; shorts 20,000 shares

July 28:    Shorts 100,000; covers 20,000 shares

July 29:    Shorts 50,000 shares

July 30:    Shorts 35,000 shares; shorts 25,000 shares; covers 60,000 shares; covers 15,000 shares; covers 25,000 shares

---

[5] Although the timestamp indicates that this trade took place on April 18, the trade date confirms that the trade actually was executed on April 17, but the trade was not booked until the early hours of April 18.

[6] Although the timestamp indicates that this trade took place on May 1, the trade date confirms that the trade actually was executed on April 30, but the trade was not booked until the early hours of May 1.

[7] At oral argument, I mistakenly stated that Rengan shorted 200,000 shares on July 23. I was confused with the approximate total amount that was shorted through and including July 30, 2008. I apologize for my error.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 6

  3. **Rengan shorted for legitimate reasons**. Beginning at least as early as July 3, 2008, Galleon analyst Jessica Kourakos, who covered AKAM, began reporting problems with AKAM. She sent her reports to the firm via email. Rengan received them all.

  **July 3, 2008**. Kourakos reported on this day that AKAM's "business was slowing substantially" and that the company is "potentially looking to layoff employees to reign in costs." "Revised my revenue and EBITDA estimates downward." She further reported that AKAM was likely to see negative ("-") movement in its stock price. ("Direction to likely estimate changes" "AKAM – [negative]"). (Exhibit C at Galleon SS 2047549.)

  **July 11, 2008**. Kourakos reported this day "more datapoints of softness in [AKAM's] business and lower traffic on their network. I believe EQIX [a competitor] is taking market share…." She further reported that AKAM is likely to see negative ("-") movement in its stock price. (Exhibit D at Galleon SS 2055602–03.)

  **July 18, 2008**. Kourakos reported on this day that AKAM was likely to see negative ("-") movement in its stock price. (Exhibit E at Galleon SS 2063718.) She also reported that EQIX (AKAM's competitor) is doing well, with "fundamentals strong and upside likely to qtr and to full year 08 guidance"). (*Id.* at Galleon SS 2063716.)

  **July 22, 2008**. Kourakos reported on this day that Comcast would offer a service that will compete with AKAM. (Exhibit F.)

  **July 25, 2008**. Kourakos reported on July 25th that she spoke to an AKAM competitor, and that AKAM "is seeing significant price erosion in longer term deals that are coming up for renewal. He estimates that deals that were 18 months old are renewing at price points that are 50% below what they originally were and that deals that were entered into 12 months ago are initiating at 30% below original pricing…. [B]elieves AKAM will have a very hard time increasing share of wallet with their value added services …. He also believes that company is tapped out as far as market share and that the[ir] ability to increase growth through adding new customers will be very difficult." (Exhibit G at Galleon SS 2072868.)

  **July 29, 2008**. Goldman Sachs issued a research report offering negative views on AKAM and recommending a "sell." (Exhibit H.) This was significant because it is rare that a sell-side firm such as Goldman would put a "sell" recommendation on a stock, potentially ruining any banking relationship with that company.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 7

  **4. Others at Galleon also shorted AKAM after July 23.** At least five other Galleon portfolio managers—other than Raj—also shorted Galleon in the same time period. Those shorts are highlighted in the Galleon trading records attached as Exhibit A in orange. (Ex. A at 9.) So far as we can tell, the following codes represent the following Galleon managers—none of whom were charged or named as a co-conspirator in trading in AKAM.

  BCG – Gary Rosenbach (President of the firm)
  BCC – Leon Shaulov (portfolio manager)
  EM2 – Joe Liu (portfolio manger)
  COP – Adam Smith (portfolio manager)
  TPS – Peter Swartz (head of research; portfolio manager)

  We further understand that Peter Swartz, who was the head of research at Galleon, distributed a weekly report listing his top long ideas (*i.e.*, stocks that he thought people should buy) and top short ideas (*i.e.*, stocks that he thought people should short). It does not appear that the government produced Mr. Swartz's weekly emails. We call upon the government to produce those communications pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and to the extent they show that Mr. Swartz also communicated any negative views about AKAM in the weeks leading up to July 30th announcement, to produce them to the Court.

  **5. Rengan covered on July 28th.**

  On July 28th, Rengan covered 20,000 shares, *i.e.*, he took a decent portion of his short bets off the table. (Ex. A at 9.) This trade was wholly at odds with someone who allegedly had information that AKAM's stock price would go down during the earnings call.

