LANKLER SIFFERT & WOHL LLP
ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, N. Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX   (212) 764-3701

June 2, 2014

**VIA FACSIMILE AND ECF**

Honorable Naomi Reice Buchwald
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    United States v. Rajarengan Rajaratnam, 13 Cr. 211 (NRB)

Dear Judge Buchwald:

    We represent Rengan Rajaratnam in the above matter and respectfully submit this letter in response to the government's June 2nd letter regarding Rengan's decision to return voluntarily from Brazil. The Court should swiftly reject the government's attempt to reargue the Court's decision permitting Rengan to introduce evidence of his decision as evidence of his "consciousness of innocence."

    After ignoring *Biaggi* in its brief in favor of cases from the Seventh Circuit, the government now raises a host of legally and factually irrelevant factors in an attempt to prevent the jury from hearing evidence that goes to the heart of Rengan's consciousness of innocence. The government fights hard to keep this evidence from the jury because it is powerful and probative proof of innocence.

    The testimony from multiple witnesses will be that immediately upon hearing he had been indicted, Rengan—then a legal permanent resident in Brazil—chose to return from Brazil to the United States to clear his name. He chose to do so knowing what awaited him here in the United States: his brother had been convicted and sentenced to 11 years' imprisonment, and the government had lined up the same evidence against him. The testimony will also be that Rengan understood he could have stayed in Brazil. Indeed, the evidence will show that Rengan understood he could have resisted any request that he return, but that he determined to come back to face the charges.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 2

      The government's recitation of Brazil's extradition treaty is irrelevant and misleading.

      First, the government points to no case interpreting the treaty to allow extradition for insider trading.

      Second, it is our understanding that "conspiracy" is not a crime in Brazil, and this Indictment—with the conspiracy count at its core—may have been a nullity there.

      Third, the government cites no insider trading case in which a legal permanent resident was extradited from Brazil.

      Fourth, the government forgets that Rengan was a legal permanent resident of Brazil and makes no attempt to explain the rights accorded to Rengan under Brazilian law. In fact, the government states simply that Brazilian citizens cannot be extradited, without mentioning that because Rengan had lived in Brazil for over one year and had attained legal permanent resident status, he could have married his Brazilian girlfriend and obtained immediate citizenship rights—and thus avoided extradition under any theory. Many would have sought to do just that, but Rengan chose to return to the United States immediately.

      Fifth, and perhaps most importantly, the government gets the standard wrong. What is at issue is not what the government says the treaty allows, but what was in Rengan's mind when he decided to return. The government's interpretation of Brazilian law that Rengan may have ultimately been extradited is beside the point. The evidence will show that at the time Rengan made his decision to return to the United States, Rengan believed he could have stayed in Brazil; in other words, Rengan believed he faced a simple choice: stay or return. Most people would have "jumped at" the choice to stay.

      This is consistent with *United States v. Biaggi*, which states that while "there may be reasons for rejecting the offer that are consistent with guilty knowledge . . . a jury is entitled to believe that most people would jump at the chance to obtain an assurance of immunity from prosecution and to infer from rejection of the offer that the accused lacks knowledge of the wrongdoing." 909 F.2d 662, 690 (2d Cir. 1990).

      Incredibly, the government states that Rengan communicated to the State Department a desire to avoid Brazilian detention. But Rengan never made any statements to the State Department; no such statements were ever produced, and there is no evidence that Rengan ever considered the possibility of Brazilian detention prior to his decision. The government also states that related to Rengan's desire to avoid Brazilian detention, Rengan coordinated with the State Department to return to the United States under FBI escort. First, and again, there is no

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 3

evidence that Rengan considered Brazilian detention in his decision to return. Second, the coordination with the State Department came *after* Rengan made his decision to voluntarily return, and was at the insistence of the government. In fact, the government insisted that Rengan return with an FBI agent, so of course there was coordination with the government—but the coordination says nothing about why Rengan returned and instead concerned the mechanics of returning and when to meet the FBI agent at the airport. In fact, as the government knows, as part of this "coordination" Rengan even agreed to pay for the FBI agent's ticket—hardly the act of someone who had doubts about returning.[1]

