LANKLER SIFFERT & WOHL LLP

ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, N. Y. 10110-3398
WWW.LSWLAW.COM

TELEPHONE (212) 921-8399
TELEFAX      (212) 764-3701

June 12, 2014

**VIA HAND DELIVERY**

Honorable Naomi Reice Buchwald
United States District Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re:     **United States v. Rajarengan Rajaratnam, 13 Cr. 211 (NRB)**

Dear Judge Buchwald:

We represent Rengan Rajaratnam in the above-referenced action.  We respectfully submit this letter, together with accompanying exhibits, to preclude the government from offering newly-disclosed statements allegedly made by Rengan to "agents involved in [his] transport and arrest" after Rengan had invoked his constitutional rights and while he was in custody.  (*See* Letter from C. Frey and R. Jackson to D. Gitner date June 9, 2014, attached as Exhibit A.)

We regret having to make this application so close to trial, particularly given the careful motion schedule the Court crafted.  But the government had previously informed the defense and the Court that Rengan made no statements to the government in connection with his arrest.  In pretrial discovery the government provided us with an FBI 302 making clear that Rengan made no statements (*See* March 26, 2013 FBI 302, attached as Exhibit B), and in a brief filed with this Court on May 9, 2014, the government stated that Rengan "made no relevant statements to law enforcement officials at the time of his arrest."  (Government Motion *in Limine* (ECF No. 74) at 13.)

It was only three days ago, at 9:20 p.m. on June 9th that the government—for the first time—disclosed these alleged statements to us in a letter.  (*See* Ex. A.)  We asked the government by email dated June 10th if it intended to offer these statements at trial.  The government responded that it intends  to offer "some, or all" of these statements during trial, and that it may reference them in its opening statement as well, even though it has neither sought nor obtained the Court's  permission to do so.

As an initial matter, we do not accept the government's description of the statements allegedly made by Rengan.  In any event, assuming for purposes of this application that some

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 2

statements were made, those statements were elicited in direct violation of Rengan's Fifth and Sixth Amendment rights and should therefore be suppressed.  As set forth in detail below, because the government was aware that Rengan was represented by counsel and had invoked his constitutional rights to remain silent and to have counsel present (*see* Consent to Voluntary Return dated March 22, 2013, attached as Exhibit C), these statements are inadmissible in the government's case-in-chief.

The government should be precluded from offering these alleged statements for other significant reasons as well.  First, the government failed to provide notice of these statements when it provided Rule 16 discovery.  Second, the government's deadline for producing its witness list and its 3500 material has passed, and it would be unfair to permit the government to make such a significant addition at this late hour.  Third, it is fundamentally unfair to the defense to receive such notice on the virtual eve of trial, after all the pretrial motions have been made and decided, and after a trial strategy has been carefully constructed in reliance upon the government's repeated representations that no statements in connection with the arrest were made.  Fourth, the alleged statements should be excluded because all the circumstances under which they suddenly appeared make the statements inherently unreliable.  Finally, the content and context of the alleged statements recently disclosed by the government are so vague and ambiguous that the alleged statements' probative value is minimal, while the risk of prejudice to the defense is substantial, making them inadmissible under Rule 403.

For all of these reasons, the government should be precluded from mentioning these alleged statements in its opening or from eliciting testimony concerning them.  If the Court is not convinced, we respectfully request a hearing prior to trial that would address all of the issues raised herein.[1]

## BACKGROUND

The Indictment was unsealed on March 21, 2013.  That same day, the government advised the Court that Rengan was represented by counsel and that Rengan had not yet been arrested.  (*See* Exhibit D.)  Also on that day (and again on Friday, March 22), Rengan's counsel communicated with the government concerning the logistics of Rengan's return to the United States.

The government insisted that Rengan be escorted by a U.S. government official during

---

[1] Given the late notice of the government's intentions with respect to the alleged statements, we endeavored to submit this application as soon as possible.  The attached exhibits set forth facts and circumstances that support this application.  If necessary, however, the defense would be prepared to have an affidavit filed.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 3

his return flight from Brazil.  After waiting most of the day on Friday, March 22, for confirmation from his counsel as to when he should leave for the airport, Rengan left for the airport to try to make an 8:55 p.m. flight to New York.  Because of the traffic, Rengan was unable to get to the airport in time.  However, anticipating that he would make the flight, he consented to a document concerning the conditions of his voluntary return.  (*See* Ex. C.)

> That document, in which Rengan specifically invoked his constitutional rights under the Fifth and Sixth Amendments, states in pertinent part:

>> I am invoking my rights under the Fifth Amendment not to speak to the FBI agent accompanying me (and any other law enforcement agent) about the facts of my case.  However, the FBI agent and other law enforcement agents may speak to me as needed about the logistics of travel to facilitate my return to the United States. I hereby waive the presence of counsel during my conversations with the FBI or other law enforcement agencies concerning my travel plans and other incidental conversation that is not related to my case.  This waiver shall remain in effect until such time as I or my counsel advise the Government in writing of the defendant's intention to rescind his waiver.

