E78LRAJ1                    Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          13 CR 211 (NRB)

5   RAJARENGAN RAJARATNAM,

6            Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         July 8, 2014
9                                        9:19 a.m.

10

    Before:
11
                    HON. NAOMI REICE BUCHWALD,
12
                                         District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    CHRISTOPHER D. FREY
17  RANDALL W. JACKSON
         Assistant United States Attorneys
18
    LANKLER SIFFERT & WOHL LLP
19       Attorneys for Defendant
    BY:  DAN M. GITNER
20       MICHAEL D. LONGYEAR
         DEREK CHAN
21
    ALSO PRESENT:  Special Agent Samuel Moon
22                 Ruby Hernandez, Paralegal
                   Tea Saiti, Paralegal
23

24

25

1          (Trial resumed)

2          (Jury not present)

3          THE COURT:  Good morning.  Some of you didn't sleep

4   last night.  Okay.  I have the letters.

5          So let me say that prior to receiving the government's

6   letter with respect to the Palecek communications issue that I

7   was not planning on giving an instruction on that.

8          MR. JACKSON:  Thank you, your Honor.

9          THE COURT:  On the trading issue, Mr. Gitner, if you

10  want to respond, that's fine.

11         Everyone can sit as far as I'm concerned.  Don't have

12  as much of an audience for my charge as you guys did.

13         MR. JACKSON:  Your Honor, before Mr. Gitner responds,

14  can I just put one more fact into the discussion so he can

15  appropriately respond to it.  I didn't have access to the

16  underlying trading records at the time, but I just want to

17  point out I had an opportunity to look at them this morning.

18  The buy that is referenced in the chart is at approximately

19  $14.  The sale is approximately 15.  We're talking about a

20  profit being made on this hundred thousand shares.  I think it

21  just further underscores some of the points we're talking

22  about.  But I just wanted to add that additional fact, two

23  different prices.

24         MR. GITNER:  I don't think underscores anything other

25  than that they sold and bought at different times.  The stock

1    prices go up and down over time.

2         Our point -- my point on summation was very simple.

3    His position remains unchanged.  And the government, there was

4    a Government Exhibit talked about all of Raj's different codes,

5    TMT, TAM -- I can't remember all of them.  Here it is,

6    Government Exhibit 13.  Our point was very simple, that on

7    March 26, Raj's position, his position remained unchanged.

8    Whether he went up and down by buying and selling quickly doing

9    a day trade is immaterial to the argument.  It's immaterial to

10   the point, frankly, that even the government was trying to

11   make.  The point is that his position remained unchanged.

12        And when Mr. Frey got up and said that what I said was

13   false, he took the extraordinary step of saying what Mr. Gitner

14   said was false, that was misleading because in fact, in fact,

15   it was not.  In fact, the position remained unchanged.

16        All I want to do in the curative instruction is remind

17   the jury what the trading records actually say.  I tried to

18   make it balanced.  I'm looking for my letter.  I tried to use a

19   balanced instruction.  If the Court doesn't want to say, to

20   point out that what the government said was incomplete, I'm

21   fine with that.  My point is not to have sort of a surrebuttal

22   through limiting instruction, what they said was wrong, what he

23   said was right.

24        My point is just so that the jury has in front of it

25   the correct records because I think it's almost impossible for

1    somebody without spending a lot of time and having a

2    significant education in how to read these records to read

3    them.  I know the documents can be before the jury and maybe I

4    think there's somebody who's a quant on the jury, maybe he can

5    do it, but it is really hard to go through them.  And it's not

6    fair for the last thing they hear about what happened on

7    March 26, such an important day, to be that Raj sold when in

8    fact his net position remained unchanged.  So all I want is for

9    that fact to be clear.

10           MR. JACKSON:  All I want is to be adopted by like a

11   billionaire, but that's not relevant to the question of whether

12   or not anything that Mr. Frey said was false.

13           Nothing Mr. Frey said was false.  You don't get a

14   curative instruction just because you'd like the jury to focus

15   specifically on something else that you want to look at.  And

16   it does matter to the argument that Mr. Gitner made because if

17   we look at what he actually said, he says, who sells stock at

18   under $17 if you know it's going to 17 bucks a share.  People

19   playing the market like everyone else.  That's who.

20           But what actually happened on March 26 is that Raj

21   buys at 14 and sells at 15, netting himself a hundred thousand

22   dollar profit.  So if that is the case, why was Raj selling?

23   The bottom line being Raj sold on that day.  And the most

24   important point is what Mr. Frey said was literally accurate.

25   What Mr. Gitner said was literally inaccurate.  And so it's up

E78LRAJ1                    Trial

1    to the jury to look at whatever records they want that are

2    appropriate.

3          But we're having a completely different discussion

4    when we start -- let me just finish -- we're having a

5    completely different discussion when we're talking about

6    whether or not there should be a curative instruction.  There

7    should only be a curative instruction if there was something

8    Mr. Frey said that was false, and he has not been able to point

9    to one thing that he said that was false.

10          MR. GITNER:  Let me do that.  "Raj's position did not

11    in fact remain unchanged."  That's what he said.

12          MR. JACKSON:  Accurate.  When you buy --

13          MR. GITNER:  Let me finish please, sir.

14          MR. JACKSON:  That's not remaining unchanged.

15          MR. GITNER:  The point is at the end of the day --

16    this is rebuttal summation, remember that -- my point was that

17    at the end of the day his position remained unchanged.  That's

18    true.  That's true.  And it's untrue that his position did not

19    remain unchanged.

20          And also we don't know if Raj bought or sold first.

21    The timing of whether he bought or sold first is not in

22    evidence, and I don't think it's frankly findable based on the

23    OMS records.  It's impossible to know if he bought or sold

24    first.  All we know is that he bought and sold and made a

25    profit.  It's unclear what Raj's motives were there.  And all

1    I'm asking for is that the facts be clear because they're not

2    right now based on what Mr. Frey said.

3         THE COURT:  Look, I think I'm not inclined to give

4    this curative instruction because had the defense summation

5    ended with Raj's position remained unchanged, period, Mr. Frey

6    could not have said what he did, but it didn't end that way.

7    There were two references to Raj not selling.  I don't think

8    that calling it false is appropriate.

9         But I think that if the jury gets into this issue in a

10   granular way, I would expect that we would receive a note from

11   them.  If we receive such a note, they're going to get the

12   complete story.  But I think that if they are that curious on

13   this issue, and if you're correct that there is nothing, no

14   exhibit that they could easily discern what actually happened

15   on March 26, they would ask us a question about it and at that

16   point they will learn that there was one trade that was a buy,

17   one trade that was a sell, that it was at the end of the day

18   Raj's funds were in the same numerical position as at the

19   beginning of the day.

20        I don't think I would be inclined to tell them about

21   the prices because of the fact that we don't know what the

22   order of the trades was in and the pricing would matter much

23   more depending on the order, what was first, what was the buy,

24   what was the sell.  If we don't know that, I think there's a

25   limited argument, a limited good argument that can be made from

1    that.

2        MR. JACKSON:  Judge, we think the Court's ruling is

3    entirely appropriate.  We think it's appropriate to point the

4    jury, if we get to that granular point you're describing,

5    whatever evidence will aid that.  I'll note when we get to that

6    point, I think we may have a slightly different view of the

7    evidence.  There is some information in the evidence that is in

8    evidence about timing of some of those transactions.  But

9    that's not a discussion that we need to address right now.

10   We'll have the appropriate, if that comes up, that's an

11   appropriate thing we can figure out.

12       MR. GITNER:  That's fine.  I'm confident that the

13   evidence that's in evidence does not address the timing of when

14   the trades were actually made, just when they were booked.  I

15   have no doubts about that, actually, but we can address that

16   later.

17       THE COURT:  All right.  Let me say one of the reasons

18   we're slightly delayed in coming down is that I had the joy of

19   rereading the charge on the train coming in this morning and

20   just noticed a couple of very small things.  But let me just

21   tell you if I remember now what they were.

22       One on page, I think it's still page 10, with respect

23   to the transcripts, I've made it clear that they are getting,

24   instead of the transcripts, they're getting a computer with the

25   tapes on them.

E78LRAJ1                    Trial

1          In terms of charts and summaries, we've taken out

2     references to either charts or summaries being based on

3     testimony since they aren't.

4          There's a reference at the end -- there was a sentence

5     that said if you want to see any of the exhibits that you don't

6     have, you can come back to court.  There are no drugs and there

7     are no guns here so it's irrelevant.  It just was a line I took

8     out.

9          We took out the reference to character evidence

10    because there was none.

11         And as we had discussed, we edited the limiting

12    instruction pursuant to our conversation yesterday.

13         I think that covers anything that we did between

14    Thursday and now.

15         MR. GITNER:  Your Honor, I have a brief request.  Just

16    looking at it this morning, on page 16, in the uncalled

17    witnesses charge, there's a sentence, just getting into it, you

18    should not draw any inferences or reach any conclusions about

19    what these uncalled witnesses would have testified to had they

20    been called.  The next sentence concerns my request.  It says,

21    their absence should not affect your judgment in any way.

22         I actually think that sentence should be deleted.  I

23    think that I'm allowed to argue lack of evidence and that can

24    affect their judgment.  And so I think the point of this is

25    that they shouldn't draw inferences about what someone would or

1    wouldn't say.  But the point of the charge, I think, is not

2    that whether their absence should affect their judgment.  I

3    think I'm allowed to argue on the evidence or lack of evidence,

4    and this sentence I think is contrary to that.

5              So I'd ask that this sentence be deleted.  I don't

6    think it affects the main thrust of the charge.

7              THE COURT:  Well, you did bring up the point that the

8    government failed to call any Galleon witness.  That was in

9    your --

10             MR. GITNER:  Yes.

11             THE COURT:  -- summation yesterday.

12             MR. GITNER:  Yes.

13             THE COURT:  The government, to balance it, there is

14   the investigative techniques charge, which --

15             MR. GITNER:  The charge is actually quite balanced

16   that they don't need to do anything.  But I think this

17   particular sentence is not quite right.  So I'm asking this

18   sentence be deleted.

19             THE COURT:  What he says makes sense to me.

20             MR. JACKSON:  Can we just have a moment, your Honor.

21             Your Honor, we're fine with taking it out.

22             MR. GITNER:  Thank you.

23             THE COURT:  Elena reminds me that the defendant

24   decided not to request a description of the defense.

25             MR. GITNER:  Yes.

E78LRAJ1                    Trial

1        THE COURT:  We just added the kind of standard

2   sentence at the top of 18 that the defendant denies the charge

3   against him and contends that the government has failed to

4   prove this charge beyond a reasonable doubt.

5        MR. GITNER:  Thank you, Judge.  Is that from the

6   standard?  It sounds standard.  I'm just wondering.

7        THE COURT:  Elena specifically found that in Judge

8   Gardephe's charge and somebody else's.  Judge Sullivan.

9        MR. GITNER:  Good enough for me.  Thank you.

10        MR. JACKSON:  Your Honor, just one small thing that we

11   noticed this morning.  On page 26 of the charge, your Honor

12   makes reference -- I'm actually not sure it's current page 26.

13        THE COURT:  Just tell me what the paragraph begins

14   with.

15        MR. JACKSON:  Absolutely, Judge.  It's paragraph that

16   talks about essential element of the crime is intent.