  **6. On July 30th, several things occurred that are inconsistent with the government's theory.**

    **a. Raj waited until 3:50 p.m. on July 30, 2008 to tell Rengan that he was short AKAM, and shared no confidential information at all.  Rengan reacted to something else that Raj said, and did not focus on Raj's AKAM comment at all.** Ten minutes before the market closed on July 30, 2008—leaving essentially no time for Rengan to react —and days after Rengan had already placed his shorts, Raj told Rengan that he was short AKAM, but did not say why or share any confidential information. The entire IM exchange is attached as Exhibit I. This is what Raj shared with Rengan about AKAM:

  **rajatgalleon** [Jul. 30, 3008 3:50:46 PM]:  am short akam and long driv for today

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 8


(Exhibit I (GX 1438).)  Raj shared no confidential information, and did not even hint he had any.  Rather, he merely shared with Rengan his position.  In the same message, Raj also shared his position in Digital River ("DRIV") (another stock, about which there has never been any accusation against Rengan).

      Importantly, Rengan responded to the bare message Raj sent him *not* by asking about AKAM, but by asking about DRIV—showing that Rengan's focus was not on what Raj said about AKAM but on what he said about DRIV.  In fact, Rengan did not react at all to the AKAM communication and instead—*within one minute*—asked another Galleon employee to investigate what "a 2% position in DRIV" would be.  (Exhibit J at Galleon SS 2716370 (3:51:25 PM).)[8]  This shows that Rengan had no appreciation for the import of what Raj had said about AKAM—which is completely inconsistent with the government's theory that Raj had passed him a confidential tip or that Rengan understood that Raj had inside information about AKAM.

      In fact, compare the complete lack of information about AKAM that Raj gave Rengan in the 3:50 p.m. instant message with the information that Raj gave others—none of whom were named as co-conspirators but all of whom Raj provided more information than he did to Rengan and did so earlier.  For example, on July 30th at 2:50 p.m., Raj told "altaircap1" not only that he was short AKAM, but also that AKAM was a "dirty pig" that was going to guide down—the exact inside information alleged—and where it would guide to.

| | |
|---|---|
| **altaircap1** [Jul. 30, 2008 2:08:01 PM]: | u playing anything tonight? |
| **altaircap1** [Jul. 30, 2008 2:10:47 PM]: | I remember akam was one of your names |
| **altaircap1** [Jul. 30, 2008 2:10:52 PM]: | and they report tonight |
| **rajatgalleon** [Jul. 30, 2008 2:13:22 PM]: | yes ..am short |
| **rajatgalleon** [Jul. 30, 2008 2:13:33 PM]: | its a dirty pig |
| **rajatgalleon** [Jul. 30, 2008 2:13:46 PM]: | guide down..goes to 25. |

(Exhibit K (GX 1437).)  Similarly, Raj told Leon Shaulov—one of the Galleon managers who also shorted AKAM—that "hopefully AKAM guides down like I think they will." (Exhibit L (GX 1440).)

---

[8] In its Rule 16 production, the government produced Rengan's instant messages in the format shown in Exhibit J, which does not allow for one to easily determine the date or time that any message was sent.  Regardless, we were able to figure out that the timestamps in Exhibit J are in "Unix epoch time," also known as Unix time.  Moreover, the timestamps are in milliseconds.  The Unix epoch time is the number of seconds that have elapsed since January 1, 1970, not counting leap seconds.  The following website will convert the timestamps to the actual date and time: http://www.epochconverter.com/.  Thus, if you type in the timestamp at the top of the first page of Exhibit J into the converter, you will see that this instant message conversation began at 3:36:39 p.m. on July 30, 2008.  To the extent we refer to the times in Exhibit J, we have converted them to regular time, as indicated in the parentheticals.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 9

Raj did not provide these details to Rengan; Raj did not provide to Rengan any information about whether AKAM would "guide down" or characterize it as a "dirty pig" or predict for him where the stock would land ("goes to 25").

        **b.**    **AKAM issued its 4:00 p.m. press release, and it contained good news.** At 4:00 p.m. on July 30th, AKAM issued a press release with its second quarter earnings information. (Exhibit M (GX 1401).) The press release noted that "[t]he number of customers under long-term services contracts at the end of the second quarter increased by 53 to a record 2,725." (*Id.* at 2.) This was good news for AKAM and indicated that its future might be rosy because more customers mean more revenue. The press release also indicated that AKAM would host a conference call at 4:30 p.m. (*Id.*). Meanwhile, Rengan was short 200,000 shares.