No less importantly, the government completely ignores part of this Court's reasoning for allowing the evidence and finding that this matter is "in the heartland of *Biaggi*":

> I do think that Mr. Gitner's point which I was aware of, that he came back so quickly, is also part of the mix of facts because he could have, theoretically, played it both ways -- stayed there just long enough to transfer some more assets, do something, position himself and then come back later. But I think the fact that he came back quickly is relevant and admissible.
>
> I think we are done.

(May 30 Transcript at 65:12–19.) Rengan learned of the Indictment on March 21st. He lived in Brazil, had a girlfriend, an apartment, a business, assets, friends, and colleagues. He is proficient in Portuguese. He had roots in the community. He could have "jumped at" the chance to stay and fight extradition, or "position" himself to come back later. There was no reason for him to return immediately, except one spurred by consciousness of innocence.

In fact, shortly after the Indictment was unsealed, because he had *already* determined to return to the United States to clear his name, Rengan drafted a power of attorney for a colleague—not to position himself to resist returning or to come back later, but to make it *easier* for him to return so that the colleague could unwind his Brazilian affairs for him. Rengan tried to return the day after he learned of the Indictment, Friday, March 22. Unfortunately, the government could not confirm that an agent was available until it was too late to make the flight.

Rengan's decision to return was so resolute that he went to the airport the next day, Saturday, March 23rd, when he could have waited until Sunday, March 24th. This is significant,

---

[1] At the last moment, the government determined that the FBI would pay for itself. Moreover, the "coordination" was between Rengan's then-lawyer and the government, not between "the defendant" and the government.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 4

because by arriving on in New York on Sunday morning, Rengan knew he would have to wait a night in the MDC, whereas had he left on Sunday, he not only would have had more time to "position himself" in Brazil, but also would not have had to spend the night in the MDC.

The government's claim that this evidence should be precluded because Rengan faced a "long extradition" process falls of its own weight. (Govt. Ltr. at 3.) First, there is no evidence that Rengan considered the "long process." Second, even if he had considered the factors argued by the government, his decision to return still demonstrates consciousness of innocence because the "long process"—which we understand could have lasted up to a *decade*—would have provided more time for Rengan to "position" himself favorably. Rengan could have done any number of things to "position himself" so that he would not have to return. Rengan also could have "positioned himself" so that the extradition process would have lasted longer. He could have transferred assets, tried to marry, fought extradition, or any number of things to "position himself" to escape extradition and/or return later. He did none of that. The government's suggestion that Rengan would have waited out that process in a Brazilian jail is specious at best. In support of its claim, the government—even with access to the State Department files—can only cite a newspaper article about a citizen from *Turks and Caicos* awaiting extradition to *Great Britain* regarding a real estate fraud. That has no bearing on Rengan—an American Citizen with Brazilian legal permanent resident status charged with conspiracy, a non-crime in Brazil.

At the end of the day, the government can only claim that Rengan "*may have* reasonably believed the safest course was to return voluntarily and litigate charges against him while bailed." But there is no evidence to support what the government thinks "*may have*" happened, nor does what "may have" happened strip the probative force from what actually happened. *Biaggi*, 909 F.2d at 690–91.

Similarly, the government's suggestion that Rengan "may have" returned because he wanted to be able to visit the United States in the future is nonsensical. This argument is just another way saying that Rengan returned because he does not want to be a fugitive. But an innocent person does not want to be a fugitive. The whole point is that Rengan immediately returned because his consciousness of innocence compelled him to return to fight the charges.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 2, 2014
Page 5

      The government's attempt to re-argue this Court's decision to allow this classic consciousness of innocence evidence should be rejected.

Respectfully submitted,

Daniel M. Gitner

cc:    Christopher D. Frey (by email)
        Randall W. Jackson (by email)