(*Id.* at 1-2.)[2]

> On Saturday, March 23, 2013, Rengan returned to the airport in Rio de Janeiro with friends.  He met a person we understand to be FBI Legal Attaché Richard Cavalieros.  Upon meeting Mr. Cavalieros at the airport, Mr. Cavalieros questioned Rengan and his friends—asking Rengan's friends to give him their names and contact information.  Rengan then boarded a plane with Mr. Cavalieros, and flew to John F. Kennedy Airport in New York in Mr. Cavalieros' custody.  Mr. Cavalieros made sure to obtain a seat next to Rengan.  Mr. Cavalieros continued to question Rengan during the flight to New York.

> Mr. Cavalieros knew that Rengan had been indicted and had a lawyer.  He also knew that Rengan had invoked his constitutional rights.  (*See* Ex. B (March 26, 2013 FBI 302 filed by Mr. Cavalieros, among others) at 1 ("Prior to being arrested, Rengan's attorney invoked the Fifth Amendment on Rengan's behalf.").)

> After Rengan returned to the United States, the government voluntarily produced Rule 16

---

[2] Attached is the form approved by Rengan.  Because Rengan received this document while attempting to return, he was unable to print and sign the document.  He consented to the form by email to the government through his then-counsel.  This sequence of events is reflected in the FBI 302, which states that prior to Rengan's arrest, Rengan's attorney "invoked the Fifth Amendment on Rengan's behalf."  (Ex. C at 1.)

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 4

materials.  At no time prior to this past Monday, June 9th, did the government ever produce any document stating or suggesting that Rengan had made any statements to law enforcement that related to his case.  To the contrary, on July 26, 2013, the government produced the March 26, 2013 FBI 302 stating that "[c]onversation with Rengan was limited to obtaining pedigree information from [him] in order to fill out the United States Marshal Service (USMS) prisoner intake forms."  (Ex. B at 1.)

On May 9, 2014, the government moved to preclude the admission of Rengan's return from Brazil as evidence of his consciousness of innocence.  (ECF No. 74.)  The government's brief identified no statements Rengan made.  Reiterating its earlier position, the government specifically stated in its motion to preclude the admission of evidence concerning Rengan's return from Brazil that Rengan "made no relevant statements to law enforcement officials at the time of his arrest." (*Id.* at 13.)

Nor did the government indicate that Rengan made any statements during the oral argument on the motion on May 30, 2014.  Rather, the government represented that if the Court admitted the "consciousness of innocence" evidence, the government would submit "*to the Court*" some additional proffer of Rengan's "interactions with the authorities leading up to his extradition . . . ." (May 30 Tr. at 65:23–66:3 (emphasis added).)

On June 2, 2014, the government filed a letter asking the Court to reconsider the ruling allowing the defense to introduce evidence of Rengan's return from Brazil.  (June 2, 2014 Letter, attached as Exhibit E.)  That letter stated, for the first time, that "[t]he defendant … communicated with the *State Department* about his desire to avoid Brazilian detention and relatedly coordinated with both the State Department and the FBI about plans to return under FBI escort to the United States." (*Id.* at 2 (emphasis added).)  The letter did not particularize any such statements or state that Rengan had made statements to the FBI about any desire to avoid Brazilian detention.  On June 6, 2014, the Court denied the government's motion to reconsider. (ECF No. 90.)

At approximately 9:20 p.m. on June 9, 2014, the government transmitted a letter not to the Court, but to the defense, claiming for the first time that Rengan made certain statements to agents involved in his transport and arrest.  (Ex. A at 1.)  Presumably, if the alleged statements were made spontaneously and not in response to questioning by the FBI, the government's letter would so state.  It does not; although the government's June 9th letter is coy, the implication of the letter is that any alleged statements were not spontaneous but the result of questioning or conversation by the agent.

In arguably the most important disclosure contained in the government's June 9 letter—

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 5

the first bullet point—the government does not disclose any specific statement allegedly made by Rengan. Instead, it provides a vague, ambiguous and conclusory disclosure claiming that Rengan made statements "*indicating that* his voluntary return was *connected to* his desire to avoid detention in a Brazilian facility." (Ex. A (emphasis added).) The government concludes its letter by stating that it has provided the "sum and substance" of Rengan's relevant communications. The government's letter attaches no notes of the alleged conversations, nor any FBI 302. At best, it appears that the government's letter constitutes a belated attempt to reconstruct the defendant's alleged statements, more than a year after the fact, and in response to this Court's denial of the government's initial motion and its motion to reconsider.

After we received the government's June 9th letter, we asked the government about its intentions with respect to the alleged statements. The government indicated that it intended to offer these statements in its case-in-chief, and might open on them as well, despite: (a) the fact that Rengan was represented by counsel and had invoked his right to remain silent before these statements were allegedly made in a custodial setting; (b) the fact that the government had twice represented to the defense and the Court that the defendant made no statements other than statements related to routine processing by the U.S. Marshals; (c) the fact that the government voluntarily produced Rule 16 discovery but made no disclosure of these statements; (d) the fact that the defense was denied a full and fair opportunity to brief their admissibility when filing its pretrial motions; (e) the fact that the government represented that it would submit any proffered evidence to the Court; (f) the fact that the Court has not yet had any opportunity to rule on their admissibility; (g) the fact that the specifics of the alleged statements—as opposed to a vague and ambiguous summary—have never been provided; and (h) the fact that these alleged statements are being disclosed on the virtual eve of trial, well after the government was required to produce its witness list and its 3500 material, and well after the defense had formulated—and indeed, disclosed—its trial strategy with respect to the defendant's return from Brazil.