17        THE COURT:  Right.

18        MR. JACKSON:  It says, it follows that good faith on

19   the part of the defendant is a complete defense to a charge of

20   securities fraud.  That's the first time the term securities

21   fraud is used in the charge.  Your charge makes clear that it's

22   the securities laws.  We just thought that the fix for that,

23   just so there's no confusion --

24        THE COURT:  Fine.

25        MR. JACKSON:  -- would be when your Honor is

E78LRAJ1          Trial

1  explaining the element on page --

2          THE COURT:  Why don't we just change it.

3          MR. GITNER:  Change it to charge, is a complete

4  defense to the charge, period.

5          THE COURT:  Works.

6          MR. JACKSON:  I think that that would be potentially

7  fine, but I think it would be -- I personally think it would be

8  more accurate to just where your Honor says insider trading and

9  conspiracy to engage in insider trading the first time, just

10  say, comma, which is a form of securities fraud.

11          THE COURT:  I am not charging that.

12          MR. JACKSON:  That's fine, Judge.

13          MR. GITNER:  Thank you, Judge.  So we would just say

14  good faith on the part of the defendant is a complete defense

15  to --

16          THE COURT:  -- this charge.

17          MR. GITNER:  -- this charge.  I think that works.

18  Thank you.

19          THE COURT:  I guess we can bring the jury in now.

20          (Jury present)

21          THE COURT:  Good morning, everyone.

22          Ladies and gentlemen, my duty at this point is to

23  instruct you as to the law.  I will endeavor to be as clear as

24  possible.  It is your duty to accept these instructions of law

25  as I give them to you and apply them to the facts as you

1    determine them.  I know that you will try the issues that have

2    been presented to you according to the oath which you have

3    taken as jurors in which you promised that you would well and

4    truly try the issues in this case and render a true verdict.

5            You should not single out any instruction as alone

6    stating the law, but you should consider my instructions as a

7    whole when you retire to deliberate in the jury room.  To that

8    end, you will all be permitted to take a copy of these

9    instructions with you into the jury room.

10           You, the members of the jury, are the sole and

11   exclusive judges of the facts.  You pass upon the weight of the

12   evidence; you determine the credibility of the witnesses; you

13   resolve any conflicts in the testimony; and you draw whatever

14   reasonable inferences you decide to draw from the facts as you

15   have determined them.

16           By the way, let me just say to the people in the

17   audience that if you choose to stay for the charge, you must

18   stay until the end.  You cannot get up and down, so, okay.

19           The defendant in this case, Rengan Rajaratnam, entered

20   a plea of not guilty to the indictment.  As I told you before,

21   the law presumes the defendant to be innocent of the charges

22   against him.  I therefore instruct you that the defendant is to

23   be presumed by you to be innocent throughout your deliberations

24   until such time, if ever, you as a jury are satisfied that the

25   government has proven him guilty beyond a reasonable doubt.

1          The burden is on the prosecution to establish the

2     defendant's guilt beyond a reasonable doubt with respect to

3     every element of the offense charged.  The burden of proof

4     never shifts to a defendant in a criminal case, and the law

5     never imposes on a defendant the obligation of doing anything

6     in a criminal trial.  Nor does the law impose on a defendant

7     the burden or duty of calling any witness or producing any

8     evidence.  The presumption of innocence alone is sufficient to

9     require an acquittal of the defendant unless and until, after

10    careful and impartial consideration of all the evidence, you,

11    as jurors, unanimously are convinced of the defendant's guilt

12    beyond a reasonable doubt.

13         The question naturally comes up is what is a

14    reasonable doubt?  The words almost define themselves.  It is a

15    doubt founded in reason and arising out of the evidence in the

16    case or the lack of evidence.  It is a doubt that a reasonable

17    person has after carefully weighing all of the evidence.  Proof

18    beyond a reasonable doubt must therefore be proof of such a

19    convincing character that a reasonable person would not

20    hesitate to rely and act upon it in the most important of his

21    or her own affairs.

22         The law does not require that the government prove

23    guilt beyond all possible doubt; proof beyond a reasonable

24    doubt is sufficient to convict.  Reasonable doubt is a doubt

25    that appeals to your reason, your judgment, your experience,

1    your common sense.  It is not caprice, whim, or speculation.

2    It is not an excuse to avoid the performance of an unpleasant

3    duty.  It is not sympathy for the defendant.

4         If, after fair, impartial, and careful consideration

5    of all the evidence, you can candidly and honestly say that you

6    are not satisfied of the guilt of the defendant, that is, if

7    you have such a doubt as would cause you, as a prudent person,

8    to hesitate before acting in matters of importance to yourself,

9    then you have a reasonable doubt, and in that circumstance it

10   is your duty to acquit.

11        On the other hand, if, after a fair, impartial, and

12   careful consideration of all the evidence, you can candidly and

13   honestly say that you are satisfied of the guilt of the

14   defendant and that you do not have a doubt that would prevent

15   you from acting in important matters in the personal affairs of

16   your own life, then you have no reasonable doubt, and under

17   such circumstances you should convict.

18        The evidence before you consists of the answers given

19   by witnesses -- the testimony they gave, as you recall it --

20   the exhibits that were received in evidence, and the

21   stipulations entered into by the parties.

22        As I indicated to you at the beginning of the trial,

23   certain things are not evidence and must not be considered by

24   you in your deliberations.

25        First, the exhibits marked for identification but not

1    received may not be considered by you as evidence.

2          Second, what lawyers say in their opening statements,

3    in closing arguments, or in objections is not evidence.

4    Similarly, you should bear in mind that a question put to a

5    witness is never evidence.  It is only the answer that is

6    evidence.  Be mindful that it is the duty of the attorney for

7    each side of a case to object when the other side offers

8    testimony or other evidence that the attorney believes is not

9    properly admissible.  Nor is anything I may have said during

10   the trial or may say during these instructions with respect to

11   a matter of fact to be taken in substitution for your own

12   independent recollection, nor should you consider anything that

13   I have said or may say as indicating that I have an opinion as

14   to what your verdict should be.  However, testimony that the

15   Court has excluded or told you to disregard is not evidence and

16   must not be considered.  If you are instructed that some item

17   of evidence is received for a limited purpose only, you must

18   follow that instruction.

19         Third, anything that you have heard outside the

20   courtroom is not evidence and must be disregarded.  You are to

21   decide the case solely on the evidence presented here in the

22   courtroom.

23         Fourth, any notes that you may take are not evidence.

24   Your notes may be used solely to assist you and are not to

25   substitute for your recollection of the evidence in the case.

1   The fact that a particular juror has taken notes does not

2   entitle that juror's views to any greater weight than those of

3   any other juror.

4          A word about stipulations.  In this case, you have

5   heard evidence in the form of stipulations that contain facts

6   that were agreed to be true.  You must accept those facts as

7   true.

8          In this case, you also heard evidence in the form of

9   stipulations of testimony.  A stipulation of testimony is an

10  agreement among the parties that, if called, a witness would

11  have given certain testimony.  You are to treat stipulated

12  testimony just as if the witness actually appeared in court.

13  It is for you to determine the effect to be given that

14  testimony.

15         There are two types of evidence that you may properly

16  use in reaching your verdict.

17         One type of evidence is direct evidence.  Direct

18  evidence is when a witness testifies about something he knows

19  by virtue of his own senses -- something he has seen, felt,

20  touched, or heard.  Direct evidence may also be in the form of

21  an exhibit where the fact to be proved is its present existence

22  or condition.

23         Circumstantial evidence is evidence that tends to

24  prove a disputed fact by proof of other facts.  There is a

25  simple example of circumstantial evidence that is often used in

1    this courthouse.

2           Assume that when you came into the courthouse this

3    morning the sun was shining and it was a nice day.  Assume that

4    the courtroom blinds were drawn and you could not look outside.

5    As you were sitting here, someone walked in with an umbrella

6    that was dripping wet.  Then a few moments later another person

7    also entered with a wet umbrella.  Now, you can not look

8    outside of the courtroom and you can not see whether or not it

9    is raining, so you have no direct evidence of that fact.  But

10   on the combination of facts that I have asked you to assume, it

11   would be reasonable and logical for you to conclude that it had

12   been raining.

13          That is all there is to circumstantial evidence.  You

14   infer on the basis of reason, experience, and common sense from

15   one established fact the existence or nonexistence of some

16   other fact.

17          Circumstantial evidence is of no less value than

18   direct evidence.  You may consider both in reaching your

19   conclusion as to whether the government has proven its case

20   against the defendant.

21          Many material facts -- such as state of mind -- are

22   rarely susceptible of proof by direct evidence.  Such facts may

23   be established by circumstantial evidence and the reasonable

24   inferences that you draw.

25          During the trial you have heard the attorneys use the

1    term "inference," and in their arguments they have asked you to

2    infer by using your reason, experience, and common sense, the

3    existence of some fact from one or more established facts.  An

4    inference is not a suspicion or a guess.  It is a reasoned,

5    logical decision to conclude that the disputed fact exists on

6    the basis of another fact that you know exists.  In drawing

7    inferences, you should use your common sense.  There are times

8    when different inferences may be drawn from facts, whether

9    proved by direct or circumstantial evidence.  The government

10   asks you to draw one set of inferences while the defense

11   attorneys ask you to draw another.  Whether or not to draw a

12   particular inference is, of course, a matter exclusively for

13   you to determine, as are all determinations of fact.

14          You have heard testimony about and seen evidence

15   derived from telephone calls which were tape recorded without

16   the knowledge of the defendant and others, but with the consent

17   and authorization of the Court.  All of this evidence was

18   lawfully obtained and properly admitted in this case and may

19   properly be considered.

20          In connection with these tapes, the parties have been

21   permitted to display transcripts of the recordings.  These

22   documents were shown to you as an aid or guide to you in

23   listening to the recordings.  However, they are not in and of

24   themselves evidence, and therefore may not be considered by you

25   during your deliberations.  However, you will be provided with

1    a computer on which you may play the tapes which have been

2    admitted into evidence.

3         During the trial, you have heard argument by counsel

4    that the government did not utilize specific investigative

5    techniques.  There is no legal requirement that the government

6    use any specific investigative techniques to prove its case.

7    Your concern, as I have said, is to determine whether or not,

8    on the evidence or lack of evidence, the defendant's guilt has

9    been proved beyond a reasonable doubt.

10         You have been presented with exhibits in the form of

11    charts and summaries.  These exhibits purport to summarize the

12    underlying evidence that was used to propose them and were

13    shown to you to make the other evidence more meaningful and to

14    aid you in considering the evidence.  They are no better than

15    the documents upon which they are based and are not themselves

16    independent evidence.  Therefore, you are to give no greater

17    weight to these charts and summaries than you would give to the

18    evidence on which they are based.

19         It is for you to decide whether the charts an

20    summaries correctly present the information contained in the

21    documents on which they were based.  In the event that a chart

22    or summary differs from the actual documents on which the chart

23    or summary is based, you are to rely on the actual document and

24    not the chart or summary.  You are entitled to consider the

25    charts and summaries if you find that they are of assistance to

1    you in analyzing and understanding the evidence.

2            You have had an opportunity to observe all of the

3    witnesses.  It is now your job to decide how believable each

4    witness was in his testimony.  You are the sole judges of the

5    credibility of each witness and of the importance of his

6    testimony.