        **c.**    **Before the 4:30 p.m. conference call, Rengan investigated the positive AKAM news regarding new customers.** At 4:05 p.m., essentially immediately after AKAM issued its 4:00 p.m. press release announcing a record number of new customers, and with a 200,000 short position to worry about, Rengan asked a Galleon employee via Instant Message to "call a few analysts and find out how many customers were expected. just call one or two. on akam." (Ex. J at Galleon SS 2716371–72 (4:05:12 PM; 4:05:15 PM; 4:05:16 PM).). Rengan learned a few minutes later that an analyst at Raymond James ("RAJA") had stated that the "street [was] in the 50s, did 53 so in-line to better b/c there was a short call out there that it would decline from 41 in the previous qtr." (*Id.* at Galleon SS 2716372 (4:07:53 PM).) In other words, Rengan learned that AKAM's press release indicated that its increase in customers was better than expected.

        **d.**    **Rengan covered his shorts before the conference call.** The AKAM conference call was set to begin at 4:30 p.m. Unbeknownst to Rengan (but apparently known to Raj), during the call the company planned to issue negative guidance, which is akin to a statement that the future looks bleak. Any person who expected that, and who was sitting on a 200,000 short position, would be cheering.

Far from cheering, prior to the 4:30 p.m. call, Rengan began to cover his shorts. At 4:27:37 p.m., Rengan told a trader (a man named Ananth Muniyappa) via instant message, "start slowly cover 100K AKAM." (Exhibit N (GX 624) at 3.) He instructed Ananth to cover "under 29," which is a way of setting the price for the cover. (*Id.*) The lower the price, the slower the cover.

Prior to the call in which negative guidance would be given, Rengan instructed Ananth to increase the cover price. At 4:29:27 and 4:33:19 p.m., Rengan raised the cover to 29.15, stating,

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 10

"want to take my trade before the conference call… use 29.15 on AKAM." (*Id.*)  By raising the cover price, Rengan made it easier to take the short bet off the table, as he attempted to cover "before the conference call."

The fact that Rengan covered his shorts before the call and in such a large volume (100,000 shares of his total position)—and did so in a way that made it easy to accomplish taking the short bets off the table—is inconsistent with him knowing the confidential tip, namely, that during the 4:30 p.m. call AKAM would issue negative guidance.  Any person expecting negative guidance would do the opposite that Rengan did—either hold or increase his short position.

   e. **AKAM's 4:30 p.m. conference call, during which AKAM issued its negative guidance.**  AKAM hosted its conference call at 4:30 p.m.  According to a summary of the call published by Businessinider.com, AKAM issued its "negative guidance" at about 4:43 p.m.  The time published by Businessinsider.com is an approximation, as the summary is not a transcript.  (Exhibit O at 3.)

   f. **Rengan cancelled his cover as soon as AKAM issued its negative guidance.**  At 4:42:47 p.m.—essentially the same time as the Businessinsider.com report indicates the negative guidance was given—Rengan wrote to Ananth, "cancel akam cover."  (Ex. N (GX 624) at 3.)

Rengan clearly did so because the negative guidance took him by surprise—which would not have happened had he known about the confidential information.  Once he heard the negative guidance, he realized that he had made a mistake in covering and tried to correct that mistake.

Minutes later, Rengan lamented to Ananth the fact that he had covered: "god this is a disaster" and "this is terrible."  (*Id.* at 3 (4:47:37 PM and 4:53:01 PM).)  He also hoped that Ananth had not had time to cover the entirety of the 100K shares, asking Ananth, "how much did you cover."  (*Id.* at 3 (4:53:35 PM).)  The answer: all "100K."  (*Id.* at 4.)

   7. **Raj's trading patterns in AKAM are inconsistent with Rengan's—and inconsistent with the slow pattern urged by Danielle Chiesi.**  After Danielle Chiesi spoke with Raj, on July 25th he shorted 200,000 shares.  (Ex. A at 9 (highlighted in pink).)  He then shorted 250,000 shares on July 29th and 150,000 shares on July 30th.  (*Id.*)  Raj's total short position was a whopping 600,000 shares.