We drafted this letter as quickly as possible to inform the Court of this significant development and to move to suppress the statements. However, given the short time available, we have not had the opportunity to fully brief the issue.

## DISCUSSION

I.    **Rengan's Alleged Statements Were Obtained in Violation of His Fifth Amendment Right to Remain Silent, and Must Therefore Be Suppressed**

    A.    **Applicable Law**

The Fifth Amendment provides that no person "shall be compelled in any criminal case

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 6

to be a witness against himself."  U.S. Const. amend. V.  "The privilege permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings."  *United States v. Ramos,* 685 F.3d 120, 126 (2d Cir. 2012).  "It also allows a person to express his desire to remain silent, or to remain silent until he has the assistance of an attorney."  *United States v. Okatan*, 728 F.3d 111, 116 (2d Cir. 2013).

In order to safeguard this right against compulsory self-incrimination, and presuming that custodial interrogation is "inherently coercive," *New York v. Quarles*, 467 U.S. 649, 654 (1984), the Supreme Court crafted the prophylactic rule of *Miranda v. Arizona*, 384 U.S. 436 (1966), dealing with police interrogation of a person in custody:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

*Miranda*, 384 U.S. at 444–45.  Once an individual in custody has invoked the right to remain silent, "the police must stop questioning and 'scrupulously honor' that decision."  *United States v. Guzman*, 724 F. Supp. 2d 434, 446 (S.D.N.Y. 2010).

The Supreme Court has defined the term "interrogation" for purposes of *Miranda* to include both "express questioning" and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 292, 301 (1980).  "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."  *Id.*

Whether an individual is in custody for purposes of *Miranda* is "based on whether a reasonable person [in the suspect's position] would have thought he was free to leave the police encounter at issue.  If the answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice of rights."  *United States v. Bershchansky*, 958 F. Supp. 2d 354, 373 (E.D.N.Y. 2013) (internal quotation marks omitted).  "If a reasonable person would not have thought himself [or herself] free to leave, the court must also ask whether 'a reasonable

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 7

person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'"  *Id.* (quoting *United States v. Newton*, 369 F.3d 659, 673 (2d Cir. 2004)).

### B.     The Government Violated Rengan's Fifth Amendment Rights

Any questions posed by the FBI agent who transported or processed Rengan, or any conversation initiated by the agent that was designed to elicit incriminating information from Rengan, violated Rengan's Fifth Amendment rights.  Accordingly, Rengan's alleged statements should be suppressed.

As an initial matter, there can be no question that Rengan was in custody during his transport from Brazil.  The government insisted that Rengan return to the United States in the custody of an FBI agent, presumably to ensure that Rengan did not change his mind about returning.  The government dictated the date Rengan left Brazil.  The FBI agent made sure to obtain a seat next to Rengan on the plane.  Rengan knew that he would not be free to leave the airport in New York on his own steam once the plane landed in the United States—indeed an arrest warrant had already been issued (*See* Ex. C, Ex. D.)  Most obviously, once Rengan met the FBI agent in Brazil, Rengan was not "free to leave."  He effectively had been detained and only awaited formal processing once the plane landed in New York.

As the government has acknowledged, Rengan invoked his Fifth Amendment rights to remain silent and to be represented by counsel prior to meeting the FBI agent at the airport.  (*See* Ex. C at 1-2; Ex. B at 1.)  He had already been indicted, and in anticipation of being escorted to the United States by an FBI agent, he had already invoked the privilege in writing.  Rengan asserted the privilege when he told the government that he was "invoking [his] rights under the Fifth Amendment not to speak to the FBI agent accompanying [him] (and any other law enforcement agent) about the facts of [his] case."  (Ex. C at 1.)  Rengan further invoked his right to counsel, which he waived for a specific, limited purpose:  he waived his right to have his counsel present for the limited purpose of "conversations . . . concerning [his] travel plans and other incidental conversation that is *not related* to [his] case."  (*Id.* at 1-2 (emphasis added).)  By its express terms, this critical limitation in the agreement remained in effect until such time as Rengan or his attorney rescinded it in writing.  (*See* Ex. C at 2.)

Rengan "was entitled to invoke the privilege," *Okatan*, 728 F.3d at 118, when he did because "the right to remain silent exists independently of the fact of arrest," *United States v. Nunez–Rios*, 622 F.2d 1093, 1100 (2d Cir. 1980).  "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous

Lankler Siffert & Wohl llp

Hon. Naomi Reice Buchwald
June 12, 2014
Page 8

because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87 (1951).

Rengan's written invocation was sufficient to put the agent, Mr. Cavalieros, "on notice [that Rengan] intend[ed] to rely on the privilege." *Salinas v. Texas*, 133 S. Ct. 2174, 2179 (2013). Thus, any and all questioning of Rengan by Mr. Cavalieros (except for the extremely limited purpose of facilitating his travel and matters incident to facilitating his travel) and any conversation intended to elicit information from Rengan was strictly prohibited.