7            Your decision whether to believe a witness may depend

8    on how that witness impressed you.  Was the witness candid,

9    frank, and forthright?  Or did the witness seem as if he was

10   hiding something, being evasive, or suspect in some way?  How

11   did the way the witness testified on direct examination compare

12   with how the witness testified on cross-examination?  Was the

13   witness consistent in his testimony or did he contradict

14   himself?  Did the witness appear to know what he was talking

15   about, and did the witness strike you as someone who was trying

16   to report his knowledge accurately?

17           How much you choose to believe a witness may be

18   influenced by the witness's bias.  Does the witness have a

19   relationship with the government or the defendant that may

20   affect how he testified?  Does the witness have some incentive,

21   loyalty, or motive that might cause him to shade the truth or

22   does the witness have some bias, prejudice, or hostility that

23   may have caused the witness -- consciously or not -- to give

24   you something other than a completely accurate account of the

25   facts he testified to?

1          Even if the witness was impartial, you should consider

2     whether the witness had an opportunity to observe the facts he

3     testified about.  Also ask yourselves whether the witness's

4     recollection of the facts stands up in light of all the other

5     evidence.

6          A witness may be inaccurate, contradictory or even

7     untruthful in some respects and yet may be entirely credible in

8     the essence of his testimony.  It is for you to say whether his

9     testimony in this trial is truthful or not in whole or in part,

10    in light of his demeanor, statements, and all of the evidence.

11         Additionally, the fact that the prosecution is brought

12    in the name of the United States of America entitles the

13    government to no greater or no less consideration than that

14    accorded to any other party in the litigation.  All parties,

15    whether the government or individuals, stand as equals under

16    the law.

17         You have heard testimony from government witnesses who

18    have pleaded guilty to the same or similar charges.  You are

19    instructed, however, that you are to draw no conclusions or

20    inferences of any kind about the guilt of the defendant merely

21    from the fact that a witness for the prosecution or a

22    coconspirator pleaded guilty to the same or similar charges.

23    The decisions of those individuals to plead guilty were

24    personal decisions about their own guilt and may not be used by

25    you in any way to infer the defendant's guilt.

1          You have heard the testimony of law enforcement

2    officers and of employees of the government.  The fact that a

3    witness may be employed as a law enforcement officer or

4    government employee does not mean that his testimony is

5    necessarily deserving of more or less consideration or greater

6    or lesser weight than that of an ordinary witness.  It is your

7    decision, after reviewing all the evidence, whether to accept

8    the testimony of the law enforcement witness and to give that

9    testimony whatever weight, if any, you find it deserves.

10          You have heard evidence during the trial that

11   witnesses have discussed the facts of the case and their

12   testimony with the lawyers before the witnesses appeared in

13   court.  Although you may consider that fact when you are

14   evaluating a witness's credibility, I should tell you that

15   there is nothing either unusual or improper about a witness

16   meeting with lawyers before testifying so that the witness can

17   be aware of the subjects he will be questioned about, focus on

18   those subjects, and have the opportunity to review relevant

19   exhibits before being questioned about them.  Such consultation

20   helps conserve your time and the Court's time.  In fact, it

21   would be unusual for a lawyer to call a witness without such

22   consultation.

23          Again, the weight you give to the fact or the nature

24   of the witness's preparation for his testimony and what

25   inference you draw from such preparation are matters completely

1    within your discretion.

2              The defendant did not testify in this case.  Under our

3    Constitution, a defendant has no obligation to testify or

4    present any evidence because it is the prosecution's burden to

5    prove a defendant guilty beyond a reasonable doubt.  As I

6    stated earlier, the burden remains with the prosecution

7    throughout the entire trial and never shifts to the defendant.

8    A defendant is never required to prove that he is innocent.

9    The right of a defendant not to testify is an important part of

10   our Constitution.  It is for that reason that you may not

11   attach any significance to the fact that the defendant did not

12   testify.  No adverse inference may be drawn against the

13   defendant because he did not take the witness stand.  You may

14   not consider this against the defendant in any way in your

15   deliberations.

16             There are people whose names you heard during the

17   course of the trial who did not appear and testify.  The

18   government is not required to prove its case through any

19   particular witnesses.  Nor does the defendant have any burden

20   or duty to call any witnesses or produce any evidence.  You

21   should not draw any inferences or reach any conclusions about

22   what these uncalled witnesses would have testified to had they

23   been called.  Again, your concern is to determine whether, on

24   the evidence that has been admitted or the lack thereof, the

25   defendant's guilt has been proven beyond a reasonable doubt.

1       Further, you are not being asked whether any person

2   other than the defendant here on trial has been proven guilty.

3   In that vein, you may not draw any inference, favorable or

4   unfavorable, toward the government or the defendant, from the

5   fact that certain persons are not on trial in this case.  You

6   may not speculate as to why other people are not on trial

7   before you now.

8       Your verdict must be based solely on the evidence

9   developed at trial or the lack of evidence.  It would be

10  improper for you to consider, in reaching your decision as to

11  whether the government sustained its burden of proof, any

12  personal feelings you may have about the defendant's or

13  witness's race, religion, national origin, sex or age.  The

14  parties in this case are entitled to a trial free from

15  prejudice, and our judicial system cannot work unless you reach

16  your verdict through a fair and impartial consideration of the

17  evidence.

18      Your verdict may be based exclusively on the evidence

19  or lack of evidence in the case, for once you let fear or

20  prejudice, bias, or sympathy interfere with your thinking,

21  there is a risk that you will not arrive at a just and true

22  verdict.

23      With these preliminary instructions in mind, let us

24  now turn to instructions of law.

25      The indictment charges the defendant, Rengan

1    Rajaratnam, with conspiring to violate the securities laws by

2    engaging in what is referred to as insider trading.  The

3    defendant denies the charge against him and contends that the

4    government has failed to prove this charge beyond a reasonable

5    doubt.  As I instructed you at the outset of this case, the

6    indictment is a charge or accusation.  It is not evidence, and

7    it is not to be considered by you as any evidence of the guilt

8    of the defendant.

9         A conspiracy is a kind of criminal partnership -- an

10   agreement of two or more persons to join together to accomplish

11   some unlawful purpose.

12        Here, the conspiracy charged is alleged to be an

13   agreement in 2008 between Rengan Rajaratnam and his brother Raj

14   Rajaratnam and others known and unknown to violate the

15   securities laws of the United States by engaging in insider

16   trading.

17        The actual commission of a substantive crime is not an

18   essential element of the crime of conspiracy.  Rather, the

19   coconspirators must simply have agreed to commit a scheme that,

20   if carried out, would have met all the requirements of the

21   crime of insider trading, as I will define it for you.  Indeed,

22   you may find the defendant guilty of the crime of conspiracy

23   even if you find that the charged conspiracy was not successful

24   and no insider trading was ever actually committed.

25        I will now instruct you about the elements of the

1    conspiracy offense.

2         To sustain its burden of proof on the charge of

3    conspiracy, the government must prove each of the following

4    elements beyond a reasonable doubt:

5         First, the existence of the conspiracy charged in the

6    indictment; that is, an agreement or understanding among at

7    least two people to commit insider trading.

8         Second, the government must prove beyond a reasonable

9    doubt that the defendant knowingly became a member of the

10   conspiracy, with intent to further its illegal purpose.

11        Third, the government must prove beyond a reasonable

12   doubt that one of the coconspirators -- not necessarily the

13   defendant -- knowingly committed at least one overt act in

14   furtherance of the conspiracy.

15        Now let us separately consider these elements.

16        As I just indicated, the first element that the

17   government must prove beyond a reasonable doubt to establish

18   the offense of conspiracy is that two or more persons entered

19   into the unlawful agreement alleged in the indictment.  In

20   other words, the government must prove that there is in fact --

21   excuse me.  Let me just say that again.  In other words, the

22   government must prove that there in fact was an agreement or

23   understanding to violate those provisions of the law which make

24   it unlawful to engage in insider trading.  The first element of

25   the crime of conspiracy thus has two parts:  one, the unlawful

1   agreement; and, two, the object of the conspiracy.

2           Now, the government is not required to show that two

3   or more people sat around a table and entered into a solemn

4   pact, orally or in writing, stating that they had formed a

5   conspiracy to violate the law and spelling out all the details.

6   Common sense tells you that when people in fact agree to enter

7   into a criminal conspiracy, much is left to the unexpressed

8   understanding.  It is rare this a conspiracy can be proven by

9   direct evidence of an explicit agreement.

10          In order to show that a conspiracy existed, the

11  evidence must show that two or more people, in some way or

12  manner, through any contrivance, explicitly or implicitly, that

13  is, spoken or unspoken, came to a mutual understanding to

14  violate the law and to accomplish an unlawful plan.

15          When people enter into a conspiracy to accomplish an

16  unlawful end, they became agents or partners of one another in

17  carrying out the conspiracy.  In determining whether there has

18  been an unlawful agreement as alleged, you may consider the

19  acts and conduct of the alleged coconspirators that were done

20  to carry out the apparent criminal purpose.  In addition, in

21  determining whether such an agreement existed, you may consider

22  direct as well as circumstantial evidence.  The old adage,

23  "actions speak louder than words," applies here.  Often, the

24  only evidence that is available with respect to the existence

25  or nonexistence of the conspiracy is that of disconnected acts

1    and conduct on the part of the alleged coconspirators.  When

2    taken all together and considered as a whole, however, those

3    acts and conduct may warrant the inference that a conspiracy

4    existed or did not exist as conclusively as would direct proof.

5    On this question, you should refer back to my earlier

6    instructions on direct and circumstantial evidence and

7    inferences.

8            So you must first determine whether the evidence

9    proves beyond a reasonable doubt the existence of the

10   conspiracy charged in the indictment.  It is sufficient to

11   establish the existence of the conspiracy, as I've said -- as I

12   have already said, if, from the proof of all the relevant facts

13   and circumstances, you find beyond a reasonable doubt that the

14   minds of Rengan Rajaratnam and at least one other alleged

15   coconspirator met to accomplish, by the means alleged, the

16   objectives of the conspiracy.  In this case, the government

17   alleges that there was a meeting of the minds between Rengan

18   Rajaratnam and Raj Rajaratnam.

19           The second part of the first element relates to the

20   object, or objective, of the conspiracy -- some illegal goal

21   that the members of the conspiracy agree they will try to

22   accomplish.  The conspiracy charged has as its object a scheme

23   to engage in insider trading.

24           In order to establish the object of the conspiracy,

25   the government must prove beyond a reasonable doubt that two or

more coconspirators agreed to obtain, in or about 2008,

material nonpublic information from one or more companies for

the purpose of trading on the companies' stock, knowing that

the information had been obtained from an insider who had

provided the information in violation of that insider's duty of

trust and confidence and in exchange for or in anticipation of

a person benefit.

          An "insider" is one who comes into possession of

material, nonpublic information about a specific security or

stock by virtue of a relationship that involves trust and

confidence.  Such a relationship can, for example, arise out of

a person's employment relationship with a company, or out of a

client relationship, or out of a relationship as a board member

to a company.  The law forbids an insider, who is expected to

keep certain information confidential, from trading in the

securities in question or assisting others to trade in

securities on the basis of that information.

          The law also prohibits a person who is not actually an

insider from trading in securities based on material, nonpublic

information, if the person, who is known as a tippee, knowingly

received material, nonpublic information from other individuals

and wrongfully used it for his own benefit when he knew that

the inside information had been disclosed in violation of a

duty of trust or confidence and in exchange, directly or

indirectly, for a personal benefit.  The benefit may be, but

1    need not be, financial or tangible in nature.  It could

2    include, for example, obtaining a useful networking contact,

3    enhancing a witness's reputation or power, obtaining future

4    financial benefits, or maintaining or furthering a friendship.