The government suggested at the May 30th oral argument that the "plan" was for Raj to "slowly" short AKAM.  But Raj did not "slowly" short AKAM, as the government urged during the pretrial conference, but put on massive bets.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 11

In addition, Raj's trades were a much higher proportion of the total trading volume than Rengan's. Per the Court's request, attached hereto as Exhibit P is AKAM's historical prices and trading volume from July 1 through August 29, 2008, which we obtained from Yahoo Finance. As the chart shows, from July 25–29, the trading volume for AKAM was between 4.4 million and 4.9 million shares per day. On July 30, the volume was much higher (most likely due to the earnings announcement), with approximately 12.6 million shares traded. Rengan's trades were never a significant portion of the total volume, but Raj's trades were a much higher percentage than what Rengan traded.

**8.      The "thank yous."** The government urges that Rengan "thanked" Raj for providing him information about AKAM. But Rengan never thanked Raj for AKAM. Here is what actually happened.

In an instant message exchange that began at 7:08:51 a.m. on July 30th, Rengan "thanked" Raj for his "incredible call" with regard to stock in a company that put out a "new product late." (Exhibit Q (GX 1434).) This cannot be AKAM, because AKAM does not sell products. Rather, as a reading of the instant message exchange quickly reveals, the "thanks" concerned Garmin ("GRMN"), the company that sells GPS devices. There is no allegation that Rengan participated in insider trading in GRMN.

The same instant message exchange continued later in the day with Rengan telling Raj, "thank you again" at 4:45:16 p.m. (*Id.*) This clearly did not refer to AKAM, because by this time Rengan was trying to cover his short bets on AKAM that turned into a "disaster" that was "terrible." (Ex. N at 3.)

In fact, when Rengan stated "thanks" just a minute later in the exchange, at 4:46:30 p.m., the "thanks" immediately followed a 4:46:20 p.m. reference to GRMN, not AKAM. (Ex. Q.) The government's claim that the "thanks" refers to AKAM is tagged to the lame analysis that instant messages sometimes do not respond to the immediate message sent prior to it, but ignores the overwhelming evidence that the entire "thank you" conversation started at 7 in the morning and clearly refers to GRMN. The government also ignores the twin facts that the "thanks" directly followed references to GRMN and that the sole reference to AKAM occurred a full minute before the "thanks"—an eternity in a quick moving IM conversation and during which GRMN was discussed.

The government also urges that Rengan thanked Raj for AKAM in a telephone call on July 30th. But it is far from clear that Rengan was referring to AKAM in that call. Here is what Rengan said:

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 12

> Dude, thank you so much, man.  I, this means the world to me, dude.  Being able to fight back.  This is, you're f****n a ….

(Exhibit R (GX 509-T) at 1:20-21.)  Rengan never mentioned AKAM.  And it is more than a stretch to believe that Rengan was thanking Raj in such effusive terms for anything having to do with AKAM, given that Rengan believed AKAM had been a "disaster" that was "terrible."  (Ex. N at 3.)

In fact, during this call, after Rengan thanked Raj, Raj *changed the subject* and asked Rengan about AKAM.  Raj then told Rengan *not* to cover AKAM—but Rengan already had begun to do so.  Rengan never informed his brother that he had covered, because Raj said Rengan should wait for "the weasels" to cover and Rengan did not want to admit that he had done what Raj said "a weasel" would do.  Raj then changed the subject again.  (Ex. R at 2:7-8.)

Far from being evidence that Rengan "thanked" Raj for a confidential tip, the call is evidence that the two were on anything but the same page when it came to AKAM.

### CONCLUSION

The evidence overwhelmingly establishes that Raj and Rengan were not in any sort of agreement—let alone an unlawful one—with regard to AKAM.  There is no close parallel between the crime charged and the acts shown.  There is no evidence that a tip was passed or that Rengan knew that Raj had confidential information.  Rengan shorted before the tip, and then covered at a time inconsistent with the confidential information.  While Raj celebrated AKAM, Rengan thought it was a "disaster" that was "terrible."  This evidence should not be admitted, as it has no probative value and it would just result in a massive waste of time.  *Nekritin*, 2011 WL 2462744, at *5 ("Evidence that a defendant charged with fraud engaged in other, non-fraudulent activity is generally irrelevant.").  It would also unfairly prejudice the defense because we would be put in the position of having to unwind and explain the government's flawed inferences by presenting the true facts of what happened.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 13

      Based on the foregoing, we respectfully request that the Court grant our motion to preclude admission of the proffered Akamai evidence.

                                            Respectfully submitted,

                                            Daniel M. Gitner

Enclosures

cc:      Christopher D. Frey (by email)
          Randall W. Jackson (by email)