Here, notwithstanding Rengan's clear invocation of his right to remain silent, as soon as the agent met him at the airport in Brazil the agent questioned Rengan and his friends. The agent asked for the identities of Rengan's friends and asked how they knew each other. The agent also ensured that he sat next to Rengan on the flight. After being seated on the plane, the agent continued to ask Rengan, among other things, why Rengan was in Brazil, what he was doing in Brazil, and the identities of the people who accompanied Rengan to the airport. This was neither idle chit chat nor conversation incidental to Rengan's "travel plans." Rather, the agent had an improper exchange with Rengan that was directed at eliciting from Rengan information that bore an obvious relationship to the case, as plainly illustrated by the motions filed by both parties relating to Rengan's return from Brazil and by the fact that the government now attempts to admit that very information.

Although the government has not specifically identified Mr. Cavalieros as the agent to whom the alleged statements were supposedly made, Mr. Cavalieros should have known, and as a trained FBI agent would have known, that any questions to Rengan about why Rengan was in Brazil and why he was returning to the United States were reasonably likely to elicit information relevant to his case. For all Mr. Cavalieros knew, Rengan might have responded—although he did not, because it was not true—that he had fled to Brazil to escape the U.S. authorities.

To the extent the agent's questions to and/or conversations with Rengan led to the statements the government now alleges Rengan made—*i.e.*, statements "indicating that" that Rengan's return to the United States was "connected to" his desire to avoid detention in a Brazilian facility—those alleged responses are in fact "incriminating" for purposes of *Innis* and *Miranda*. That Rengan may not have viewed the responses as inculpatory at the time is irrelevant. *See Innis*, 446 U.S. at 301 n.5 ("By 'incriminating response' we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda*: . . . 'no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory.'").

Because the FBI agent expressly questioned Rengan despite his clear invocation of his

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 9


Fifth Amendment rights, his alleged responses must be suppressed.

## II.     Rengan's Alleged Statements Were Obtained in Violation of His Sixth Amendment Right to Counsel

Rengan's Sixth Amendment rights attached the moment he was indicted.  *See United States v. Gouveia*, 467 U.S. 180, 189 (1984).  "Once the right attaches, 'the Sixth Amendment renders inadmissible in the prosecution's case-in-chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.'"  *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990)); *see also United States v. Yousef*, 327 F.3d 56, 140 (2d Cir. 2003).

The Sixth Amendment right applies not only to interrogation, but also to conversation designed to elicit incriminating information.  *See Maine v. Moulton*, 474 U.S. 159, 176 (1985) (ruling that the state has an "affirmative obligation not to act in a manner that circumvents the protections accorded to the accused by invoking [the Sixth Amendment] right.").  *Cf. United States v. Henry*, 447 U.S. 264 (1980) (suppressing statements made to jailhouse informant who had not directly questioned defendant but had "stimulated" conversations in order to "elicit" incriminating information).

Not only was Rengan indicted before the alleged statements were made, the government was well aware that Rengan was represented by counsel at the time.  As discussed above, on March 21, 2013, the date the Indictment was unsealed, the government wrote the Court to notify Your Honor about the Indictment and identified Rengan's then-counsel.  (*See* Ex. D.)  Moreover, Rengan unequivocally invoked his right to counsel through his consent to voluntary return.  (*See* Ex. C at 1-2.)  Rengan executed an extremely limited waiver of his right to have counsel present during conversations with the FBI agent accompanying him from Brazil; that written waiver covered *only* his "travel plans and incidental conversation that is not related to [his] case."  (*Id.* at 1-2.)

As further discussed above, any questioning or conversation that elicited the recently disclosed statements did not concern Rengan's "travel plans" and was not incidental to his travel plans.  Because the questioning and/or conversation plainly exceeded the scope of the waiver, it was strictly forbidden.  Any statements made by Rengan in response to questions posed by the agent or conversation initiated by the agent were elicited in violation of Rengan's Sixth Amendment rights and must therefore be suppressed.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 10


III.     **The Government Should Be Precluded from Offering the Statements Allegedly Made By Rengan For Several Additional Reasons**

In addition to the government's violation of Rengan's constitutional rights, there are other compelling reasons for the Court to preclude the government from offering the statements allegedly made by Rengan.

First, although Rengan was indicted more than a year ago, the government failed to provide any notice of these statements to the defense when it provided Rule 16 materials—which the Court ordered produced by November 8—and indeed failed to provide any notice of the statements until a week before trial.  Having been ordered to produce discovery by the Court, the government was obligated to search its files, to interview its agents, and to collect and disclose all relevant custodial statements.  The experienced prosecutors handling this case undoubtedly know that custodial statements play a critical role in the formulation of pretrial motions, as well as trial strategy.  Presumably, they made some inquiry before notifying the defense, and later notifying the Court, that no relevant custodial statements existed.  It is difficult to understand, then, why these alleged statements did not surface until now, especially given that the circumstances surrounding Rengan's return from Brazil formed the basis of the government's own motion.

It appears from comments made by the prosecutors during the recent oral argument on the motions that prior to that date, that they had some awareness that statements were made by Rengan concerning the reasons for his return to the United States.  The prosecutor stated during the oral argument that if the defense were permitted to offer Rengan's return from Brazil as evidence of consciousness of innocence, the government would

> submit *to the Court* some additional proffer of what [it anticipated]—some of the types of topics that [it anticipated it] would put in, in response to [the consciousness of innocence evidence] . . . including information about the defendant's interactions with the authorities leading up to his extradition that [it thinks] are probative of his not having a consciousness of innocence or that being the only explanation for his return.