5          Information is nonpublic if it was not available to

6    the public or authorized to be disclosed to the public through

7    such sources as press releases, Securities and Exchange

8    Commission filings, trade publications, analyst reports,

9    newspapers, magazines, television, radio, word of mouth, or in

10    response to requests.  The confirmation by an insider of

11    unconfirmed facts or rumors may itself be inside information.

12    However, the law permits analysts and portfolio managers to

13    meet and speak with corporate officers and other insiders, as

14    well as experts affiliated with such companies, in order to

15    ferret out and analyze information useful in making investment

16    decisions.

17          Information is "material" if a reasonable investor

18    would have considered it significant in deciding whether to

19    buy, sell, or hold securities, and at what price to buy or sell

20    securities.

21          An insider trading scheme involves the use of the

22    material, nonpublic information in connection with a stock

23    purchase or sale of securities -- in other words, the

24    information would be at least a factor in the decision to buy

25    or sell.  An insider trading scheme must also involve the use

1   of an instrumentality of interstate commerce, in other words,

2   the mails, telephone, wire, or any device or facility that can

3   be used to transmit information or communications across state

4   borders, or of a national securities exchange, such as, for

5   example, the New York Stock Exchange or the NASDAQ, in

6   furtherance of the scheme.  This might include placing a

7   telephone call or placing an order with a trader or a brokerage

8   firm to buy or sell a security on a national exchange.

9         If you conclude that the government has proven beyond

10  a reasonable doubt that the charged conspiracy existed and that

11  the conspiracy had as its object the illegal purpose charged in

12  the indictment, then you must next determine whether Rengan

13  Rajaratnam joined in the conspiracy with knowledge of its

14  unlawful purpose and in furtherance of its unlawful objective.

15  The government must prove beyond a reasonable doubt that Rengan

16  Rajaratnam unlawfully, knowingly, and intentionally became a

17  member of the charged conspiracy.

18        "Knowingly" means to act voluntarily and deliberately,

19  rather than mistakenly or inadvertently.  "Intentionally" means

20  to act deliberately and with a bad purpose, rather than

21  innocently, and to act with an intent to defraud and thereby

22  harm the company from which the inside information was

23  obtained.

24        The question of the defendant's intent is a question

25  of fact that you are called upon to decide, just as you

1    determine any other fact at issue.  A person's intent involves

2    the state of his mind and the purpose with which he acted at

3    the time of the -- start that again.  A person's intent

4    involves the state of his mind and purpose with which he acted

5    at the time the acts in question occurred.  Direct proof of

6    knowledge and intent is almost never available, and it is not

7    required to find that such proof exists.  It would be a rare

8    case where it could be shown that a person wrote or stated that

9    as of a given time in the past he had committed an act with

10   fraudulent intent.  Such direct proof is not required.

11         Knowledge and criminal intent, though subjective, may

12   be established by circumstantial evidence, based on a person's

13   outward manifestations, his words, his conduct, his acts, and

14   all the surrounding circumstances disclosed by the evidence and

15   the rational or logical inferences that may be drawn therefrom.

16         Since an essential element of the crime charged is

17   intent to defraud, it follows that good faith on the part of

18   the defendant is a complete defense to this charge.  It is for

19   you to decide whether the defendant acted in good faith or not.

20   If you decide that the defendant at all relevant times acted in

21   good faith, it is your duty to acquit him.  The law is not

22   violated if the defendant acted in good faith and held an

23   honest belief that his actions were proper and not in

24   furtherance of any illegal venture.  In this respect, I would

25   remind you that the defendant has no burden to establish the

1    defense of good faith, however.  The burden is on the

2    government to prove criminal intent and consequent lack of good

3    faith beyond a reasonable doubt.

4          I want to caution you that mere knowledge or

5    acquiescence, without participation, in the unlawful plan is

6    not sufficient.  Moreover, the fact that the acts of a

7    defendant, without knowledge, merely happen to further the

8    purposes or objectives of the conspiracy, does not make the

9    defendant a member.  What is necessary is that the defendant

10   must have participated in the conspiracy with knowledge of its

11   unlawful objective and with the intention of aiding in the

12   accomplishment of that objective.

13         It is for important for you to note that a defendant's

14   participation in the conspiracy must be established by evidence

15   of his own acts or statements.  However, you may consider the

16   defendant's acts and statements in the context of the acts and

17   statements of the alleged other conspirators, and the

18   reasonable inferences that may be drawn therefrom.

19         To become a member of the conspiracy, the defendant

20   need not have known the identifies of each and every other

21   member, nor need he have been apprised of all their activities.

22   In fact, a defendant may know only one other member of the

23   conspiracy and still be a coconspirator.  Moreover, the

24   defendant need not have been fully informed as to all of the

25   details, or the scope, of the conspiracy in order justify an

1   inference of knowledge on his part.

2           Nor is it necessary that the defendant receive any

3   monetary benefit from participating in the conspiracy.  While

4   proof of a financial interest in the outcome of a conspiracy is

5   not essential, if you find that the defendant had such an

6   interest, that determination is a factor which you may properly

7   consider in determining whether or not the defendant was a

8   member of the conspiracy charged in the indictment.

9           If you determine that the defendant became a member of

10  the conspiracy, the extent of his participation in that

11  conspiracy has no bearing on the issue of his guilt.  A

12  conspirator's liability is not measured by the extent or

13  duration of his participation.  Indeed, each member may perform

14  separate and distinct acts and may perform them at different

15  times.  Some coconspirator -- I'm sorry.  Some conspirators

16  play major roles, while others play minor roles in the scheme.

17  An equal role is not what the law requires.  In fact, even a

18  single act may be sufficient to draw the defendant within the

19  ambit of the conspiracy.

20          I want to caution you, however, that a defendant's

21  mere association with one or more members of the conspiracy

22  does not automatically make the defendant a member himself.  A

23  person may know, be friendly with, be a colleague of, or be

24  related to a criminal without being a criminal himself.  Mere

25  similarity of conduct or the fact that they may have assembled

1    together and discussed common aims and interests does not

2    necessarily establish membership in a conspiracy.

3              It is not required that the government show that the

4    defendant, in addition to knowing what he was doing and

5    deliberately doing it, also knew that he was violating some

6    particular federal statute.  But to meet its burden, the

7    government must establish beyond a reasonable doubt that the

8    defendant acted with the intent to help carry out some

9    essential step in the execution of the scheme to defraud that

10   is alleged in the indictment.

11             The third element that the government must prove

12   beyond a reasonable doubt is that at least one of the

13   conspirators -- not necessarily the defendant -- committed at

14   least one overt act in furtherance of the conspiracy, during

15   the time that the conspiracy was in existence.  The overt act

16   element is a requirement that the agreement went beyond the

17   mere talking stage, the mere agreement stage.

18             This burden may be met by the government showing that

19   Rengan Rajaratnam or one of his coconspirators knowingly and

20   willfully committed an overt act in furtherance of the

21   conspiracy.  This is because such an act becomes, in the eyes

22   of the law, the act of all the members of the conspiracy.

23             However, you must all agree on at least one overt act

24   that a conspirator committed in order to satisfy this element.

25   In other words, it is not sufficient for you to agree that some

1    overt act was committed without agreeing on which overt act was

2    committed.

3           You should bear in mind that the overt act, standing

4    alone, may be an innocent, lawful act.  You are therefore

5    instructed that the overt act does not have to be an act which

6    in and of itself is criminal or constitutes an objective of the

7    conspiracy.

8           Finally, in considering whether the government has

9    proven the charged conspiracy and whether the government has

10   proven the defendant's participation in the charged conspiracy,

11   you may not rely on evidence of the defendant's trades in

12   Clearwire securities, but you may consider other evidence

13   related to Clearwire in deciding whether the government has

14   proven the charged conspiracy and the defendant's participation

15   in the charged conspiracy.

16          As I mentioned to you throughout this trial, you have

17   heard references to companies other than Clearwire and AMD on

18   some of the wiretapped phone calls.  These references included

19   Cisco, EMC, and other companies.  This evidence was not

20   introduced to show that the defendant engaged in insider

21   trading in those stocks and there is no evidence that he did.

22          Now, in addition to dealing with the elements of the

23   conspiracy, you must also consider the issue of venue, namely,

24   whether any act in furtherance of the unlawful activity

25   occurred within the Southern District of New York.  The

1  Southern District of New York encompasses Manhattan, the Bronx,

2  Westchester, Rockland, Putnam, Dutchess, Orange, and Sullivan

3  County.  So, anything that occurs in those counties occurs in

4  the Southern District of New York.

5          In this regard, the government need not prove that the

6  crime itself was committed in this district or that the

7  defendant himself was present here.  It is sufficient to

8  satisfy this element if any act in furtherance of the crime

9  occurred within this district.  Such an act would include, for

10  example, the placing of a telephone call to or from the

11  Southern District of New York or the execution or settlement of

12  a securities trade within this district.

13          I note that on this issue, and this issue alone, the

14  government need not offer proof beyond a reasonable doubt and

15  that it is sufficient if the government proves venue by a mere

16  preponderance of the evidence.  A preponderance of the evidence

17  means to prove that the fact is more likely than not true.

18  Thus, the government has satisfied its venue obligations if you

19  conclude that it is more likely than not that any act in

20  furtherance of the crime you are considering occurred within

21  the Southern District of New York.

22          The government, to prevail, must prove each essential

23  element of the crime charged beyond a reasonable doubt.  To

24  report a verdict, it must be unanimous.

25          Each juror is entitled to his or her opinion; each

1    should, however, exchange views with his or her fellow jurors.

2    That is the very purpose of jury deliberation -- to discuss and

3    consider the evidence; to listen to the arguments of fellow

4    jurors; to present your individual views; to consult with one

5    another; and to reach an agreement based solely and wholly on

6    the evidence -- if you can do so without violence to your own

7    individual judgment.

8         Each of you must decide the case for yourself, after

9    consideration with your fellow jurors of the evidence in the

10   case.  But you should not hesitate to change an opinion which,

11   after discussion with your fellow jurors, appears erroneous.

12        However, if, after carefully considering all the

13   evidence and the arguments of your fellow jurors, you entertain

14   a conscientious view that differs from the others, you are not

15   to yield your conviction simply because you are outnumbered.

16        Your final vote must reflect your conscientious

17   conviction as to how the issues should be decided.

18        I want to say a word about punishment and sentencing.

19   The question of possible punishment of the defendant is of no

20   concern to the jury and should not, in any sense, enter into or

21   influence your deliberations.  The duty of imposing sentence

22   rests exclusively with the Court.  Your function is to weigh

23   the evidence in the case and to determine whether or not the

24   defendant is guilty beyond a reasonable doubt, solely on the

25   basis of such evidence.  Under your oath as jurors, you cannot

1    allow a consideration of the punishment which may be imposed

2    upon the defendant, if convicted, to influence your verdict in

3    any way or in any sense enter into your deliberations.

4            Now that I have charged you as to what the law is, you

5    are about to go into the jury room and begin your

6    deliberations.  I am going to have the exhibits that have been

7    admitted into evidence brought to you in the jury room.  If you

8    want to review any of the testimony, that can also be done if

9    you send us a note.  But, please remember that it is not always

10   easy to locate what you might want, so be as specific as you

11   possibly can in requesting portions of the testimony that you

12   may want.