(May 30 Tr. at 65:23–66:5 (emphasis added).)  But the prosecutors did not submit the alleged statements to the Court in its June 2nd letter and only produced the alleged statements to the defense after 9 pm on June 9th, and then unilaterally stated that it would offer them and might open upon them.  The last-minute disclosure of a defendant's custodial statements—statements so significant to the government's case that it may seek to mention them in its opening statement—should not be countenanced.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 11

In any event, such late disclosure obviously prejudices the defense.  As the Court is aware, and as the government is aware as well, the formulation of a defense to a federal criminal case does not take place in the week before trial commences.  The government's deadline to identify its witnesses and provide 3500 material passed over five weeks ago.  Those deadlines were set by the Court precisely because of reasonable concerns that late disclosure of significant materials can fundamentally prejudice a defendant's right to a fair trial.  At this stage of the proceedings, the defense should be in the position of fine-tuning its presentation; it should not be forced to stop its trial preparation, turn its attention to preparing a motion that should have been made and would have been made months ago but for the government's failure to identify and disclose critical information, and possibly be forced to significantly alter its trial strategy as the clock runs down.  The government's last-minute disclosure of these alleged custodial statements is fundamentally unfair.

The Court should also consider precluding the government's use of these belatedly-identified statements based on the circumstances surrounding their disclosure.  It is indisputable that the statements appear for the first time more than a year after they were allegedly made, and only after the government's motions have been denied.  It is also indisputable that the government has twice represented that no statements were made.  There apparently is no FBI 302 that memorializes the alleged statements—suggesting that the agent would be claiming to testify from memory about a conversation well over a year old.  To the contrary, the FBI 302, authored in part by Mr. Cavalieros, identifies no such alleged statements.  Taken together, these circumstances render them patently unworthy of the jury's credence.

Finally, even assuming for the sake of argument that Rengan made some statement or statements to the FBI agent who transported him from Brazil, an examination of the government's letter disclosing the alleged statements reveals that the key statement is so vague and conclusory that it lacks sufficient probative value under Rule 403 to serve the purpose for which the government apparently seeks to offer it.  The government neglects to inform the defense to whom or exactly when it alleges the statements were made.  The government apparently wants to argue, in essence, that the defendant said he was returning to the United States *because* he did not wish to be confined in the harsh circumstances of a Brazilian facility, and that his return was therefore not a reflection of his consciousness of innocence.  But it is impossible to determine from the notice provided by the government if the defendant said any such thing.  According to the government's letter, "during the course of the defendant's transport and/or arrest processing, the defendant made statements *indicating that* his voluntary return *was connected to* his desire to avoid detention in a Brazilian facility."  (*See* Ex. A (emphasis added).)  The specific words supposedly spoken by the defendant do not appear.  The words "indicating that" are clearly the words of an agent or the government, not of the defendant, and without

Lankler Siffert & Wohl llp

Hon. Naomi Reice Buchwald
June 12, 2014
Page 12

notice of the words that—according to the agent—provided "an indication," it is impossible for the defense to defend against the inference the government seeks to draw.  Even worse, the alleged statement merely says that the desire to avoid detention in Brazil was "connected to" Rengan's return.  Without the specific words spoken by Rengan, there is simply no way effectively to cross-examine the agent on whether this supposed "connection" was drawn by Rengan or by the agent.

In short, the gist of the government's late disclosure is that Rengan said something that made the agent think that Rengan did not wish to be detained in Brazil, and that in the agent's mind, that concern was somehow connected to Rengan's voluntary return.  Because the specific words are missing, and because these alleged statements have apparently been reconstructed more than a year after the fact, there is no way to know what was actually said by Rengan, or the context in which it was said.  For all we know from the government's letter, the agent could have commented upon harsh prison conditions in Brazil, and Rengan could have responded that he was glad he was returning home voluntarily and would not have to face those conditions, *even if that thought had played no role in his decision voluntarily to return*.  The agent's conclusory statement is an insufficient basis upon which to ask the jury to attribute the specific motives that the government seeks to attribute to Rengan.  The minimal probative value of this vague and conclusory statement is substantially outweighed by the risk that the jury will simply speculate as to what Rengan actually said to the agent.  Therefore, the statement should be precluded.[3]

## CONCLUSION

The alleged statements were obtained in violation of Rengan's Fifth and Sixth Amendment rights.  In addition, the government's last-minute disclosure of the statements unfairly prejudices the defense.  Moreover, given the context of the statements' disclosure and their contents, the statements are unreliable and lack sufficient probative value to outweigh the danger of unfair prejudice.  The alleged statements should be suppressed, and the government should be precluded from opening on them or introducing them into evidence.

---

[3] No less importantly, the alleged statements are irrelevant.  They were made well after Rengan decided to return.

LANKLER SIFFERT & WOHL LLP

Hon. Naomi Reice Buchwald
June 12, 2014
Page 13


If the Court is not prepared to preclude the evidence at this time, we respectfully request a hearing regarding these issues.