13           I will also give you a copy of -- a number of copies

14   of this charge on the law for use during your deliberations.

15   If you feel that you need any of the legal principles clarified

16   during your deliberations, I will be happy to do so.

17           Your requests for testimony or for additional

18   instructions on the law -- in fact, any communication with the

19   Court -- should be made to me in writing, signed by your

20   foreperson, and given to one of the court officers.  I will

21   respond to any questions or requests that you have as promptly

22   as possible, either in writing or by having you return to the

23   courtroom so I can speak with you in person.  In any event, do

24   not tell me or anyone else how the jury stands on the issue of

25   the defendant's guilt until after a unanimous verdict is

1    reached.

2              At this time I want to tell you that juror No. 1,

3    Isabel Tirado, will serve as the jury's foreperson.  The

4    foreperson will be responsible for signing all communications

5    to the Court on behalf of the jury and for handing them to the

6    marshal during your deliberations.  This should not be

7    understood to mean that an individual cannot send the Court a

8    note should the foreperson refuse to do so.  After you have

9    reached a verdict, your foreperson will advise the officer

10   outside your door that you are ready to return to the

11   courtroom.

12             I will stress once again that each of you should be in

13   agreement with the verdict that is announced in court.  Once

14   your verdict is announced by your foreperson in open court and

15   officially recorded, it cannot ordinarily be revoked.

16             The custom and tradition in this court requires,

17   although I know it is totally unnecessary, that I admonish you

18   to be polite and respectful towards each other in the course of

19   your discussions in the jury room so that each juror will have

20   his or her position made clear and so that when you reach a

21   verdict you will know that it is a just one.

22             Finally, let me state that your oath sums up your duty

23   and that is:  without fear or favor to anyone, you will well

24   and truly try the issues between the government and the

25   defendant, based solely on the evidence and this Court's

1   instructions as to the law.

2         Let me ask counsel if there's anything we need to talk

3   about on the charge.

4         MR. JACKSON:  No, your Honor.

5         MR. GITNER:  One moment, Judge.

6         Thank you, your Honor.

7         THE COURT:  All right.  There are 13 of you left

8   standing, but a jury can only be 12.  So at this time I'm going

9   to inform Mr. Jones that you're actually the alternate.  You

10  are not, however, excused.  You may leave, but you're not

11  legally excused.

12        What that means is that should it happen, and

13  occasionally it does, that during deliberations somehow we lose

14  a juror, we will need to call you back in.  So that means that

15  the admonition that you can't talk about the case continues.

16  We will, I promise, call you within, you know, 15 minutes of

17  there being a verdict to let you know what it is and to let you

18  know that you're really excused.

19        But before you go I want to thank you for your

20  service.  We talked a little bit about that Thursday.  That's

21  essentially what I say to all jurors.  We very much appreciate

22  your attention and your time and your taking the time out of

23  your normal life to participate in this really special American

24  tradition of jury service.  And, again, on behalf of the entire

25  court and the parties, we thank you.

1      So I think we have to swear in the marshal, the court

2  officer.

3      (Marshal sworn)

4      THE COURT:  So as I said, just practically, the

5  exhibits are going to be brought to you, you're going to be

6  given verdict forms, you already have note pads.  There are, I

7  understand, envelopes which you can put any note already in the

8  jury room.  You're going to get the scrubbed computer that only

9  has the tapes that were admitted into evidence.  Your snack

10  should come on time.  And I don't know if there are any other

11  details at this point that we need to talk about.

12      So the moment, in a sense, that you've been waiting

13  for to be able to talk is a moment away, but let Mr. Jones

14  leave before you start to deliberate.  You don't have to walk

15  out.  Just when you leave, before you guys talk, just say

16  good-bye, say it was nice to meet you and let him go, okay.

17      We have cell phone for you, contact information,

18  right, in case we need contact you, right, Mr. Jones?

19      JUROR:  Yes.

20      THE COURT:  Okay.  Great.  Thank you.

21      (Jury retired to deliberate; time noted:  10:30 a.m.)

22      MR. JACKSON:  Your Honor, just to clarify, and I'm

23  sure when your clerks pass all the exhibits over they can

24  explain this, but the scrubbed computer doesn't actually

25  contain the recordings.  The parties have assembled disks that

E78LRAJ1

have all the recordings, which are marked, and the computer can play all the recordings. It's of no moment. There's a password that's on the computer; it's pasted on there. It's very simple.

MR. GITNER: Before I discuss that, Judge, I didn't want to do it in front of the jury. I just want to repeat just for the record my -- I'll phrase them as exceptions. To the extent that I had made certain requests like multiple conspiracy charge, I think to make my record more perfect I need to repeat that now just to state that I have made those exceptions. I would request them again. I understand your Honor is denying them and is not going to do that.

I think we have, with regard to the tapes, I do think we've worked together and created a disk and index. I think we have one dispute about one item on the index that might make sense for the lawyers to talk about before this stuff goes back. And I think we just have to look at the paper exhibits, that shouldn't take long, and they can go back.

I think that was it. Your Honor, could we get a copy of the verdict sheet?

THE COURT: We gave it to you yesterday.

MR. GITNER: I think I saw it but I think in the confusion we -- I can't find it.

(Continued on next page)

1             MR. GITNER:  Thank you.

2             THE COURT:  Could I get clarification.  Are the

3     exhibits ready to go back?

4             MR. GITNER:  They are.  I think literally we need to

5     put our eyes on it and then it can go back.  One last thing,

6     one thing.  I know it's the government's computer that's been

7     scrubbed, but I'm not sure where the speakers are.  I actually

8     thought they would come with better speakers than just the

9     single computer.  I'm not sure if the government then brought

10    speakers for the computer.

11            MR. JACKSON:  We can bring up some extra speakers if

12    that will be helpful.  I'll get them after we bring the

13    computer in there, then we did use that.  It will be simple.

14    It will be easy to plug in.  In fact, I assume as defense

15    counsel is doing its duties, we can retrieve extra speakers.

16            MR. GITNER:  Thank you.  That's it.

17            I think we have to discuss something.  There's one

18    issue on the index that I think there was some disagreement

19    over.  We have to figure that out.

20            (Recess pending verdict)

21            (In open court; jury not present)

22            MR. JACKSON:  We have a dispute because we removed,

23    pursuant to your Honor's order regarding the Clearwire trades

24    from the government exhibits, the chart which depicted Rengan

25    Rajaratnam's personal trades in his Fidelity account.  We took

E78GRAJ2                    Trial

1   that out.  We also took out another related chart to that

2   compensation.

3        What we do still have are two charts the defense

4   objects to, Government Exhibits 24 and 25 which depict trading

5   in Clearwire by certain Galleon portfolio manager codes from

6   March 24 through April 21, 2008 and a second one depicts the

7   realized profit or loss during that same time period.

8        Mr. Gitner's objection is that the very last entry on

9   this chart is a 657 -- it's an almost negligible trade that

10  occurred on 4/21, 2008, Mr. Gitner says that it's his belief

11  that that's Rengan Rajaratnam's trade.

12       What we have said is, we don't think that there's any

13  evidence in the record supporting that that's his trade and so

14  these charts don't need to be altered in any way in order to go

15  back to the jury.

16       However, we offer, if the defendant likes, we'd be

17  willing to redact that trade from it and have the charts

18  offered as redacted.  But the defense is suggesting that the

19  entirety of these charts needs to be removed when they have

20  clearly been the subject of a lot of discussion at the trial,

21  and I don't think they run afoul of your Honor's order in any

22  way.

23       MR. GITNER:  It's not quite my objection.  I don't

24  have a copy.  If I can borrow it?  We agree the charts mark 14,

25  26 and 27 are not going to go back pursuant to your Honor's

E78GRAJ2                    Trial

1    order.  So what's at issue are Exhibits 24 and 25.  Twenty-four

2    is a chart that --

3              THE COURT:  Which ones are not going back?

4              MR. GITNER:  We have agreed that Government Exhibits

5    14, 26 and 27 are not going back.

6              What's at issue are 24 and 25.  If it's okay, I'm

7    going to talk about 25 first because I have it in front of me.

8    This is the one that is realized profit or loss from trading in

9    Clearwire, associated with certain Galleon portfolio manager

10   codes from March 24 through April 21, 2008.  And although it

11   ends on April 21, 2008, the government clearly has argued that

12   Rengan had some control over BCR prior to April 21, 2008.

13             The second -- the second chart, 24, my objection is

14   the same:  It's not just that I can prove, which I did, that

15   Rengan regained control by April 21.  It's that the government

16   has argued that Rengan had control before then.  And prior to

17   my proving that by Bear Stearns and the loss be with it was the

18   government's position I think that Rengan had some control over

19   BCR much earlier, in fact, they didn't put in any proof about

20   Rengan losing control.  Without me, the jury would think that

21   he had control the entire time over BCR.

22             So I think these charts as government exhibits are

23   misleading.  They're not just misleading, but they concern what

24   the government has said are Rengan's trades.  And I think your

25   Honor's order was that Rengan's trades are not proof of

Rengan's participation in the conspiracy.  And my memory of

when we discussed this earlier was that the charts about

Clearwire trading were not going to go back, so that's my

objection.

I can hand these back to the government if they want

to talk about.

MR. JACKSON:  If what defense counsel just said is

confusing, I think it's because it doesn't really make sense.

THE COURT:  You can't have it both ways.

It's accurate, is it not, that it was only the defense

that put in evidence that Rengan lost trading authority over

his portion of the Buccaneer fund?

MR. JACKSON:  Yes, your Honor, that's their theory.

MR. GITNER:  Exactly.

MR. JACKSON:  I'm not sure what that "exactly" refers

to, but my only point, your Honor, is that there has clearly

been --

THE COURT:  So, if you take the opposite position,

then these charts reflect Rengan's trading in Clearwire, which

you may not argue from and you may not give the jury exhibits

reflecting.

MR. JACKSON:  Judge, we haven't taken the opposite

position.  We put evidence in that showed that BCR was his

general trading code.  They put in evidence showing that he was

demoted during this time period, and we haven't contested that

evidence at all.  So what this reflects is what is very

relevant to the case:  Galleon, Raj's activity in Clearwire

throughout this time period.

          The only reason that there's reason to believe that

the BCR trade, which is the last one on here which is almost

negligible, the 4/21 BCR trade of just 657 shares, the only

reason there's reason to believe that trade is attributable to

Rengan is because after proving up that Mr. Rengan

Rajaratnam --

          THE COURT:  The BCR trades are going back, those are

Rengan trades, right?

          MR. JACKSON:  No.  The defense has --

          THE COURT:  Wait a second.  Your exhibit?

          MR. JACKSON:  Yes, your Honor, but he has stated those

are Raj's trades and we haven't contested that.

          MR. GITNER:  They actually did.

          Mr. Jackson himself, in cross-examining Mr. Sito, who

was the witness who testified about what happened, challenged

his credibility, challenged his bias.  Mr. Jackson himself did

that.  They have stated that.

          And I have no burden.  If I had sat here and done

nothing, what would this chart say?  And what if some juror on

there decided to tune me out every time I spoke?  That's the

danger of this chart.