Respectfully submitted,

Daniel M. Gitner


Enclosures

Cc:   AUSA Christopher D. Frey (by email)
        AUSA Randall W. Jackson (by email)

**EXHIBIT A**

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New                                York, New York 10007*

June 9, 2014

**BY ELECTRONIC COMMUNICATION**

Daniel M. Gitner
Lankler Siffert & Wohl LLP
500 Fifth Ave, 34th Floor
New York, NY 10110
(212) 921-8399

 Re:   <u>United States v. Rajarengan Rajaratnam, a/k/a "Rengan Rajaratnam,"</u>
 13            Cr. 211 (NRB)

Dear Mr. Gitner:

 In connection with the Court's ruling, on June 6, 2014, permitting your intended evidence related to the defendant's return from Brazil, the Government has had additional conversations with agents involved in the transport and arrest of the defendant. Please be advised of the following:

- During the course of the defendant's transport and/or arrest processing, the defendant made statements to FBI agents indicating that his voluntary return was connected to his desire to avoid detention in a Brazilian facility;

- The defendant further stated that he had seen at least one film that had informed his desire to avoid Brazilian detention, and specifically identified the Bangu Penitentiary Complex in Brazil as a facility that he had learned was particularly harsh, and noted that he had observed a movie that depicted harsh conditions in Bangu called "Elite Squad";

- The defendant stated that he was aware of a friend who had been detained in a foreign jail who, during his detention, had taken such steps as smearing feces on himself in order to avoid assault in the foreign jail.

Daniel Gitner, Esq.
June 9, 2014
Page 2


       The statements described above constitute the sum and substance of the defendant's relevant communications during his transport and/or arrest of which the Government is currently aware. Thank you.


                         Very truly yours,

                         PREET BHARARA
                         United States Attorney


         By:   _____/s/_____
               Christopher D. Frey
               Randall W. Jackson
               Assistant United States Attorneys
               (212) 637-2270/1029

**EXHIBIT B**

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



Date of entry _____03/26/2013_____

RAJARENGAN RAJARATNAM (RENGAN), date of birth ██████ social security account number ██████, home address ██████, ██████, was arrested at John F. Kennedy International Airport, Terminal 8, Queens, New York, as RENGAN exited American Airlines Flight 974 on 03/24/2013 at approximately 6:30AM pursuant to an authorized arrest warrant issued out of the Southern District of New York (SDNY) on 03/20/2013.

The following Federal Bureau of Investigation (FBI) personnel executed the arrest:

SA Samuel Moon

SA Matthew T. Callahan

SA Eric R. Burns

Legal Attache (LEGAT) Richard E. Cavalieros

RENGAN was arrested without incident. Subsequent to being taken into custody, RENGAN was brought to the office of Customs and Border Patrol (CBP) for secondary screening where RENGAN was officially entered into the United States. RENGAN's wallet, watch, belt, cell phone, and US Passport were received from RENGAN. An FD-597, Receipt for Received Property, was executed for the aforementioned items, and a copy of the receipt was given to RENGAN. SA Moon held on to this Receipt for Received Property for RENGAN and advised RENGAN that SA Moon would give RENGAN's attorney the receipt.

RENGAN was then transported to FBI NYO, 26 Federal Plaza, New York, New York for processing. During the transport, RENGAN was advised of his Miranda rights. Prior to being arrested, RENGAN's attorney invoked the Fifth Amendment on RENGAN's behalf. Conversation with RENGAN was limited to obtaining pedigree information from RENGAN in order to fill out the United States Marshal Service (USMS) prisoner intake forms.

Upon arrival to the FBI office in Manhattan, RENGAN was processed, fingerprinted, and photographed. Furthermore, RENGAN was allowed to

---

Investigation on  03/24/2013  at  Queens, New York, United States (In Person)

File # ██████ Date drafted  03/26/2013

by  Samuel Moon, CALLAHAN MATTHEW THOMAS, SA Eric Robert Burns, CAVALIEROS RICHARD E

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  Arrest of Rengan Rajaratnam _____ , On  03/24/2013 , Page  2 of 2

privately speak to his attorney, DAVID TOBIN, over the phone located in the
23rd floor interview room of 26 Federal Plaza, New York, New York.

RENGAN was then transported to Metropolitan Detention Center (MDC),
address 80 29th Street, Brooklyn, New York, 11232, where he was housed
until Monday, 03/25/2013, morning.

On Monday 03/25/2013, RENGAN was picked up from MDC, brought to SDNY,
and then processed by the US Marshalls. RENGAN was brought before U.S.
District Judge Naomi Reice Buchwald for his Arraignment. RENGAN pleaded not
guilty and was released on bail and his passport was turned over to
Pretrial Services. Pretrial Services provided SA Moon with a receipt for
the passport. SA Moon released the following items to RENGAN's attorney,
VINOO VARGHESE (VINOO): wallet, watch, belt, and, cell phone. An FD-597
Receipt for Released Property was executed for the aforementioned items and
a copy of the receipt was given to VINOO. The FD-597, Receipt for Received
Property, previously signed by RENGAN was also given to VINOO.

The aforementioned documents and forms will be maintained in a 1A
envelope and filed accordingly.