          MR. JACKSON:  That's a mischaracterization of what

1    happened with Mr. Sito.  The fact that I cross-examined

2    Mr. Sito does not mean that I ever said, and by the way no

3    questions will be evidence anyway, but I never posed a question

4    to him suggesting that this was actually Rengan's trading.  We

5    haven't contested that this was Raj's trade.

6          THE COURT:  You didn't create this chart believing

7    that Rengan had nothing to do with the purchase of Clearwire on

8    March 24 and March 25.

9          MR. JACKSON:  Judge --

10          THE COURT:  Because there would be no purpose in your

11    creating this chart this way unless you believed that this was

12    his trade, not the block trade by Raj divided in three ways.

13          MR. JACKSON:  No, your Honor, we respectfully

14    disagree.

15          From our perspective, this is relevant to show what

16    Galleon, what Raj was doing.  Raj's trading in Clearwire

17    throughout this time period is relevant in this case; and it's

18    also admissible under your Honor's ruling, which speaks to the

19    conspiracy in this case.

20          We have not contested their theory that this is all

21    Raj's trading, but to excise from the case charts that reflect

22    what was happening at Galleon that don't specifically reference

23    Rengan trading, your Honor, will create an unfair depiction of

24    what is going on, and what is going on in terms of Raj's

25    trading is relevant.  It's critical to the conspiracy.

1        THE COURT:  The jury wants Government Exhibits 514,

2   516 and 518.

3        (At 11:00 a.m., a note was received from the jury)

4        MR. GITNER:  514, 516 and 518?

5        THE COURT:  Yes.  Plus they want the charge.  Can we

6   get that to them?  Get it in.

7        MR. JACKSON:  We're just waiting on defense to

8   finalize the redactions on the disk.

9        MR. GITNER:  I think they'll have all of them in just

10  a few moments.

11       MR. JACKSON:  Just to put Government Exhibit 25 in its

12  context, far from smearing the defendant, this chart doesn't

13  even depict any profit being made in Buccaneer.

14       Even if you assumed, as defense is attempting to

15  suggest, that the jury might construe this as some of Rengan's

16  trading, that portion of it is consistent with the defense

17  argument, but it doesn't, it doesn't in any way suggest that

18  Rengan was involved --

19       THE COURT:  Can we get them what you guys have agreed

20  to because they obviously want to get to work.

21       MR. JACKSON:  Yes.  We're just waiting for the

22  process.

23       THE COURT:  I expected this to all be done, counsel.

24  I really had.

25       MR. GITNER:  We apologize, your Honor.

1            MR. JACKSON:  Your Honor, to go back to the bottom

2      line with regard to these charts --

3            THE COURT:  Aren't there a lot of other exhibits?

4            MR. GITNER:  I think we can send the paper exhibits

5      back.

6            MR. JACKSON:  We have all of our recordings ready.  We

7      can send our recordings back and that will be responsive to

8      request.

9            THE COURT:  What's the problem?

10           MR. GITNER:  There was a tape that apparently wasn't

11     redacted the right way that the government noticed, so we had

12     to redact it now and they're burning it right now.  It's not

13     like you can just cross it out.  You have to sort of process

14     that has to happen to redact it so it works.  So we have

15     somebody from Doer here doing it now and he's literally tapping

16     as we speak.  We can send back all of the paper exhibits and

17     then the disk can go back in a few minutes.

18           MR. JACKSON:  Perhaps we can start the set-up of the

19     computer.  If we can have permission -- I don't know if one of

20     your law clerks want to do it or Ms. Hernandez can do it with

21     instructions not to speak to the jury.

22           MS. HERNANDEZ:  There are instructions.

23           MR. JACKSON:  We can give the computer.

24           MR. GITNER:  And the paper exhibits.

25           MR. JACKSON:  They can start setting it up.

E78GRAJ2          Trial

1          MR. GITNER:  The disk will be on its way in a minute

2     or two.

3          MR. JACKSON:  May I say a quick couple of things about

4     this.  Your Honor's ruling, which the government completely

5     understood and corresponded with by voluntarily removing all of

6     those -- we took it upon ourselves to make sure we removed from

7     our submitted exhibits all of the exhibits that referenced

8     Rengan's tradings.  Your Honor's ruling was with respect to

9     Clearwire trades done by Rengan Rajaratnam.

10          Now, it's the government's position that there is no

11    evidence in the record, excepting what the defense put in, that

12    identifies these as Rengan Rajaratnam's.

13          THE COURT:  If the jury sees BCR, what thought process

14    do you think they could go through and conclude that BCR does

15    not mean Rengan?

16          MR. JACKSON:  Because the defense spent a huge

17    percentage of their case throughout the case emphasizing that

18    Rengan Rajaratnam was demoted during this period; that these

19    are Raj's trades.

20          Your Honor, we're left, if we have our exhibits which

21    show the overall Galleon portfolio and what happened with

22    Galleon --

23          THE COURT:  You want to put a nice, red --

24          MR. JACKSON:  Bar over 657?

25          THE COURT:  No.

E78GRAJ2          Trial

1          Do you want to put nice in writing "None of the trades

2     on this exhibit are trades by Rengan"?

3          MR. JACKSON:  If that's what they want, that's fine,

4     your Honor.  We'd be willing to redact the 657, but this is our

5     only --

6          THE COURT:  And what about the rest of them?

7          MR. JACKSON:  Or we'd be willing to put that on there,

8     but your Honor this is our only proof that shows what Raj was

9     doing in the trades during Clearwire.  It's critical proof.

10    It's not excluded by your Honor's ruling, so we should be

11    allowed to put this in.

12         THE COURT:  What if, in nice, big letters, there was a

13    note:  "This exhibit only reflects trades by Raj Rajaratnam,

14    not Rengan Rajaratnam"?

15         MR. JACKSON:  If that's what your Honor thinks is

16    appropriate.

17         THE COURT:  If that's your position if you agree that

18    it should not be understood as reflecting trades by Rengan.

19         MR. GITNER:  I appreciate that suggestion, Judge, but

20    the problem is still that the 4/21 trade on Exhibit 24 is

21    Rengan.

22         THE COURT:  You said you'd take that out.

23         MR. GITNER:  Okay.  I'm not sure how we'd do that.

24         MR. JACKSON:  We have technology that allows us to do

25    that.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1          THE COURT:  Even I might know how to do that.

2          MR. GITNER:  Exhibit 25, the realized profit/loss

3  would have to be changed because, as I understand it, that

4  includes the BCR trade on the 21st.

5          MR. JACKSON:  That's a negligible trade that would

6  only increase the profitability of this period.  If he wants us

7  to redo the calculation and boost this number up from nine --

8          THE COURT:  Look, it's the same time period by date.

9          MR. GITNER:  I understand.  The problem with 25 is it

10  says realized profit and loss from date A, March 24 through

11  date B, April 21.  It's completely inaccurate if you include

12  BCR at all because BCR also shorted that day.

13          MR. JACKSON:  That's false because it says realized.

14  There was no realized profit or loss from shorts that were

15  enacted on that date.  Mr. Callahan was very clear when he

16  testified that he was aware during this time period, shorting

17  activity wasn't reflected because it wasn't realized.

18          THE COURT:  Look.  I have my markup copy, which has

19  lots of marks on it, and one of them was that the 4/21 leaves

20  out a short of 145,000 shares.

21          MR. GITNER:  Right.

22          MR. JACKSON:  First of all, correct me if I'm wrong,

23  but the shorting is not on 4/21.  The short starts to take

24  place subsequent to that.

25          THE COURT:  That's not -- 145,000 on 4/21.

E78GRAJ2                    Trial

1      MR. JACKSON:  But they're not realized.  They're not

2 covered.

3      THE COURT:  They're shorts, but the point is that

4 they --

5      MR. GITNER:  That's the problem with 24, too.  It says

6 it goes through April 21.  So, even if you take off the 21st,

7 you have to completely change this and make it go through

8 April 20, I suppose, or April 18.  It's just an inaccurate

9 chart.  It's completely inaccurate and it concerns trades by

10 Rengan and it shouldn't go in.

11      MR. JACKSON:  I would just argue this is an unfair

12 point for the defense to be raising this.  We had the witness

13 on the stand.  He cross-examined him.  We had taken away the

14 charts that were inconsistent with your Honor's ruling, and now

15 he wants to obscure the picture of what Raj was doing during

16 the time period.  The jury is entitled to know what Raj was

17 doing during this time period.  And if we put the footnote on

18 this chart, Government 24, he should have no objection to these

19 charts going in.  He just wants the jury not to be able to see

20 these Clearwire trades that Raj was doing.

21      MR. GITNER:  It shouldn't be a footnote.  It should be

22 a watermark.

23      THE COURT:  It's better and larger than the typing.

24      MR. GITNER:  Exactly.  What the government did here in

25 their first chart, in their first Exhibit 24, they didn't break

1  out the way they broke it out here, which was produced on the

2  eve of trial or right in the middle of trial.  What these

3  trades are on each day on the 24th and 25th and 26th, they're

4  actually block trades like we discussed at the side bar, all

5  made by Raj and then allocated into different accounts.

6          The reason the government decided to break them out

7  this way is to make them look like they are three separate

8  trades when, in fact, it's one trade at one time and the

9  intranet data proves it.  It then gets allocated into the

10 different accounts.

11         So the whole chart is made to look like -- because at

12 the time, the government thought Rengan ran BCR because they

13 hadn't heard Mr. Sito -- to make it look like BCR, Rengan, was

14 making these trades.  That was essentially what they opened on

15 and that was their theory.  And even though now Mr. Jackson

16 accepts that their theory was wrong, he never got up and said

17 I'm wrong.  He is just doing that now when the jury is not

18 here.  Again, the jury, just because he's accepting it there

19 could be a juror or two or three that doesn't accept it, that

20 tuned me out, whatever.  They put this before the jury and now

21 the jury is allowed to make whatever determination it wants.

22         This is misleading and the government put in evidence

23 to make it look like Rengan did these trades, and now they want

24 to send this chart back, which was devised to look like Rengan

25 did these trades.  So even with a big red thing attached to it,

1    I still think it's misleading.

2              MR. JACKSON:  Nothing is devised to make it look like

3    anything.  The chart reflects what is in the OMS data.  It

4    doesn't make any suggestions beyond that.  It doesn't say

5    Rengan Rajaratnam on it.  It refers to technology codes.  It

6    refers to portfolio manager codes.  And Mr. Gitner's made his

7    record about who was responsible for those.

8              Your Honor has excluded trades done by Rengan

9    Rajaratnam and told the jury not to consider those in terms of

10   proof.  I would just point out one additional thing:  The

11   defense introduced, again, a lot of evidence about what was

12   transpiring on the 21st, the 22nd and the 23rd during the

13   course of their case.

14             They made that stuff relevant to the case regardless

15   of what -- after your Honor's ruling, they made that decision.

16   So the idea that we need to excise that from the government's

17   charts when that was a major portion of the defense, it doesn't

18   even make sense.  But more to the point, under the defense

19   theory, these are Raj's charts.  These are Raj's trades.  They

20   come in.

21             The defense's attempt to obscure the picture of what

22   Raj was doing now, even beyond what Rengan was doing, is

23   unfair.  The jury should be able to see Raj made trades in

24   Clearwire during this time period and that he profited from

25   them.

1          THE COURT:  If the 4/21 trade, the sell is out of 24,

2     what is the impact on 25?