GOV-00000060

# EXHIBIT C

## CONSENT TO VOLUNTARY RETURN

*Rajaratnam* (W)

I, Rajarengan ~~Rajanatham~~, a U.S. citizen, born on September 20, 1970, having been

fully informed by my attorney, David C. Tobin and/or Vinoo Varghese, of my rights under U.S.

and international law, do hereby express my desire to willingly, voluntarily and knowingly

return to the United States of America to face the criminal charges contained in the indictment

returned against me on March 20, 2013, in the United States District Court for the Southern

District of New York: *United States* v. *Rajarengan Rajaratnam*, 13 Cr. 211.  I am aware that

the above-referenced indictment charges me with one count of conspiracy to commit securities

fraud, in violation of Title 18, United States Code, Section 371, and six counts of securities

fraud, in violation of Title 15 U.S.C. §§ 78j(b) & 78ff.  My attorney has explained these

charges to me, as well as their potential penalties, which include a maximum sentence of five

years' imprisonment for the conspiracy count and twenty years' imprisonment for the securities

fraud counts.

I express my desire to travel to the United States from my current location in Rio de

Janeiro, Brazil, in the company of agents from the Federal Bureau of Investigation ("FBI").  I

understand that these agents will remain with me until I arrive in the United States, at which

time I will be arrested pursuant to the warrant of arrest issued by the United States District

Court for the Southern District of New York in connection with the above-referenced

indictment.

I am invoking my rights under the Fifth Amendment not to speak to the FBI agent

accompanying me (and any other law enforcement agent) about the facts of my case.  However,

the FBI agent and other law enforcement agents may speak to me as needed about the logistics

of travel to facilitate my return to the United States.  I hereby waive the presence of counsel

during my conversations with the FBI or other law enforcement agencies concerning my travel plans and other incidental conversation that is not related to my case. This waiver shall remain in effect until such time as I or my counsel advise the Government in writing of the defendant's intention to rescind his waiver.

I am not under the influence of any alcohol, drugs or medication that impairs my mental faculties in any way. I have not been pressured, coerced, threatened, or in any way influenced to voluntarily return to the United States. No promises or other inducements have been offered me in consideration for my return. I am aware that my counsel and the Government have had conversations about a possible bail package upon my return to the United States, but that my counsel and the Government have not reached an agreement on all terms of a possible bail package.

Rajarengan Raj~~anatham~~ Rajaratnam

Vinoo Varghese, Esq.
Counsel for Rajarangan Rajaratnam

Date: 3/22/13

**EXHIBIT D**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

March 21, 2013

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

       Re:    <u>United States</u> v. <u>Rajarengan Rajaratnam</u>, 13 Cr. 211 (NRB)

Dear Judge Buchwald:

       The Government writes to advise the Court that the above-referenced indictment was unsealed today and has been wheeled out to Your Honor.  A copy of the indictment is enclosed. The defendant, who is commonly known as "Rengan Rajaratnam," is represented by David C. Tobin, Esq.

       Rengan Rajaratnam has not been arrested; the Government believes he is currently outside the United States.  The Government has made an oral request to Mr. Tobin that Mr. Rajaratnam surrender to law enforcement authorities.

       The Government does not believe that a conference is necessary at this time, and Mr. Tobin agrees with that assessment.  The Government will advise the Court of any developments concerning Mr. Rajaratnam's situation.

              Respectfully submitted,

              PREET BHARARA
              United States Attorney

         By: _____
              David B. Massey
              Assistant United States Attorney
              (212) 637-2283

cc:    David C. Tobin, Esq.

**EXHIBIT E**



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New                    York, New York 10007*

June 2, 2014

<u>BY FACSIMILE AND ECF</u>

The Honorable Naomi Reice Buchwald
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

> Re:     <u>United States v. Rajarengan Rajaratnam, a/k/a "Rengan Rajaratnam,"</u>
> 13         Cr. 211 (NRB)

Dear Judge Buchwald:

The Government respectfully submits this letter in connection with Your Honor's inquiry regarding extradition from Brazil at today's oral argument. The Government has examined the underlying law and facts, and proffers the following supplemental information:

- The operative treaty regarding extradition between the United States and Brazil was entered into force December 17, 1964. Article II of this Treaty identifies 32 separate crimes for which Brazil will extradite an individual.[1] Article II further provides that attempts and participation, *i.e.* conspiracy, for any of the 32 enumerated offenses are extraditable;

- Section 17 of Article II identifies "larceny" as an extraditable offense, Section 18 identifies "[o]btaining money, valuable securities or other property by false pretenses," Section 19 identifies "[r]eceiving any money, valuable securities or other property knowing the same to have been unlawfully obtained," and Section 20 identifies as extraditable "[f]raud or breach of trust by a bailee, banker, factor, trustee, executor, administrator, guardian, director or officer of any company or corporation or by anyone in any fiduciary capacity";

- Subject to these provisions, individuals have been extradited to the United States from Brazil for various fraud offenses, including Securities Fraud. *See, e.g.*, *United States* v. *Yanes*, 542 Fed. Appx. 797, 803 (11th Cir. 2013) (observing, in health care fraud

---

[1] A subsequent amendment prohibits the extradition of Brazilian citizens – that feature of Brazilian extradition law is irrelevant here, since the defendant was never a citizen.