3          MR. JACKSON:  I would have to do a little calculation

4     just to know exactly what the 657 shares does to the picture,

5     but I can tell you that the sale was 657 shares.  We're talking

6     about hundreds of dollars I would believe in terms of the

7     alteration here.

8          MR. GITNER:  It would be thousands.

9          MR. JACKSON:  No, not in terms of the realized

10    profitability.  Maybe it's a couple thousand if that's what

11    they want to argue, but it's certainly not a meaningful change

12    to the number.

13         THE COURT:  Wait a minute.

14         MR. GITNER:  I don't want to interrupt.

15         THE COURT:  I don't care if it's meaningful or not,

16    but it's inconsistent with the ruling to have that trade on the

17    chart and the chart was an advocacy document in the first

18    place.  It was never an attempt to be comprehensive.

19         MR. JACKSON:  It was an attempt to be comprehensive

20    about what the realized profit and loss was from trading in

21    Clearwire at Galleon during the time period in question.  And

22    it accurately reflects what the realized profit and loss was

23    from trading in Clearwire at Galleon associated with these

24    portfolio manager codes was during this time period.

25              The defense wants us to put on here that none of this

1    stuff was Rengan Rajaratnam's, we'll put that on there.  If the

2    defense wants us to basically put that these are Raj's trades,

3    we'll put that on there that these are Raj's trades.  If the

4    defense wants an additional note on Government Exhibit 25 that

5    says this does not reflect, note, the $8,600 loss in Buccaneer,

6    you know, it's actually, you know, there's also a 657 share

7    trade you should disregard, that's fine, but I think that would

8    just be confusing unnecessarily.

9          It doesn't create any meaningful change in the chart

10   and the chart is our only evidence that gives the jury a clear

11   picture of how Raj was able to make money on Clearwire during

12   this period.

13         We don't have the ability after Rule 29, after your

14   Honor has made its decision, to recall our witnesses and redo

15   the charts.  This is the portion of the case that your Honor

16   did not exclude, and so we should be able to retain that to the

17   extent that it's not misleading.

18         We're not trying to do anything misleading.  It's not

19   dirtying up Rengan.  It doesn't say Rengan.  It says BCR and it

20   notes the loss in BCR.

21         THE COURT:  That argument is a loser.

22         The question is, if we're going to revise this to

23   limit it, limit them both, clearly identified as only being

24   Raj's trades, which we can certainly do by eliminating the 657

25   shares, that line can come out; and we can certainly have in

1    nice, bold type that this chart only reflects trades by Raj and

2    does not reflect any trades by Rengan.

3              I can deal with that.

4              MR. GITNER:  You also have to change the date at the

5    top, but that's easy.

6              THE COURT:  Right.  Yes.  We'll make it through 4/18.

7    That we can do, but how do we deal with --

8              MR. JACKSON:  We don't have to change the date if

9    we're putting the note that says it only reflects Raj's trades

10   because it reflects all of Raj's trades during that time

11   period.  It's just taking away --

12             MR. GITNER:  It says Galleon portfolio manager codes.

13             MR. JACKSON:  But the note is going to say that this

14   chart is only reflecting Raj's trades, so if we redact the last

15   one, if we redact the last trades, it reflects Raj's trades.

16             MR. GITNER:  Why would you not agree?

17             MR. JACKSON:  Judge, I'm just trying to not have this

18   chart -- once we start making a million changes, we have more

19   confusion.

20             THE COURT:  Who is being confused?  If there's no

21   trade for 4/21, why would a juror be concerned about the

22   heading at the top?

23             MR. JACKSON:  Because we have our price chart reflects

24   the time period, the subsequent chart Government Exhibit 25

25   reflects the time period.

1          THE COURT:  But it wouldn't then, right, because the

2     only trade on 4/21 is -- well, I don't know what it would do.

3     I see what you mean, that if there would still be Buccaneer

4     trades on 25 and if that -- well, I guess the question is what

5     date does that go through?  I don't know why it would go

6     through 4/21, but the point is, how can the Buccaneer

7     profit/loss number be adjusted properly?

8          MR. GITNER:  It's actually exceedingly difficult to

9     adjust because we have to determine we're going to have a FIFO

10    determination, a LIFO determination.  It's not necessarily so

11    simple.

12         THE COURT:  This is all short trading.  This is no

13    long gains.

14         MR. JACKSON:  It's a short trade.  You can look at the

15    elements.  Can we pull up the elements that are in now.

16         MR. GITNER:  It's actually quite complicated from an

17    accounting point of view about what exactly the profit or loss

18    would be.  It's not like these codes are -- you're buying at

19    one time and you're selling at another time.  They're buying

20    and selling over time, and so when you sell on April 21, you

21    don't necessarily know your profit.  It's going to be like a

22    weighted average.  It's a very complicated formula to determine

23    what the numbers were.

24         I could have crossed Mr. Callahan for quite some time,

25    frankly, over his determination of these numbers.  I chose not

1   to because I thought it was not necessarily the most relevant

2   point in this case, but it is relevant to making the numbers

3   accurate and it's not simple at all.

4            MR. JACKSON:  Judge, we're talking about --

5            MR. GITNER:  In fact, I made a motion on this, I don't

6   know if your Honor recalls, about keeping profit numbers out

7   because it was subject to opinions essentially about what the

8   profit or loss could be based on very complicated transaction

9   calculations.

10           MR. JACKSON:  It's not that complicated.  And your

11  Honor, if now we're talking about the accuracy --

12           THE COURT:  The issue he's raising is how do you match

13  a trade on a certain day, the sell with the buy.  Which buy are

14  you allowed to match it against?

15           MR. JACKSON:  Typically, we're talking about first,

16  you know, we're talking about the last trade and the last sell,

17  right?

18           Your Honor, let me just say this.  Very respectfully,

19  defense counsel is basically creating an issue out of an issue.

20  Your Honor's determination right now that we should put on 24

21  something indicating this is all Raj's trading clears

22  completely the ambiguity that they are concerned with.  Now

23  they're talking about or are concerned about the accuracy of

24  the chart that's in 25 when 25 is already accurate.  It

25  reflects all of the realized profit and loss.

1      There's an artificial issue being created when they

2  now say oh, but we need to take the 657 out because this is

3  inaccurate.  All that would happen if we take the 657 out is

4  that this number goes up.  It just goes up by either a couple

5  of hundred or a couple thousand dollars.  But it doesn't in any

6  way -- if we're talking about what realistically could be

7  perceived by the jury, it doesn't in any way affect the jury's

8  determination as to anything with regard to Rengan Rajaratnam.

9  We don't need to change this to the extent that it's

10  already -- it is accurate; it reflects all of the realized

11  profit and loss.

12      When we put on the previous exhibit the notation that

13  your Honor instructed where it says "this is Raj's trading,"

14  that should cure their concern about ambiguity.  The concern

15  about the accuracy or the method utilized to calculate by Agent

16  Callahan, that's far afield of what we should be addressing

17  just when we're putting the exhibits into the jury room.

18      I'd also like to ask whether the defense has finished

19  burning his disk.

20      MR. GITNER:  It's on its way.

21      MR. JACKSON:  I would request permission to send the

22  government's disk back because --

23      MR. GITNER:  No.  We're having one disk.  It's one

24  disk with all of the calls.  That was the agreement with

25  Mr. Frey:  One disk with all of the calls.  That's what's

E78GRAJ2                     Trial

1    taking so long.  It can't be two disks.

2              MR. JACKSON:  It can be two disks.  The agreement with

3    Mr. Frey was contingent upon our expectation that they would

4    have the appropriate stuff done.

5              MR. GITNER:  No, no, no.  This is not fair.  We just

6    happen to be the people doing it.  It's not that we didn't have

7    the appropriate stuff done.

8              THE COURT:  Apparently, the government failed to

9    redact some things that should have come off, so it has to be

10   done again.

11             MR. JACKSON:  No.  The defense failed to redact.  The

12   defense failed to redact things that should have come off.  Our

13   disk with regard to our exhibits, everything is accurate.  It's

14   prepared.

15             MR. GITNER:  The reason why we're having a delay now

16   is because we had an understanding that it would be one disk.

17   And then the government -- I don't want to push blame on

18   anybody, my team was under the impression from the government

19   without going through me there should be two disks.  Now we're

20   just making one disk.  It's happening right now.  It should be

21   ready at any moment.

22             THE COURT:  Would you object if Mr. Gardner tried to

23   help the jury start the computer.

24             MR. JACKSON:  No objection?

25             MR. GITNER:  No objection.

1            MR. JACKSON:  I'll note for Mr. Gardner, the password

2     is taped on to the computer.  It's actually physically on the

3     computer.

4            THE LAW CLERK:  Okay.

5            MR. GITNER:  We're literally putting the label on the

6     disk right now.

7            THE COURT:  And if the 657 shares sold at a profit,

8     sold at loss?  Forget the details.

9            MR. GITNER:  You're asking a question, was it profit

10    or loss?

11           THE COURT:  Yes.

12           MR. JACKSON:  Your Honor, I think we can clarify this.

13    The last purchase of BCR in Clearwire occurs on 3/28 of 25,000

14    shares.  Those are purchased at $14.59.

15           The sale then, the 657 sale, to the extent that it

16    comes out of that is at 13.39, about 1.20 difference on those

17    600 shares.  And you can theorize that would be an additional

18    loss of 657 times a dollar 20, which amounts to $788.  So, it's

19    an additional loss if you include -- it's part of the loss

20    calculation is $788.

21           So to make this accurate, if we took that off of

22    there, we would increase the number from 969 -- not accurate, I

23    want to be clear, it's already accurate -- but if we were to

24    change this to reflect what Mr. Gitner is asking for to take

25    away this, it would change it from 969,114 to 969,902.  The

1    number goes up to 969,902, which we're perfectly happy to do.

2              THE COURT:  Could someone clue me in as to what is

3    going on about this disk?

4              MR. GITNER:  I'm not sure, Judge.

5              MR. FREY:  We had prepared a disk of government

6    admitted audio files that we understand that defense counsel

7    was going to be preparing a defense version, a separate disk.

8    We understand from speaking with counsel this morning that they

9    would like to combine all of that onto one disk.

10             The problem is that there were a few calls where your

11   Honor either had ruled portions come out for various reasons or

12   defense counsel submitted portions and not the full version.

13   And my understanding is hat that wasn't done prior to this

14   morning; the government's were, but not the defense side.  So

15   we're just working through the combining and the splicing

16   issues.

17             MR. JACKSON:  Judge, since the jury is clearly engaged

18   in their deliberations and they requested it, there's no reason

19   this all has to be on one disk.  They can send in the defense

20   disk when they finish with it and we can send in the government

21   exhibit disk now which the jury has requested so the jury is

22   not delayed at this point.

23             THE COURT:  Is there any reason that we could not send

24   the government's disk in now.  When you get the combined, we'll

25   trade out the disks?

1    MR. GITNER:  I suppose we can do that.  I think it's

2    going to be ready I'm told in a few moments.  It was ready but

3    apparently they tried to write something over.  One file didn't

4    get written over, so it still existed.

5    MR. JACKSON:  We've been waiting for more than a few

6    moments.  So we ask to send this stuff in and when they get

7    their --

8    MR. GITNER:  I understand the technical difficulties.

9    I apologize.  I think it's exceedingly unfair in this case to

10   only send in the government's tapes even if just for a few

11   minutes, and I understand there's been a note, but given the

12   fact that what I have been told, it should be less than three

13   minutes, we'll have the whole thing.  It just seems exceedingly

14   unfair to send in the government exhibits because Mr. Jackson

15   is pushing, pushing, pushing as he's good at doing.  We can

16   just wait three minutes and the government will have it.