Hon. Naomi Reice Buchwald, U.S.D.J.
June 2, 2014
Page 2

prosecution, "[i]n fact, in a sentencing memorandum Yanes conceded a 'substantial' difference between himself and his co-conspirators because he had to be extradited from Brazil to face charges, and at sentencing, Yanes described his flight to Brazil as an 'aggravating factor.'"); *United States* v. *Paul*, 634 F.3d 668, 671 (2d Cir. 2011) ("In December 2000, Paul suddenly departed for Brazil. On June 8, 2001, a grand jury in the Eastern District of New York returned a two-count indictment charging Paul with conspiracy to commit securities fraud and securities fraud. Between August 2001 and July 2003, Paul was incarcerated in Brazil, awaiting extradition to the United States. Paul was arraigned on September 15, 2003 and, on January 21, 2005, Paul was released on bail, subject to home detention and electronic monitoring");

- A red notice was filed with Interpol for the defendant in connection with the instant charges. The Government also had initiated the process for seeking the defendant's extradition[2] – in connection, the Government contemporaneously engaged in discussions with prior defense counsel regarding possible steps that could be taken, including voluntary return to the United States, which would allow the defendant to avoid Brazilian detention. The defendant also communicated with the State Department about his desire to avoid Brazilian detention and relatedly coordinated with both the State Department and the FBI about plans to return under FBI escort to the United States.

The Government submits that, based on all of these factors, the defendant simply is not in a similar position to the defendant in *Biaggi*, who sought to introduce evidence that he had rejected an offer of complete immunity. *See United States* v. *Biaggi*, 909 F.2d 662, 689-90 (2d Cir. 1990). The point of *Biaggi* was that there was a reasonable argument, if the jury accepted the defendant's version of the facts, that *only* an innocent man would reject an offer of total immunity when facing a slew of serious federal charges. *See id.* The subsequent decisions which have rejected attempts to extend *Biaggi* have all been based on the fact that where, as here, a defendant engages in activity more susceptible to alternative interpretations, supposed "consciousness of innocence" evidence should be excluded. Thus, in *United States* v. *Wilson*, Judge Cote rejected the argument that a defendant's declination of a deferred prosecution agreement was analogous to *Biaggi*, and excluded this evidence. *See United States* v. *Wilson*, No. 98 Cr. 640 (DLC), 1998 WL 770561 at *2 (S.D.N.Y. 1998) ("This is not a case, therefore, where the defendant faced a simple and stark 'opportunity to preclude all exposure to a conviction and its consequences.' *Biaggi*, 909 F.2d at 691. In other words, unlike the defendant in *Biaggi*, Wilson had many reasons to choose trial and to reject the Government's offer quite apart from any considerations of innocence or guilt"), *aff'd* 201 F.3d 433 (2d Cir. 1999); *see also United States* v. *Goffer*, 721 F.3d 113 (2d Cir. 2013) (rejecting securities fraud defendant's

---

[2] The Government stated at oral argument that it believed a Provisional Arrest Warrant had issued in Brazil for Mr. Rajaratnam. The Government has examined the record of DOJ's extradition efforts related to the defendant, and it appears that after the Office of International Affairs approved the PAW and transmitted it to Brazil, it was almost immediately withdrawn before it was formally "filed," because the defendant by that point had voluntarily returned to the United States.

Hon. Naomi Reice Buchwald, U.S.D.J.
June 2, 2014
Page 3

attempt to analogize his rejection of plea offer to *Biaggi*, writing "[t]he defendant in *Biaggi* was offered complete immunity. *Id.* Relying on the difference between this and 'an offer to plead guilty to reduced charges,' we held that a defendant's decision to reject an offer of *immunity* was probative . . . . [Goffer's case] was not a case where the defendant was permitted to walk away scot free and declined to do so out of a strong belief of his innocence") (emphasis in original).

Similarly, the defendant here did not have the possibility of walking away "scot free" simply by remaining in Brazil. He faced the likelihood of a long extradition process that would almost certainly end with his extradition. And as Your Honor indicated at oral argument, the question of whether the defendant possibly faced extradition is highly significant to the determination of the admissibility of this evidence. It is clear now that he did face extradition, and indeed faced the possibility of detention in a Brazilian facility while the often lengthy extradition process played out. Indeed, the media has reported on other prominent financial criminals who have been recently detained in Brazil while awaiting international extradition. *See, e.g.* Matt Sandy, "Michael Misick: Turks and Caicos Premier facing extradition from Brazil," THE TELEGRAPH, April 28, 2013 (describing the lengthy detention of former foreign political official awaiting extradition on British charges of having illegally sold certain real estate, writing "'[t]his arrest serves to discredit the idea that major international criminals can live peacefully and spend their dirty money in Rio,' said the city's Interpol chief, Orlando Nunes"), available at http://www.telegraph.co.uk/news/worldnews/centralamericaandthecaribbean/turksandcaicosislands/10022501/Michael-Misick-Turks-and-Caicos-premier-facing-extradition-from-Brazil.html.

Given these circumstances, the defendant may have reasonably believed the safest course was to return voluntarily and litigate the criminal charges against him while bailed. He may have concluded that it was more reasonable to expend whatever resources he possessed on the inevitable criminal litigation here rather than the losing litigation in Brazil. He may have simply found distasteful the possibility of never being able to return to the United States, given his substantial contacts in this country. Whatever the defendant's motivations, it cannot be credibly argued that the *only* explanation for his return to the United States was innocence. Given this fact, the Court should reject the defendant's proffered "consciousness of innocence" evidence.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     _____/s/_____
Christopher D. Frey
Randall W. Jackson
Assistant United States Attorneys
(212) 637-2270/1029

cc:     Daniel Gitner, Esq. (By E-mail)