17   MR. JACKSON:  I'm not pushing, okay.  The jury has

18   requested these exhibits.  It's not exceedingly unfair.  Being

19   in courtrooms, we only send in what the jury has requested.

20   And they're going to get the defense exhibits as soon as the

21   defense pulls its tech together.  So, we should send in what we

22   have and allow the jury not to be impeded in their

23   deliberations.

24   MR. GITNER:  I'm told less than two minutes according

25   to the clock on the computer.

E78GRAJ2                     Trial

 1              THE COURT:  Are we going to get to the government has

 2      to check whether it's accurate or not?

 3              MR. FREY:  Yes, we would want to check it.

 4              THE COURT:  Okay.  The government will act

 5      extraordinarily quickly to confirm, no delays.  I'm going to

 6      stay here and I'm going to watch you, but I think that we have

 7      to respect the jury and the government disk can go in and it's

 8      going to be taken right out as soon as the single disk is

 9      created.

10              MR. JACKSON:  Thank you, Judge.

11              THE COURT:  Can we go back to Exhibit 24, put a nice

12      huge header on it to clarify what it is and take out the 4/21

13      trade and the question is whether they -- if we also put on

14      Exhibit 25 --

15              MR. JACKSON:  Can we have one person from defense team

16      on this issue really quickly, government Exhibit 25, your

17      Honor.

18              THE COURT:  Can we put a header on it.  Instead of

19      bothering to adjust the numbers, which might be more accurate,

20      but is also immaterial by any definition of materiality, that

21      to say that these reflect the realized profits and loss from

22      trading by Raj.

23              MR. GITNER:  I understand the materiality issue,

24      Judge, I fully appreciate it.  My issue is that I do not want

25      in any way to suggest that anything that happened on April 21

 1    is Raj.  It's not.  That's the problem.

 2              April 21 is when the shorts occur, and your Honor will

 3    remember in argument in letters to your Honor, the government

 4    was arguing that there was no proof that Rengan directed those

 5    shorts.  They have taken the position before this Court that

 6    that's not Rengan's shorts, and it wasn't until I had to point

 7    them to a few instant messages that they have sort of backed

 8    off.  They have taken that position.  It's not fair to suggest

 9    that what happened on the 21st is not Rengan.

10              THE COURT:  Then can we agree that instead of the

11    calculation being in accordance with GAAP or whatever other

12    standard is utilized, that we do what is referred to as a

13    back-of-the-envelope calculation like Mr. Jackson just did and

14    adjust the numbers.

15              MR. GITNER:  And move the date.

16              THE COURT:  Move the date, adjust the number.

17              MR. JACKSON:  If we move the date, how are we

18    adjusting the number, your Honor?

19              THE COURT:  Because when you take out the 4/21 trade,

20    which is at a loss of a-dollar-something or other a share, it

21    obviously comes out of both the Buccaneer number and the total.

22              MR. JACKSON:  Okay.

23              THE COURT:  That's how you do it.  It's not that hard.

24              MR. JACKSON:  So we'll just agree pursuant to

25    stipulation of the parties that we're going to change

1    Government Exhibit 25 to reflect -- we'll change the Buccaneer

2    number by the $788 and we'll change the date to April 18.

3              THE COURT:  Right.

4              MR. GITNER:  Right.

5              MR. JACKSON:  Then we'll have the total number be

6    $969,902.

7              THE COURT:  Since it's in the Buccaneer fund, you make

8    the adjustment.

9              MR. JACKSON:  In the Buccaneer fund.

10             THE COURT:  In the Buccaneer fund, and in the total.

11             MR. JACKSON:  Great.  I'm going to go make those

12   changes right now.

13             THE COURT:  Show it to Mr. Gitner.  I'll be upstairs

14   in case you need me.

15             MR. GITNER:  They're doing the final check on the

16   disk.

17             THE COURT:  Right.

18             MR. GITNER:  Everything seems fine.  We have a thumbs

19   up.  We need to look at it for two seconds.

20             THE COURT:  So we're going to trade out the disk right

21   now.

22             MR. GITNER:  Just so your Honor knows, what we propose

23   to do, I think the government is fine with this.  We each

24   basically have an index, defense exhibits, their government

25   exhibits, because the file name just says 510.  The index says

E78GRAJ2            Trial

1    the date and the participants.  So we'll send in our respective

2    indices as well with this disk if your Honor is okay with that.

3            THE COURT:  Fine.

4            THE LAW CLERK:  They need an extension chord.

5            MR. GITNER:  That I don't have.

6            THE COURT:  The Court has one.

7            MR. JACKSON:  I'll also take a look and see if we have

8    one.

9            THE COURT:  Switch out the disk.

10           MR. GITNER:  Should one of your clerks bring it in to

11   swap it out?

12           THE COURT:  Yes.

13           (Recess pending verdict)

14           (In open court; jury not present)

15           MR. JACKSON:  Actually, I placed a copy on the judge's

16   bench, as well as yours.

17           After conferring, the parties agree that we revert

18   back to the original exhibits, but we would place this

19   coversheet on Government Exhibit 24 that is in front of your

20   Honor.

21           Just for the record, the coversheet says "The parties

22   agree that the trading reflected in Government Exhibit 24 from

23   March 24, 2008 through April 18, 2008 was caused by Raj

24   Rajaratnam."  So that's actually stapled now on the original

25   Government Exhibit 24 and we're reverting back to the original

1      Government Exhibit 25.

2              Just to be clear, that's the Government Exhibit 24

3      that includes the April 21 BCR trade and the Government Exhibit

4      25 that comes to a total calculation of $969,114.

5              MR. GITNER:  So rather than have the header on the

6      exhibit, the header is essentially on a coversheet essentially.

7      The exhibit remains the same rather than altering the exhibit.

8              THE COURT:  If it's agreeable to you, I don't have any

9      objections.

10             MR. JACKSON:  Thank you very much, Judge.

11             THE COURT:  The only one that has to be swapped out is

12     24?

13             MR. JACKSON:  I don't think we actually sent back 24

14     and 25.

15             MR. GITNER:  That was my understanding.  The folders

16     were actually pulled.

17             THE COURT:  I'm sorry.  I thought I got some word from

18     my law clerk that there was a swapping issue.

19             MR. GITNER:  I think the swapping was amongst me and

20     the government.

21             MR. JACKSON:  It was between ourselves.

22             THE COURT:  So all that has to happen now is that 24

23     and 25 need to be given to the jury, and I assume your exhibits

24     were in a card or box.

25             MR. JACKSON:  Yes, we have them in the same format

1  that the rest of the exhibits are.  They're here in original

2  folders.

3          THE COURT:  So we can just ask the court officer to

4  add them.  They're in a box, right?

5          MR. JACKSON:  Yes.  They're in a container of some

6  kind.  It may be a red well or a box, but this can be placed

7  into it.

8          MR. GITNER:  If the court officer can go and place it

9  in obvious order.

10          THE COURT:  Explain to the court officer what he

11  should do.

12          MR. GITNER:  My concern would be the court officer

13  throws it on the table.

14          THE COURT:  And highlights it.

15          MR. GITNER:  Exactly.  It should just be placed.

16          THE COURT:  The collection was missing something.

17          MR. GITNER:  Exactly.

18          MR. JACKSON:  Judge, two housekeeping questions before

19  we let the Court have its lunch.

20          THE COURT:  It's much too early for my lunch.

21          MR. JACKSON:  I know that sometimes judges instruct

22  the parties that they can be away from the courthouse during

23  the lunch hour.  Is that your Honor's expectation?

24          THE COURT:  No.  I don't want you to starve, but we

25  haven't even inquired of the jury as to whether they want

1    lunch.

2              MR. JACKSON:  Absolutely.

3              THE COURT:  We'll probably not ask that question for

4    about another 25 minutes, unless they contact us first.  If

5    they're eating lunch, it would probably be about 2:00.  I don't

6    have any reason to believe that they will necessarily stop

7    talking just because they're eating, even if it's rude to talk

8    with food in your mouth.

9              MR. JACKSON:  We'll stay within the current range of

10   the courthouse.

11             THE COURT:  We have your cell.  If you're in the

12   cafeteria or something, we'll have no problem getting ahold of

13   you.

14             MR. JACKSON:  Great.  That was the other thing I was

15   going to pass up to your law clerk if it's permissible because

16   I actually don't know if you have our cell numbers.

17             MR. GITNER:  Chris gave it.  Chris' handwriting is

18   actually better than the typed version.

19             THE COURT:  Just to let you know, we really won't be

20   sitting past 4:30, 4:40 today, assuming all that time is used

21   up.

22             MR. JACKSON:  Absolutely.  Thank you very much.

23             (Recess pending verdict)

24

25             (In open court; jury not present)

E78GRAJ2                    Verdict

1          THE COURT:  As we have been informed, we understand

2    the jury has reached a verdict.  I guess you'll stand for them.

3          (At 2:34 p.m., jury present)

4          THE COURT:  Everyone may be seated.

5          THE LAW CLERK:  Will the jurors please answer present

6    when your name is called.

7          (Jury roll called; all present)

8          THE LAW CLERK:  Will the foreperson please rise.  Has

9    the jury agreed upon a verdict?

10          THE FOREPERSON:  Yes, we have.

11          THE LAW CLERK:  The question on the verdict form

12    reads:  Do you find that the government has proven beyond a

13    reasonable doubt that the defendant, Rajarengan Rajaratnam,

14    also known as Rengan Rajaratnam, is guilty of conspiracy to

15    commit insider trading?

16          How do you find, guilty or not guilty?

17          THE FOREPERSON:  Not guilty.

18          THE LAW CLERK:  Ladies and gentlemen of the jury,

19    listen to your verdict as it stands recorded.

20          On the question of whether the jury finds that the

21    government has proven beyond a reasonable doubt that the

22    defendant, Rajarengan Rajaratnam, also known as Rengan

23    Rajaratnam, is guilty of conspiracy to commit insider trading,

24    the jury finds the defendant not guilty.

25          Madam foreperson, is that the jury's verdict?

E78GRAJ2                    Verdict

1           THE FOREPERSON:  Yes, it is.

2           THE COURT:  Is there a request to poll the jury?

3           MR. FREY:  No, your Honor.

4           THE COURT:  Are we thanking the jury again for their

5    service or do we need to keep them any further?

6           MR. FREY:  No, your Honor.

7           THE COURT:  I understand that there's a request that I

8    speak with you.

9           THE FOREPERSON:  Yes.

10          THE COURT:  Could you just wait for me in the jury

11   room.

12          THE FOREPERSON:  Should we all leave?

13          THE COURT:  Yes.  Just go and wait for me.

14          (Jury excused)

15          THE COURT:  Is there anything else we need to cover?

16          MR. GITNER:  I just ask that bail be extinguished.

17          THE COURT:  Absolutely.

18          MR. GITNER:  Thank you, your Honor.

19          THE COURT:  You can still get back to Brazil for the

20   finals.

21          THE DEFENDANT:  Absolutely.

22          MR. JACKSON:  Thank you, your Honor.

23          MR. GITNER:  Thank you, Judge.

24          (Adjourned)

25